**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**
**No. 26-2715**

---

**CLEAN ENERGY CHOICE COALITION NFP,**

**Plaintiff-Appellant,**

**v.**

**VILLAGE OF OAK PARK, ILLINOIS,**

**Defendant-Appellee.**

---

**On Appeal from the United States District Court**
**for the Northern District of Illinois, Eastern Division**
**No. 1:25-cv-04353**
**The Honorable Franklin U. Valderrama**

---

# APPELLANT'S BRIEF

---


Kian J. Hudson
Kristin Froehle
BARNES & THORNBURG, LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Kian.hudson@btlaw.com
Kristin.froehle@btlaw.com

*Counsel for Plaintiff-Appellant*

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition NFP v. Village of Oak Park, Illinois

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Clean Energy Choice Coalition NFP

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Barnes & Thornburg LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

The Coalition further states that it does not have a parent corporation.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

The Coalition states that no publicly held corporation owns 10% or more of its stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Kian J. Hudson Date: 08/19/2026

Attorney's Printed Name: Kian J. Hudson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 11 S. Meridian Street
Indianapolis, IN 46204

Phone Number: (317) 229-3111 Fax Number: (317) 231-7433

E-Mail Address: kian.hudson@btlaw.com

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition NFP v. Village of Oak Park, Illinois

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Clean Energy Choice Coalition NFP

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Barnes & Thornburg LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

The Coalition further states that it does not have a parent corporation.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

The Coalition states that no publicly held corporation owns 10% or more of its stock.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Kristin Leigh Froehle Date: 9/28/2026

Attorney's Printed Name: Kristin Leigh Froehle

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 11 S. Meridian Street

Indianapolis, IN 46204

Phone Number: (317) 231-7352 Fax Number: (312) 759-5646

E-Mail Address: kristin.froehle@btlaw.com

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iii

JURISDICTIONAL STATEMENT .......... 1

INTRODUCTION .......... 1

STATEMENT OF THE ISSUE .......... 4

STATEMENT OF THE CASE .......... 5

I. Statutory Background .......... 5

II. The Village's Ordinance .......... 11

III. Procedural History .......... 12

SUMMARY OF THE ARGUMENT .......... 14

STANDARD OF REVIEW .......... 15

ARGUMENT .......... 16

I. EPCA Expressly Preempts the Village's Ordinance .......... 16

A. This case turns on the express-preemption provision's plain text, which clearly applies to the Village's Ordinance .......... 16

B. The express-preemption provision's use of the term "concerning" broadens its scope .......... 18

C. The building-code exemption confirms the Coalition's interpretation of the express-preemption provision .......... 22

II. The Contrary View Of EPCA'S Express-Preemption Provision Is Incorrect .......... 24

A. "Energy use" has a different meaning than "energy conservation standard" .......... 24

B. The phrases "point of use" and "determined in accordance with test procedures" in the definition of "energy use" do not exclude from preemption regulations of actual energy use .......... 26

1. The building-code exemption implies that the express-preemption provision encompasses regulations of actual energy use ........ 27

2. The plain-text reading of "at point of use" supports the Coalition's view ........ 30

3. Even granting a technical meaning of the definition of "energy use," EPCA's text and structure confirm that its express-preemption provision applies to the Ordinance ........ 36

C. A regulation prohibiting appliances from using more than zero fossil fuels concerns the quantity of fossil fuels those appliances consume ........ 37

CONCLUSION ........ 40

STATEMENT OF RELATED CASES ........ 41

CERTIFICATE OF COMPLIANCE ........ 42

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) .......... 5, 6, 19, 33

*Arana v. Bd. of Regents of Univ. of Wisconsin Sys.*,
182 F.4th 670 (7th Cir. 2026) .......... 15

*Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*,
180 F.4th 434 (2d Cir. 2026) .......... *passim*

*Bond v. United States*,
572 U.S. 844 (2014) .......... 17

*Building Industry Association of Washington v. Washington State Building Code Council*,
683 F.3d 1144 (9th Cir. 2012) .......... 28, 29

*California Restaurant Association v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) .......... *passim*

*Common Cause Ind. v. Lawson*,
937 F.3d 944 (7th Cir. 2019) .......... 13

*Commonwealth of Puerto Rico v. Franklin Cal. Tax Free-Trust*,
579 U.S. 115 (2016) .......... 16, 17

*Coventry Health Care of Mo., Inc. v. Nevils*,
581 U.S. 87 (2017) .......... 19

*Freytag v. C.I.R.*,
501 U.S. 868 (1991) .......... 25

*Haywood v. Wilhelm-Copas*,
No. 25-2098, 2026 WL 2263918 (7th Cir. Aug. 6, 2026) .......... 18, 19

*Laborers' Pension Fund v. Miscevic*,
880 F.3d 927 (7th Cir. 2018) .......... 16

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .......... 18, 20, 21, 37, 39

**Cases [cont'd]**

*LTV Steel Co. v. Nw. Eng'g & Const., Inc.*,
41 F.3d 332 (7th Cir. 1994) .................... 15

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
486 U.S. 825 (1988) .................... 30

*Mellouli v. Lynch*,
575 U.S. 798 (2015) .................... 19, 20

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .................... 17

*Nat. Res. Def. Council, Inc. v. Abraham*,
355 F.3d 179 (2d Cir. 2004) .................... 5

*Nat'l Ass'n of Home Builders v. Montgomery County*,
No. 8:24-cv-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) .................... 31, 32

*Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*,
No. 24-cv-02942 (ACR), 2026 WL 837674 (D.D.C. Mar. 26, 2026) .................... 27, 29

*Pyles v. Nwaobasi*,
829 F.3d 860 (7th Cir. 2016) .................... 31

*Russello v. United States*,
464 U.S. 16 (1983) .................... 25

*United States v. Hansen*,
599 U.S. 762 (2023) .................... 33

*United States v. Kraemer*,
933 F.3d 675 (7th Cir. 2019) .................... 19, 20

*United States v. Patel*,
778 F.3d 607 (7th Cir. 2015) .................... 30, 31, 32

*United States v. Williams*,
106 F.4th 639 (7th Cir. 2024) .................... 30, 31, 32

*Ye v. GlobalTranz Enters., Inc.*,
74 F.4th 453 (7th Cir. 2023) .................... 16, 17

**Statutes and Regulations**

10 C.F.R. § 430.32 .......... 7, 39

10 C.F.R. § 431.91 .......... 8

10 C.F.R. § 431.101 .......... 8

10 C.F.R. § 431.151 .......... 8

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

29 C.F.R. § 1910.1200 app. C, § C.2.4.5 .......... 32

40 C.F.R. § 141.2 .......... 32

42 U.S.C. § 300g .......... 32

42 U.S.C. § 6201 .......... *passim*

42 U.S.C. § 6291 .......... *passim*

42 U.S.C. § 6293 .......... 8

42 U.S.C. § 6295 .......... 7

42 U.S.C. § 6297 .......... *passim*

42 U.S.C. § 6311 .......... 8

42 U.S.C. § 6316 .......... 1, 6, 8, 17

Energy Policy Act of 1992, Pub. L. No. 102-486, § 122, 106 Stat. 2776, 2816 (1992) .......... 6, 19

National Appliance Energy Conservation Act, Pub. L. No. 100-12 § 327, 101 Stat. 103 (1987) .......... 6

National Energy Conservation and Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978) .......... 5

Oak Park Village Code § 7-1-1 .......... 11

Oak Park Village Code § 7-1-2 .......... 11, 12

**Statutes and Regulations [cont'd]**

Oak Park Village Code § 7-6-1 .......... 11

Oak Park Village Code § 7-6-2 .......... 11, 12

**Other Authorities**

H.R. Rep. No. 100-11 (1987) .......... 33

S. Rep. No. 100-6 (1987) .......... 6, 9, 10, 19, 33

Scalia & Garner, Reading Law: The Interpretation of Legal Texts § 12 (West 2012) .......... 38

U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions*, https://www.energy.gov/cmei/energy-intensity-indicators-terminology-and-definitions .......... 34

U.S. Energy Info. Admin., *Glossary*, https://www.eia.gov/tools/glossary/ .......... 35

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of Illinois had subject matter jurisdiction under 28 U.S.C. § 1331 because the Clean Energy Choice Coalition ("Coalition") brought this action against Village of Oak Park (the "Village") under the Supremacy Clause and the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201 et seq.

The district court entered final judgment granting the Village's motion for summary judgment and denying the Coalition's cross-motion for summary judgment, disposing of all claims as to all parties. The Coalition timely filed its notice of appeal on August 20, 2026. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

This appeal presents a pure question of statutory interpretation: Does EPCA, which expressly preempts laws "concerning . . . energy use" of consumer and industrial appliances, 42 U.S.C. §§ 6297(c), 6316(b)(2)(A), preempt the Village's Ordinance banning natural gas appliances in new buildings? The answer is yes.

This question has produced a nascent circuit split, with courts adopting two different views of EPCA's express-preemption provision.

The view advanced by the Coalition and the Ninth Circuit in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), gives EPCA's words their ordinary meaning. EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use," 42 U.S.C. § 6291(4)—and that last four-word phrase, "as a matter of ordinary meaning, . . . means the 'place where something is used,'" *Cal. Rest. Ass'n*, 89 F.4th at 1101 (quoting Oxford English

Dictionary Online (2022)). EPCA further defines "energy" to "mean[] electricity, or fossil fuels," 42 U.S.C. § 6291(3). EPCA's express-preemption provision also includes the broadening term "concerning," *id.* § 6297(b), and indicates that it applies, among other things, to "building code requirements," *id.* § 6297(f) (heading). "So putting these terms together, EPCA preempts regulations, including 'building code requirements,' that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Cal. Rest. Ass'n*, 89 F.4th at 1101 (alteration in original; citation omitted). Thus, EPCA preempts natural-gas bans because "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." *Id.* at 1102.

The Second Circuit and the Village take a different view. This view starts by adopting a technical understanding of "at point of use," which it treats *not* as meaning the place where the appliance is used, but instead as meaning that the measurement of "energy use" should exclude "energy consumed in . . . transporting [the energy] to the location of the [appliance]." *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 180 F.4th 434, 439, 452 (2d Cir. 2026) ("*Plumbers*") (quoting *Cal. Res. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting from denial of rehearing en banc)). This view then infers from this technical understanding of "at point of use" that "energy use" does *not* refer to the quantity of energy an appliance "consumes at its 'intended final destination[],'" *id.* at 451 (alteration in original) (quoting *Cal. Rest. Ass'n*, 89 F.4th at 1102), but instead refers to "a standardized, fixed measure assigned to a product before it reaches consumers," determined using federally specified "test

procedures . . . performed in a controlled setting," *id.* at 439. On this basis, *Plumbers* concluded that laws banning fossil-fuel-powered appliances "govern by the type of energy consumed . . . , not the amount of energy an appliance consumes under standardized testing procedures," and are therefore not preempted. *Id.* at 445.

The district court followed *Plumbers*, agreeing "with the Second Circuit and the Village that 'energy use' in EPCA refers to a predetermined value that is assigned to a product before it reaches consumers." S.A. 19. According to the district court, "'Energy use' as preempted in EPCA is thus *unimpacted by the actual energy an appliance consumes in the hands of consumers*." S.A. 19 (emphasis added). It therefore concluded that EPCA preempts *only* regulations setting "energy-efficiency or energy-use performance standards" and does *not* preempt a regulation of "the types of energy or fuel" (or, on the district court's reasoning, the *amount* of energy or fuel) "that covered appliances may use in certain buildings." S.A. 19. The district court thus refused to find the Ordinance preempted—even though the Ordinance flatly states that for appliances in new buildings, "'*the source of energy shall not be fossil fuels*.'" S.A. 1 (emphasis added; quoting Oak Park Vill. Code § 7-1-2 at P301.1).

The view taken by *Plumbers* and the district court cannot be reconciled with EPCA's text and structure. Congress expressly defined "energy" to mean "electricity, or fossil fuels." 42 U.S.C. § 6291(3). Substituting that definition into "energy use" makes clear that EPCA preempts regulations that "concern[]," *id.* § 6297(b), the "quantity of [fossil fuels] consumed" by covered products, *id.* § 6291(4). A rule, such as the Village's Ordinance, that prohibits appliances from consuming fossil fuels sets

that quantity at zero. There is no legally significant difference between a cap set at zero and a cap set at slightly more than zero. Both "concern" the quantity consumed, and both are preempted. *Plumbers* never mentions EPCA's definition of "energy," much less explains how that definition is consistent with the opinion's distinction between regulations concerning "the type of energy consumed" (which it says are not preempted) and regulations concerning "the amount of energy . . . consume[d] under standardized testing procedures" (which it says are preempted). 180 F.4th at 445.

Nor can this view make sense of EPCA's building-code exemption. *Plumbers* acknowledged that "for the exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exemption would do no work." 180 F.4th at 448. Yet neither *Plumbers* nor the district court (nor the Village) offers any coherent reconciliation between their view and the building-code exemption. The crux of their view is that localities *can* regulate "the *actual energy* an appliance consumes in the hands of consumers." S.A. 19 (emphasis added). That implies that any building code will evade preemption so long as it limits the energy appliances *actually use in the building* (as building codes generally do). That result makes nonsense of the building-code exemption. This Court should reject it.

EPCA's plain text resolves this case in the Coalition's favor, and each of the contrary arguments advanced by the Second Circuit, the district court, and the Village falls short. This Court should reverse and hold the Ordinance preempted.

## STATEMENT OF THE ISSUE

Does EPCA preempt the Village's Ordinance banning natural gas appliances in new buildings?

## STATEMENT OF THE CASE

### I. Statutory Background

***The Energy Conservation Act.*** Congress enacted EPCA in 1975 after the 1973–74 oil embargo, as part of a "comprehensive energy policy" addressing the economic and national-security consequences of the United States' reliance on foreign energy. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005); *Nat. Res. Def. Council, Inc. v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). The original statute focused on information and voluntary measures: It required manufacturers to label covered appliances and authorized the Federal Energy Administration to prescribe mandatory standards if labeling proved ineffective. *Air Conditioning*, 410 F.3d at 499. It also allowed significant state participation, permitting state regulations that differed from federal requirements so long as those state regulations "were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Id.* (citing Pub. L No. 94-163, § 327(b)(2), 89 Stat. 871, 927 (1975)).

In 1978, Congress amended EPCA through the National Energy Conservation and Policy Act ("NECPA"), Pub. L. No. 95-619, 92 Stat. 3206 (1978). NECPA replaced the largely voluntary labeling approach with a nationwide program requiring the Department of Energy ("DOE") to prescribe minimum energy-efficiency standards for thirteen covered products, and it tightened the conditions under which a State could obtain a waiver for a more stringent rule. *See Air Conditioning*, 410 F.3d at 499; *Nat. Res. Def. Council*, 355 F.3d at 185. DOE nevertheless adopted a general policy of

granting waiver requests rather than promptly issuing the required standards, producing what Congress described as a "growing patchwork of differing State regulations" that complicated manufacturers' design, production, and marketing plans. S. Rep. No. 100-6, at 4 (1987); *see also Air Conditioning*, 410 F.3d at 499–500.

Congress responded in 1987 with the National Appliance Energy Conservation Act ("NAECA"), Pub. L. No. 100-12 § 327, 101 Stat. 103 (1987). NAECA established uniform national appliance standards, added the express-preemption provision now codified at 42 U.S.C. § 6297(c), and made waivers more difficult to obtain—all to reduce the regulatory and economic burdens created by divergent state requirements. S. Rep. No. 100-6, at 2, 4–5 (1987); *Air Conditioning*, 410 F.3d at 500. Notably, at the same time this amendment added EPCA's current express-preemption provision, it added an exemption from preemption for certain building codes that satisfy several statutory criteria. *See* Pub. L. No. 100-12 § 327, 101 Stat. 103 (1987).

In 1992, Congress extended EPCA's regulatory and preemption framework to commercial and industrial equipment through the Energy Policy Act of 1992, Pub. L. No. 102-486, § 122, 106 Stat. 2776, 2816 (1992), adding the parallel express-preemption provision now codified at 42 U.S.C. § 6316(b)(2)(A).

In sum, each time Congress has amended EPCA over the last half-century, it has made federal regulation more definitive and more comprehensive, including by expressly preempting state and local regulation on the subject.

***EPCA's Express-Preemption Provisions.*** EPCA's consumer-product express-preemption provision applies to a product after DOE establishes for that

product, under 42 U.S.C. § 6295, a federal "energy conservation standard[]"—a term defined to mean "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use," or a "design requirement." *Id.* § 6291(6)(A)–(B). Once an energy conservation standard becomes effective for a product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," unless the regulation falls within one of the provision's enumerated exceptions. *Id.* § 6297(c).

This provision applies to a broad range of products. A "consumer product" means an "article . . . [that] consumes, or is designed to consume, energy or . . . water . . . and . . . is distributed in commerce for personal use or consumption by individuals" to a significant extent. 42 U.S.C. § 6291(1). Covered products include statutorily listed products such as water heaters, furnaces, stoves, ovens, and clothes dryers. *Id.* §§ 6291(2), 6292(a); 10 C.F.R. § 430.32.

Three statutory definitions supply the central terms in EPCA's express-preemption provisions. They identify the governmental bodies to which the provision applies, the types of "energy" measures subject to the provision, and what the statute means by "energy." First, "'[s]tate regulation' means a law, regulation, or other requirement of a State or its political subdivisions." 42 U.S.C. § 6297(a)(2)(A). This definition therefore expressly sweeps in local ordinances. Second, "energy use" means "the quantity of energy directly consumed by a consumer product at point of use,

determined in accordance with test procedures under section 6293 . . . ." *Id.* § 6291(4).[1] Third, "energy" means "electricity, or fossil fuels." *Id.* § 6291(3). The statute thus expressly provides that "energy" can refer to natural gas and other fossil fuels. Read together, these provisions mean that section 6297(c) preempts state and local regulations concerning "the quantity of [electricity, or fossil fuels] directly consumed by" a covered product at point of use.

EPCA separately regulates "industrial equipment," including furnaces, boilers, and air-conditioning equipment distributed for industrial or commercial use. 42 U.S.C. § 6311(1)–(2)(A); 10 C.F.R. §§ 431.91, 431.101, 431.151. And a parallel preemption rule applies to state and local regulations of industrial equipment. Section 6316(b)(2)(A) provides that a federal standard established under section 6313(a), beginning on its effective date, "shall . . . supersede any State or local regulation concerning the energy efficiency or energy use of a product" for which the standard applies. As used in this provision, EPCA likewise defines "energy" to mean "electricity, or fossil fuels" and defines "energy use" as "the quantity of energy directly consumed by an article of industrial equipment at the point of use." 42 U.S.C. §§ 6311(4), (7), 6316(b)(2)(A).

---

[1] Section 6293 authorizes the Secretary of Energy to promulgate rules setting forth procedures for "measur[ing] energy efficiency, energy use, water use . . . , or estimated annual operating cost of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293 (b)(3). The Secretary has done so, imposing extremely detailed requirements for measuring the energy use of electric and natural-gas-powered water heaters, furnaces, stoves, ovens, and clothes dryers. *See* 10 C.F.R. § Pt. 430, Subpt. B, App. E (water heaters), App. N (furnaces), App. I1 (stoves and ovens), App. D1 (clothes dryers), App. D2 (clothes dryers).

These preemption rules are broad and are subject to a limited set of exceptions, which Congress adopted at the same time it enacted EPCA's original express-preemption provision. Two such exceptions are significant here—an exception for waivers issued by the Secretary of Energy and an exception for certain building-code requirements. 42 U.S.C. § 6297(d), (f).

Under the waiver provision, a State or locality may seek permission from the Secretary to enforce a regulation that would otherwise be preempted. This provision enumerates several detailed requirements and factors the Secretary must consider in determining whether to grant a waiver, including that the "regulation is needed to meet unusual and compelling State or local energy" interests that are substantially different in nature or magnitude from those prevailing generally in the United States. 42 U.S.C. § 6297(d)(1)(B)–(C). Further, the Secretary cannot grant a waiver if the regulation would significantly burden the covered product's manufacturing, marketing, distribution, sale, or servicing on a national basis, or would likely make substantially equivalent product types or performance characteristics unavailable in the State or locality in question. *Id.* § 6297(d)(3)–(4). Congress recognized that achieving a waiver would be difficult. S. Rep. No. 100-6, at 2 (1987).

The building-code exception is similarly narrow. It is limited to "[a] regulation or other requirement . . . contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product." 42 U.S.C. § 6297(f)(1)–(3). Such a building-code regulation is preserved only if it satisfies all seven requirements specified in section 6297(f)(3): It must (1) allow a builder to

meet a building-wide energy-consumption or conservation objective "by selecting items whose combined energy efficiencies meet the objective"; (2) avoid requiring a covered product to exceed the applicable federal standard; (3) award credit for products exceeding the applicable federal standard "on a one-for-one equivalent-energy-use or equivalent-cost basis"; (4) ensure any baseline building designs are based on products that meet but do not exceed the applicable federal standard; (5) when offering optional combinations that include a product exceeding such a baseline, offer an alternative combination that allows that product to simply meet the baseline; (6) specify the energy-consumption or conservation objective in terms of estimated total energy consumption, "specified in units of energy or its equivalent cost"; and (7) determine the estimated energy use of covered products using the applicable section 6293 test procedures, subject only to adjustments for local conditions or other documented, technically accurate procedures. *Id.* § 6297(f)(3)(A)–(G).

The legislative history indicates that Congress imposed these conditions to ensure this exemption would preserve only "performance-based codes"—i.e., codes that allow builders to "trade off the efficiencies of various building components" to meet an overall energy objective. S. Rep. No. 100-6, at 10-11 (1987). A code that flatly requires one type of appliance or energy source, without an overall consumption objective and without equivalent credits for alternative efficiency measures, does not fit that description. EPCA thus preempts most building codes that regulate energy use (including those that ban certain energy sources) while preserving a narrow class of performance-based codes. *See Cal. Rest. Ass'n*, 89 F.4th at 1101.

## II. The Village's Ordinance

In June 2023, the Village enacted the "Electrification Requirements" Ordinance at issue here. Dkt. 29 ¶ 5. The Ordinance supplements the Village's two preexisting building codes—the 2021 International Building Code (the "Building Code") and the 2021 International Residential Code (the "Residential Code")—by providing that, in all "new buildings," "[t]he source of energy for the building shall be all electric and *the source of energy shall not be fossil fuels*." Oak Park Vill. Code § 7-1-2 at P301.1 (emphasis added); *id.* § 7-6-2 at X301.1; Dkt. 29 ¶ 4–5; S.A. 1. Most buildings in Oak Park are governed by the Building Code, while single- and dual-family homes generally fall under the Residential Code. Oak Park Vill. Code §§ 7-1-1, 7-1-2, 7-6-1, 7-6-2; Dkt. 29 ¶ 5 n.1.[2] The Ordinance states that its purposes are to reduce greenhouse-gas emissions and to provide minimum electrification requirements for all new buildings. Oak Park Vill. Code § 7-1-2 at P101.1–.2; *id.* § 7-6-2 at X101.1–.2; Dkt. 29 ¶ 6.

In addition to this overarching building-wide requirement, the Ordinance prescribes specific requirements for appliances installed in new buildings. Dkt. 29 ¶ 7. For example, it amends the Building Code to require all cooktops to be "electric induction types" and all ovens to be "electric types." It also amends both Codes to

[2] The Building Code defines "new building" as "[a] newly constructed structure with an existing or new foundation." Oak Park Vill. Code § 7-1-2 at P201.1. The Residential Code defines "new residential building" as "a new independent or attached residential structure on a newly created foundation." *Id.* § 7-6-2 at X201. Both the Residential Code and Building Code define "fossil fuels" to include natural gas. *Id.* (Residential Code); *id.* § 7-1-2 at P201.1 (Building Code).

require that “energy for any clothes dryer shall be provided by an electric heat pump.” Oak Park Vill. Code § 7-1-2 at P301.1(6)–(8); *id.* § 7-6-2 at X301.1(6); Dkt. 29 ¶ 7. The Ordinance further prohibits “directly piped exterior gas fire pits and gas cooking grills whose source of energy is fossil fuels,” while allowing comparable appliances powered by fossil fuels stored in tanks or canisters. Oak Park Vill. Code § 7-1-2 at P301.1(10); *id.* § 7-6-2 at X301.1(8); Dkt. 29 ¶ 7.

The Ordinance took effect on January 1, 2024. Dkt. 29 ¶ 8. Since then, consumers, businesses, and building professionals designing or constructing new buildings in Oak Park cannot select natural-gas appliances. Dkt. 29 ¶ 9. The Ordinance thus requires building professionals and their customers to choose electric appliances instead of natural-gas appliances, even when a natural-gas appliance would better suit the customer’s needs. Dkt. 29 ¶ 10.

In short, for new buildings, the Ordinance categorically prohibits fossil-fuel-powered appliances, including appliances that use natural gas.

## III. Procedural History

The Coalition is an Illinois nonprofit organization whose purpose is to ensure that energy consumers in the Chicagoland area and throughout Illinois have access to a wide range of established and emerging technologies and energy alternatives, including natural gas. Dkt. 29 ¶ 1. The Coalition’s members include organizations and businesses whose work depends on the availability of natural-gas service, appliances, and infrastructure. The Ordinance has imposed, and continues to impose, significant consequences on those members, including increased costs and reduced customer bases. Dkt. 29 ¶¶ 12–27. These members face continuing injuries from the

Ordinance, including lost work, increased costs, and reduced revenue. *Id.* ¶¶ 23–27. The Coalition brought this action to vindicate its members' interests in providing natural-gas services and appliances to consumers—interests germane to the Coalition's organizational purpose. *See Common Cause Ind. v. Lawson*, 937 F.3d 944, 957 (7th Cir. 2019) (citations omitted).

The Coalition filed this action on May 14, 2025, in the United States District Court for the Northern District of Illinois, seeking a declaration that EPCA preempts the Ordinance and a permanent injunction prohibiting its enforcement. Dkt. 1. The parties filed cross-motions for summary judgment, agreeing that this case presents a pure question of law without any material factual disputes. *See* Dkt. 27; Dkt. 34 at 5; Dkt. 46 at 1 n.1 (noting that the Village's brief opposing summary judgment did not identify any disputes of material fact). Both parties also submitted supplemental authorities addressing subsequent decisions, including the Second Circuit's recent decision in *Plumbers*, 180 F.4th 434. *See* Dkt. 54; Dkt. 56; Dkt. 58; Dkt. 60.

The district court granted the Village's motion for summary judgment and denied the Coalition's cross-motion. It held that the Ordinance does not concern the "energy use" of covered products and is therefore not preempted. S.A. 19. In doing so, the district court adopted the Second Circuit's reasoning wholesale, stating that "energy use" refers to a "predetermined value assigned to a product before it reaches consumers," and that a regulation restricting the types (or quantity) of "*actual energy an appliance consumes in the hands of consumers*," does *not* "concern" "energy use." S.A. 19–20 (emphasis added).

## SUMMARY OF THE ARGUMENT

The Village's Ordinance provides that for appliances in new buildings—including appliances subject to federal energy conservation standards—"'*the source of energy shall not be fossil fuels*.'" S.A. 1 (emphasis added) (quoting Oak Park Vill. Code § 7-1-2 at P301.1). This case turns on whether that is a prohibition "concerning" the appliances' "energy use." 42 U.S.C. § 6297(c). It is.

The Court should start and end with EPCA's plain text. EPCA defines "energy" as "electricity, or fossil fuels," and defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." 42 U.S.C. § 6291(3), (4). Thus, as relevant here, EPCA preempts regulations "concerning," *id.* § 6297(c), the quantity of fossil fuels directly consumed by any covered product (a quantity DOE measures at point of use in accordance with its detailed testing procedures). That is precisely what the Ordinance does: It prohibits appliances in new buildings from using any (i.e., more than zero) fossil fuels. As the Ninth Circuit aptly put it, "a building code that prohibits consumers from using natural gas–powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Cal. Rest. Ass'n*, 89 F.4th at 1102 (alteration in original).

The contrary interpretation advanced by the Village—adopted by the district court, the Second Circuit, and a handful of other district courts—does not withstand scrutiny. The Village's argument that "energy use" equates to "energy conservation standard" violates elementary principles of statutory interpretation: Congress defined these terms separately, placed only the term "energy use" in the express-

preemption provision, and used both terms side by side in EPCA's waiver provision, proving they are not interchangeable. And there are several separately fatal flaws with the notion that EPCA preempts *only* regulations of the design of appliances as they leave the factory floor (i.e., that EPCA does *not* preempt regulations of the energy that appliances actually consume when used by consumers and businesses): This notion is inconsistent with the building-code exemption, it ignores the fact that "point of use" carries an ordinary "place of use" meaning that is confirmed by dictionary definitions and the ordinary meaning's consistent use in other federal statutes, and it disregards EPCA's structure and the statute's use of broadening language. Further, *Plumbers*' type-versus-amount distinction fails because it never addresses EPCA's definition of "energy" as "electricity, or fossil fuels." That definition confirms that EPCA preempts regulations concerning the quantity of *fossil fuels* consumed by covered products; preemption plainly applies to a ban setting that quantity to zero.

## STANDARD OF REVIEW

This Court reviews a district court's determination on cross-motions for summary judgment *de novo*, considering the question anew without deference to the district court's conclusions. *See Arana v. Bd. of Regents of Univ. of Wis. Sys.*, 182 F.4th 670, 678 (7th Cir. 2026). Summary judgment is proper when "there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)). Where, as here, "[t]here are no genuine issues of material fact and the dispute primarily concerns a question of interpreting a statute," the question is "properly resolved on a motion for summary judgment." *LTV Steel Co. v. Nw. Eng'g & Const., Inc.*, 41 F.3d 332, 334 (7th Cir. 1994) (citing Fed. R. Civ. P. 56(c)).

## ARGUMENT

### I. EPCA Expressly Preempts the Village's Ordinance

#### A. This case turns on the express-preemption provision's plain text, which clearly applies to the Village's Ordinance

Determining the scope of an express-preemption provision is a "task . . . of statutory construction . . . ." *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 457 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 564 (2024). And as this Court held in *Ye*, the Court conducts this analysis by "focus[ing] on the text" of the statute without applying any "presumption against preemption." *Id.* at 465. After all, applying such a presumption would stand "in direct conflict with the Supreme Court's instruction" in *Commonwealth of Puerto Rico v. Franklin Cal. Tax Free-Trust*, 579 U.S. 115, 125 (2016), to "'focus on the plain wording of the clause' instead of 'invok[ing] any presumption against pre-emption.'" *Ye*, 74 F.4th at 465 (alteration in original) (quoting *Franklin*, 579 U.S. at 125). Notably, both the Village and the district court concede this point. *See* S.A. 10 ("[T]he Court agrees with [the Coalition] that the presumption should not apply here. The Village does not dispute this principle . . . .").[3]

[3] Below, the Village's supporting *Amici* argued otherwise, on the theory that the presumption should apply because the Ordinance is a valid exercise of the Village's traditional police power over public health and safety. *See* Dkt. 37 at 19 (citing *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927 (7th Cir. 2018)). This is wrong: *Laborers' Pension Fund* provides no reason to apply the presumption here, for that case involved ERISA preemption, followed ERISA-specific precedent, and did not address *Franklin* or *Whiting*. *Ye* postdates *Laborers' Pension Fund* and controls here.

For these reasons, a court's assessment of an express-preemption provision will "begin with the Act's text," *Ye*, 74 F.4th at 458, and will end there if "the statute's language is plain," *Franklin*, 579 U.S. at 125 (citation omitted); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("The question . . . is one of statutory intent, and we accordingly begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks and citations omitted)).

Applying these principles here leads directly to one conclusion: The Ordinance is preempted. EPCA expressly preempts any "State regulation concerning the . . . energy use" of covered appliances. 42 U.S.C. § 6297(c); *see also id.* § 6316(b)(2)(A). Although "energy" and "energy use" are defined terms, it is useful to start with their ordinary meaning. "In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition." *Bond v. United States*, 572 U.S. 844, 861 (2014). And here, the Ordinance indisputably falls within the ordinary meaning of the express-preemption provision's terms, for banning covered appliances from *using fossil fuels* clearly "concerns" the appliances' "energy use." *See, e.g.*, *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting from denial of rehearing en banc) (acknowledging that Berkeley's ban on natural-gas piping "affects the *use* of natural gas products in a colloquial sense").

The statutory definitions of these terms are consistent with this commonsense conclusion. First, EPCA defines "State regulation" to include "a law, regulation, or

other requirement of a State *or its political subdivisions*." 42 U.S.C. § 6297(a)(2)(A) (emphasis added). Second, it defines "energy" to mean "electricity, or fossil fuels." *Id.* § 6291(3). Third, it defines "energy use" to mean "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." *Id.* § 6291(4).

Accordingly, EPCA expressly preempts any local regulation that "concern[s]" "the quantity of [fossil fuels] directly consumed by a consumer product at point of use." And that is plainly what the Ordinance does: It prohibits any appliance that uses more than zero fossil fuels—and "more than zero" is indisputably a "quantity." *See Cal. Rest. Ass'n*, 89 F.4th at 1102 (quoting Oxford English Dictionary Online (2022) to note that "'quantity' means 'a property or attribute that can be expressed in numerical terms'"). This suffices to establish preemption, because, as all parties agree, express preemption turns on statutory text, not the Village's motive in enacting its Ordinance. *See, e.g.*, *Plumbers*, 180 F.4th at 444 n.7 (noting that the Court's holding "is not premised, in any way, on the purpose of the challenged laws").

### B. The express-preemption provision's use of the term "concerning" broadens its scope

The express-preemption provision's use of "concerning" confirms that the Ordinance is preempted, for "[c]oncerning" is a broadening term: It reaches both the subject itself and "matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) ("The Court finds no basis to conclude . . . that 'related to' has a materially different meaning than . . . 'concerning' . . . ."); *see also Haywood v. Wilhelm-Copas*, No. 25-2098, 2026 WL 2263918, at *2 (7th Cir. Aug. 6,

2026) ("Words like 'relating to' . . . are often—though not always—read expansively to refer to matters relevant to a given subject."). As both this Court and the Supreme Court have noted, "'Congress characteristically employs [such] phrase[s] to reach any subject that has "a connection with, or reference to," the topics the statute enumerates.'" *United States v. Kraemer*, 933 F.3d 675, 679 (7th Cir. 2019) (quoting *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017)).

The broad scope of a provision using the term "concerning" or "related" is not unlimited—but breadth is the default. Courts apply three principles in determining the broadening effect given by the term "concerning."

First, courts retain the default, broad-scope interpretation where a statute's history confirms Congress intended breadth. *See Kraemer,* 933 F.3d at 681; *Mellouli v. Lynch*, 575 U.S. 798, 812–13 (2015). That is certainly true here. The history of EPCA's amendments shows that Congress moved consistently in one direction—broader preemption. The original 1975 Act permitted divergent state regulations "justified by a substantial state or local need." *Air Conditioning*, 410 F.3d at 499. The 1978 amendments tightened that standard, but DOE's liberal waiver policy nonetheless produced a "growing patchwork of differing State regulations." *Id.* at 500 (quoting S. Rep. No. 100-6, at 4). Congress responded in 1987 by enacting the express-preemption provision at issue here, and by making waivers "more difficult" to obtain, *id.*—all "to reduce the regulatory and economic burdens on the appliance manufacturing industry," S. Rep. No. 100-6 at 2. Congress then extended that identical framework to industrial equipment in 1992. Pub. L. No. 102-486, § 122, 106

Stat. 2776, 2816. At no point did Congress narrow the scope of preemption; at every point Congress broadened it.

Second, courts retain the default, broad-scope interpretation where Congress has omitted textual limits. *See Kraemer*, 933 F.3d at 682–84; *Mellouli*, 575 U.S. at 813. EPCA contains no limiting language that narrows the broadening term itself or the express-preemption provision more generally (other than specifically enumerated exceptions to preemption that are undisputedly inapplicable here). EPCA's express-preemption provision does of course contain a limiting principle: To be preempted, a regulation must bear on "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." § 6291(4). The Ordinance clears that bar because it sets the permissible quantity of fossil fuels consumed by covered products to zero. The key point for this purpose, though, is that the phrase "determined in accordance with test procedures" attaches to "the quantity" and instructs DOE *how to measure* energy use. It does *not* attach to "concerning" and thus does not temper the broadening effect of the term "concerning." *See Mellouli*, 575 U.S. at 808n.9 (concluding that a parenthetical modified the connector "relating to" and thereby narrowed what qualified as "relating to"); *Kraemer*, 933 F.3d at 681 (giving "relating to" broad meaning because Congress could have "clearly and specifically" limited the provision but chose not to).

Third, courts retain the default, broad-scope interpretation of "concerning" where a narrow reading would "read[] [that term] out of the statute." *Lamar*, 584 U.S. at 719 (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). That rationale excludes

a narrow reading here, as the district court's opinion itself illustrates. The district court held that the Ordinance does not "concern" energy use because it "regulates the types of energy or fuel that covered appliances may use . . . rather than establishing or affecting . . . federally regulated energy-efficiency or energy-use performance standards." S.A. 19. Under that logic, a regulation "concerns" energy use only if it *is* an "energy conservation standard" as defined under 42 U.S.C. § 6291(6) and as measured under the testing procedures promulgated under section 6293. This conclusion not only renders superfluous the express-preemption provision's use of the term "energy use" (rather than the separately defined term "energy conservation standard"), it also renders superfluous the provision's use of the term "concerning." If Congress had wanted to enact the rule adopted by the district court, it could have simply said "no State energy conservation standard shall be effective." Because "Congress did not use such narrow language," this Court should reject the district court's interpretation. *Lamar*, 584 U.S. at 719 (refusing to interpret a "statement respecting the debtor's financial condition" to "mean[] only a statement that captures the debtor's overall financial status" because "[h]ad Congress intended" that meaning, "there are several ways in which it could have so specified").

For these reasons, Congress's use of the term "concerning" extends EPCA preemption to regulations that have a "direct relation to or impact on," *Lamar*, 584 U.S. at 720, the "quantity of energy directly consumed by a consumer product," 42 U.S.C. § 6291(4). The Village's Ordinance providing that appliances in new buildings

can use *zero* fossil fuels plainly has an "impact on" the quantity of fossil fuels consumed by appliances. It is therefore preempted.

### C. The building-code exemption confirms the Coalition's interpretation of the express-preemption provision

Finally, EPCA's exemption for certain building codes further confirms that preemption applies even if the state or local rule does not regulate appliances directly. 42 U.S.C. § 6297(f). As the Ninth Circuit summarized in *California Restaurant Association*, EPCA's building-code exemption provides that a "'regulation . . . that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product' is superseded by EPCA unless it complies with various requirements." 89 F.4th at 1101 (emphasis omitted; quoting 42 U.S.C. § 6297(f)(1)–(3)). Because building codes by definition do not directly regulate appliances, the exemption "demonstrates that EPCA's preemptive scope extends *beyond direct or facial regulations of covered products* to at least include building codes 'concerning the energy . . . use' of such products." *Id.* (emphasis added).

Applying this reasoning, *California Restaurant Association* held that EPCA preempted a Berkeley, California ordinance that, rather than "directly banning [natural-gas] appliances in new buildings," banned fuel gas piping in new construction, thereby "rendering the gas appliances useless." 89 F.4th at 1098. The Ninth Circuit panel unanimously concluded that "EPCA preempts regulations, including 'building code requirements,' § 6297(f), that relate to 'the quantity of [natural gas] directly consumed by' certain consumer appliances at the place where those products are used." *Id.* at 1101–02. It thus held Berkeley's ordinance

preempted, explaining that "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1101 (alteration in original). In other words, the Berkeley ordinance was a regulation "concerning . . . energy use" because it entirely "eliminate[d] the 'use' of an energy source"—namely, natural gas and other fossil fuels. *Id.* at 1102. And Berkeley's "total ban on natural gas [appliances] [wa]s not exempt from EPCA just because it lower[ed] the 'quantity of energy' consumed to 'zero.'" *Id.*

The Village's Ordinance is even more plainly preempted than the Berkeley ordinance invalidated in *California Restaurant Association*. Whereas Berkeley's ordinance *indirectly* banned natural-gas appliances (by banning natural gas piping), the Village's Ordinance *directly bans* natural-gas appliances. The Ordinance's regulation of fossil-fuel consumption could scarcely be more direct, for it categorically provides that "'*the source of energy shall not be fossil fuels*.'" S.A. 1 (emphasis added; quoting Oak Park Vill. Code § 7-1-2 at P301.1). As one member of the Ninth Circuit panel observed, "EPCA would *unquestionably* preempt a building code that *prohibited the attachment of covered appliances* to the owner's piping that receives gas at the utility's service delivery point." *Cal. Rest. Ass'n*, 89 F.4th at 1119 (Baker, J., concurring) (emphases added). That precisely describes the Village's Ordinance. This Court should therefore hold the Ordinance preempted.

## II. The Contrary View of EPCA's Express-Preemption Provision Is Incorrect

Against this ordinary-meaning interpretation of EPCA, the Second Circuit, the district court, and the Village take a different view of the statute. This view results from essentially three interpretive moves: (1) the argument that EPCA preempts only regulations that act as "energy conservation standards"; (2) the argument that giving "energy use" a technical meaning implies that only regulations of products' design are preempted, rather than regulations targeting the *actual energy* that an appliance consumes in the hands of consumers and businesses; and (3) the argument that a complete ban on fossil fuels does not "concern" the "quantity" of "energy" an appliance consumes. *Plumbers*, 180 F.4th at 439–45; S.A. 19–20; Dkt. 35 at 12. All these arguments are meritless, and they do not come close to showing that the Village's interpretation is superior to the common-sense, plain-meaning interpretation adopted by the Ninth Circuit and advanced by the Coalition.

### A. "Energy use" has a different meaning than "energy conservation standard"

Begin with the argument—advanced in various forms by the Village, the district court, and the Second Circuit—that EPCA preempts only local regulations prescribing the equivalent of a federal energy conservation standard, i.e., only those that "set energy conservation standards and impose . . . design requirements," Dkt. 35 at 4–5; *see also* S.A. 13, 19 (holding Ordinance not preempted because it does not "establish[] or affect[] the appliances' federally regulated energy-efficiency or energy-use performance standards"); *Plumbers*, 180 F.4th at 446 (asserting that "the preemption provision's structure closely mirrors the statute's definition of 'energy

conservation standard'"). This argument directly contradicts the familiar principle that "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). It also conflicts with courts' "deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Freytag v. C.I.R.*, 501 U.S. 868, 877 (1991) (quotation marks and citation omitted). Together, these canons foreclose this argument.

Critically, EPCA's express-preemption provision, section 6297(c), does not use the term "energy conservation standard" at all. Congress instead drafted the provision to preempt regulations "concerning . . . energy use." 42 U.S.C. § 6297(c). That choice was surely intentional. After all, "energy use" and "energy conservation standard" are defined terms with *different* definitions. "Energy conservation standard" can refer to "a design requirement" or "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of *energy use*" for a covered product. 42 U.S.C. § 6291(6)(A)–(B) (emphasis added). "Energy use" is thus a component *within* the definition of "energy conservation standard"—not a synonym for it. An energy conservation standard governs how an appliance is designed and must be imposed by DOE in accordance with the testing procedures required by section 6293. *Id.* In contrast, "energy use" refers to "the *quantity* of energy directly consumed" by the appliance. *Id.* § 6291(4) (emphasis added). And the fact

that *both* of these terms are used in section 6297(d)'s DOE-waiver provision further demonstrates that they are distinct, not equivalent. *See id.* § 6297(d)(1)(A) (authorizing Secretary to exempt from preemption "any energy conservation standard *or other requirement with respect to energy use*" (emphasis added)).

As the Ninth Circuit explained, courts cannot "supplant 'energy use' and replace th[at] term[] with 'energy conservation standard.'" *Cal. Rest. Ass'n*, 89 F.4th at 1105. To do so would violate the surplusage canon by rendering meaningless *both* the separate definitions in section 6291 *and* the distinct terms used in section 6297(c). The Village's reading requires equating two terms that the statute's own definitions and structure prove are not interchangeable. For that reason alone, the Court should reject the Village's view and hold the Ordinance preempted.

### B. The phrases "point of use" and "determined in accordance with test procedures" in the definition of "energy use" do not exclude from preemption regulations of actual energy use

The Village's view also rests on the mistaken notion that "the preemption provision does *not*" apply to a regulation addressing "the *energy an appliance consumes in the hands of consumers*.'" *Plumbers*, 180 F.4th at 439–40 (emphasis added). This counterintuitive notion relies on EPCA's definition of "'energy use' as 'the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293.'" *Id.* at 439 (quoting 42 U.S.C. § 6291(4)). According to the Village and the courts that have adopted this view, this definition means that "'energy use' is a standardized, fixed measure assigned to a product before it reaches consumers." *Id.* Thus, so the argument goes, preemption applies *only* to regulations setting pre-sale design

standards—i.e., regulations of appliances as they leave the factory floor. *See id.* at 441 ("[T]he term refers to a metric determined before an appliance ever reaches consumers, *not the energy that appliance uses in the hands of consumers*." (emphasis added)); *Cal. Restaurant Ass'n*, 89 F. 4th at 1122 (Friedland, J., dissenting from denial of rehearing en banc) (concluding that "energy use" "does not depend on any given consumer's *actual* use" (emphasis in original)); *Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*, No. 24-cv-02942 (ACR), 2026 WL 837674, at *10 (D.D.C. Mar. 26, 2026) (holding that EPCA preempts "regulations of product design, *not* actual energy consumption in a particular location" (emphasis in original)).

This argument does not survive scrutiny. It is contradicted by the building-code exemption, it improperly discards the ordinary meaning of "at point of use," and it cannot overcome the express-preemption provision's broadening language.

**1. The building-code exemption implies that the express-preemption provision encompasses regulations of actual energy use**

At the outset, this argument cannot square with the building-code exemption. In carving out a narrow subset of building codes from the scope of preemption, the building-code exemption implies that most building codes *are* preempted. Thus, because building codes by definition are not design standards, do not regulate appliances directly as they leave the factory floor, and do not act as conservation standards for individual types of appliances, this exception "demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy. . . use' of such products." *Cal. Rest. Ass'n.*, 89 F.4th at 1101.

Notably, the Second Circuit and the district court both acknowledged that "for the [building-code] exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exemption would do no work." *Plumbers*, 180 F.4th at 447; *see also* S.A. 19 (adopting Second Circuit's reasoning). As the *Plumbers* put it, anti-superfluity concerns would weigh strongly against an interpretation of the express-preemption provision that "were to exclude" the "kind of regulations covered by the building code exemption" *Id.*

Though *Plumbers* thought it successfully navigated this point, its "interpretation of the preemption provision" is *not* "consistent with the building code exemption." 180 F.4th at 447. As noted, *Plumbers* insists that the express-preemption provision does *not* apply to regulations concerning the quantity of energy an appliance actually "uses in the hands of consumers." *Id.* at 441. But in addressing the building-code exemption, *Plumbers* concedes that EPCA *does* preempt building codes that "target[] building-wide energy conservation" and "achieve[] the goal of *regulating the performance* of the individual appliances within that building." *Id.* at 447 (emphasis added). That concession creates a contradiction in *Plumbers*' view, because such building codes plainly regulate *actual energy use in the building*, not merely how appliances are designed or how they perform in controlled testing environments.

*Plumbers* also favorably cited the Ninth Circuit's opinion in *Building Industry Association of Washington v. Washington State Building Code Council*, 683 F.3d 1144, 1151 (9th Cir. 2012), acknowledging that the Ninth Circuit in that case "did not question that the regulation would be preempted" if it did not satisfy EPCA's detailed

requirements for exempting building codes, and noting that the Ninth Circuit's "analysis squares with our interpretation." *Plumbers*, 180 F.4th at 448 n.13 (citing *Bldg. Indus. Ass'n*, 683 F.3d at 1151). The building code at issue in *Building Industry Association*, however, *addressed real-world energy use*: It mandated "a 15% reduction in new buildings' energy consumption" in pursuit of "the broader goal of building zero fossil-fuel greenhouse gas emission homes and buildings by the year 2031." 683 F.3d at 1148–49 (quotation marks and citation omitted). *Plumbers* was thus forced to implicitly concede that building codes such as the one in *Building Industry Association*—which targeted actual use—fall within the scope of EPCA's express-preemption provision. And that concession simply cannot be squared with the decision's core assumption that EPCA only preempts pre-sale design standards, not regulations of actual energy consumption.

The District of Columbia's decision in *National Association of Home Builders*, which adopts the same view as *Plumbers*, provides a further illustration of this point. That decision likewise rested on the notion that EPCA preemption "covers regulations of product design, *not* actual energy consumption in a particular location," 2026 WL 837674, at *10 (emphasis in original), and it similarly failed to reconcile that notion with the building-code exemption: The decision conceded that EPCA *would* preempt a building code that "provide[d] that all gas appliances *consume only a certain amount of energy while switched on in certain buildings*"—a regulation that, despite the court's characterization as "design-related," plainly concerns *actual use*. *Id.* at *9 (emphasis added).

In short, the express-preemption provision cannot be read to apply only to design standards for appliances as they leave the factory floor. If EPCA preemption were that narrow, the statute's limited savings clause for certain building codes—regulations that invariably address actual use—would serve no purpose. At the very least, it would be far easier for a municipality to alter a building code to regulate actual use than to comply with the building-code exemption's detailed requirements. *See* 42 U.S.C. § 6297(f)(3)(A)–(G). Because the Village's view renders the building code superfluous, it should be rejected. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of the same law.").

### 2. The plain-text reading of "at point of use" supports the Coalition's view

Even apart from the building-code exemption, the Village's view founders on the ordinary meaning of EPCA's language. EPCA defines "energy use" to mean the "quantity of energy directly consumed by a consumer product at point of use." 42 U.S.C. § 6291(4). The ordinary, common-sense reading of "at point of use" understands it to mean "where it is used." The Village argues that "[t]he term instead distinguishes between the energy an appliance consumes on-site and the additional energy required to generate, transmit, and distribute that energy," Dkt. 35 at 15–16, but this reading is foreclosed by well-established canons of statutory interpretation.

It is black-letter law that an undefined statutory term "must be given [its] ordinary and plain meaning." *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015)

(quoting *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000)). Courts determine that meaning by consulting (1) dictionary definitions, (2) the construction of similar terms in related statutes, (3) the statute's purpose, and (4) the statute's specific context, including any technical usage. *See United States v. Williams*, 106 F.4th 639, 650 (7th Cir. 2024) (quoting *United States v. Johnson*, 47 F.4th 535, 543 (7th Cir. 2022)); *see also id.* ("[W]hen words have several plausible definitions, context differentiates among them." (quoting *United States v. Hansen*, 599 U.S. 762, 775 (2023)); *Cal. Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting) ("[W]here Congress has used technical words or terms of art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate.'" (quoting *Greenleaf v. Goodrich*, 101 U.S. 278, 284 (1880)). Each of these four factors confirms that "point of use" carries its ordinary meaning: "the place where something is used."

First, courts consider dictionary definitions of the undefined term. *Williams*, 106 F.4th at 650 (adopting the dictionary definition of the statutorily undefined term "analogue" as its ordinary meaning after consulting multiple dictionaries and rejecting the defendant's argument that a separately defined term's definition should apply); *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016) (interpreting undefined statutory term "good cause" by its dictionary definition). Here, dictionaries converge on a single, consistent meaning of "point of use" as a locational term. *See Cal. Rest. Ass'n*, 89 F.4th at 1101–02 (noting Oxford English Dictionary Online defines phrase as "the place where something is used"); *see also Nat'l Ass'n of Home Builders v. Montgomery County*, No. 8:24-cv-03024-PX, 2026 WL 817322, at *5 (D. Md. Mar. 25,

2026) (noting that the Cambridge English Dictionary Online (2025) defines "point of use" as "the place where or time when a product or service is used").

Second, courts may confirm the ordinary meaning by considering the construction of similar terms in other statutes. *See Patel*, 778 F.3d at 613 (looking to Stark Act's definition of "referral" to illuminate meaning of same undefined term in Anti-Kickback Statute, and concluding that Congress's choice to define term broadly in related statute "suggests that Congress considers the government's broad reading of the term . . . to be a permissible one"); *Williams*, 106 F.4th at 650 (comparing undefined term "analogue" to similar defined term "controlled substance analogue" to reject applying that defined term to the undefined "analogue"). In this case, no statute defines "point of use" directly, and no similar defined term exists for comparison. But other federal statutes consistently use "point of use" to denote a physical location. For example, the Safe Drinking Water Act uses the phrase in its familiar, ordinary sense to describe treatment devices installed at the place where water is consumed. *See* 42 U.S.C. § 300g-1(b)(4)(E)(ii) (referring to "point-of-use" devices); 40 C.F.R. § 141.2 (defining "point-of-use" device as one "physically installed or connected to a single fixture, outlet, or tap to reduce or remove contaminants in drinking water"). And Occupational Safety and Health Administration's regulations use the phrase to describe the place where a hazardous chemical is handled. *See, e.g.*, 29 C.F.R. § 1910.1200 app. C, § C.2.4.5 (conditioning label text on whether information "is provided with the chemical at the point of use"). This consistent statutory usage reinforces the ordinary, locational meaning of "at point of use."

Third, courts confirm ordinary meaning by looking to the statute's purpose. For example, in *Patel*, this Court held that "referral" must be read broadly because the Anti-Kickback Statute's "central purpose" is "to prevent Medicare and Medicaid fraud," and a narrow reading "would defeat the central purposes" of the statute. 778 F.3d at 616. Here, EPCA's purpose confirms the ordinary, locational meaning of "at point of use." Congress created these preemptive national standards to address the problem of "'a growing *patchwork of differing State regulations* which would increasingly complicate [appliance manufacturers'] design, production and marketing plans.'" *Air Conditioning*, 410 F.3d at 500 (emphasis added; quoting S. Rep. No. 100-6 at 4); *see also* H.R. Rep. No. 100-11, at 24 (1987). If the express-preemption provision did not cover actual use, it would be trivially easy for states to evade preemption by regulating actual use—resulting in the very "patchwork of differing State regulations" that Congress intended to foreclose.

Fourth, courts may confirm the ordinary meaning by examining a statute's specific context, including technical meanings. *See Hansen*, 599 U.S. at 775. Judge Friedland's dissent from the denial of rehearing en banc in *California Restaurant Association* invoked this principle, arguing that EPCA's "technical provisions" required the court to "consider[] the specialized meanings of key terms," including "point of use." 89 F.4th at 1121.

The Coalition does not dispute this general principle. EPCA concerns energy conservation, so courts may consider the statute's undefined terms in light of energy-sector usage. But the technical definition asserted by the Village (as well as Judge

Friedland, *Plumbers*, and the district court) would completely displace the ordinary dictionary definition *without any basis*. The Village does not identify a standalone definition of "at point of use" that treats the phrase as setting a measurement methodology. Instead, the Village extracts a single clause from a DOE webpage defining a *different* term—"delivered energy," which is defined as "the amount of energy consumed at the point of sale . . . without adjustment for any energy loss in the generation, transmission, and distribution of that energy." U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions*, https://www.energy.gov/cmei/energy-intensity-indicators-terminology-and-definitions (cited in Dkt. 35 at 7). A purported technical meaning that must be excavated from a *different term's definition* in secondary regulatory materials likely has not acquired a specialized meaning that displaces the ordinary one.

This is made all the clearer by the fact that the Village does not accurately describe the sources on which it relies. The Village's reference to the DOE webpage's definition of "delivered energy" omits a parenthetical which makes clear that "delivered energy" includes a locational component: delivered energy is "the amount of energy consumed at the point of sale *(e.g., that enters the home, building, or establishment)* without adjustment for any energy loss in the generation, transmission, and distribution of that energy." U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions*, https://www.energy.gov/cmei/energy-intensity-indicators-terminology-and-definitions (emphasis added). And the Village repeats this ruse when citing a proposed DOE rule, asserting that "point-of-use"

assesses how much "electricity, natural gas, propane, and/or fuel oil an appliance uses and where it is operated." Dkt. 35 at 7 (citing 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011)). Once again, this omits critical language: The proposed rule describes point of use as assessing "use of electricity, natural gas, propane, and/or fuel oil by an appliance *at the site where the appliance is operated*." Thus, even the Village's technical energy-sector meaning of "point of use," read in the correct context, includes a locational component—and converges with the ordinary dictionary meaning: "the place where something is used."

The Village's argument is further weakened by a different federal-government energy glossary that consistently uses "at point of use" *in its ordinary locational sense*. *See* U.S. Energy Info. Admin., *Glossary*, https://www.eia.gov/tools/glossary/. This Glossary defines "direct-use energy" as energy "produced and consumed at the final point of use"; it defines an "instantaneous water heater" as one that heats water "at the point of use as it is needed"; and it defines "solar thermal direct-use energy" as heat "collected and consumed at the final point of use, such as in solar thermal water heating systems." *Id.* The measurement-methodology reading cannot be clearly substituted into any of these definitions. If "at point of use" meant only "without adjustment for upstream and downstream energy losses"—as Judge Friedland's dissent and the courts following it would have it—then "direct-use energy" would be energy "produced and consumed at the [measurement without adjustment for losses]," an "instantaneous water heater" would heat water "at the [measurement without adjustment for losses] as it is needed," and solar thermal energy would be

heat "collected and consumed at the [measurement without adjustment for losses]." These definitions work only if "point of use" denotes a physical location, as the ordinary reading does.

### 3. Even granting a technical meaning of the definition of "energy use," EPCA's text and structure confirm that the express-preemption provision applies to the Ordinance

Finally, even under the Village's technical understanding of the definition of "energy use," EPCA's express-preemption provision would *still* apply to the Ordinance. *Plumbers* and the district court insist that, under EPCA's definition of "energy use," EPCA preemption reaches only regulations that directly regulate "the quantity of energy directly consumed by a consumer product at point of use, in accordance with testing procedures under section 6293." 42 U.S.C. § 6291(4). As *Plumbers* puts it, EPCA preempts only regulations that require an appliance's design to conform to a "standardized, fixed measure assigned to a product before it reaches consumers." 180 F.4th at 439.

This reasoning ignores the context of "energy use" within EPCA. The term "energy use" is used throughout the statute—not just in the express-preemption provision. There is thus no basis to assume that the energy-use definition's "at point of use, determined in accordance with test procedures" language was meant to narrow the scope of preemption. And there is certainly no basis to conclude (as the Village's theory implies) that the energy-use definition would allow a locality to evade preemption simply by measuring energy in manner *different* from the "test procedures under section 6293." 42 U.S.C. § 6291(4). If "energy use" is read to exclude

preemption of regulations of actual energy use, it would eviscerate the express-preemption provision. Localities could dictate the type and quantity of actual energy consumed at a building while claiming they are not regulating "energy use" at all.

The statutory text does not require eviscerating the express-preemption provision in this manner. Critically, EPCA's express-preemption provision uses the broadening language "concerning . . . energy use." 42 U.S.C. § 6297(c). A regulation capping the quantity of energy an appliance actually consumes in a home may not *constitute* a regulation of the "the amount of energy an appliance consumes under standardized testing procedures," *Plumbers*, 180 F.4th at 445, but such a regulation certainly *concerns* such an amount. *See supra* at 19–22. Here, the Village's ban on fossil-fuel appliances at a minimum has a "direct relation to or impact on," *Lamar*, 584 U.S. at 720, the amount of energy appliances consume under DOE testing procedures; if the amount of fossil fuels an appliance consumes under such procedures is more than zero, the Ordinance bans the appliance from being installed in new buildings. The Ordinance is therefore preempted.

### C. A regulation prohibiting appliances from using more than zero fossil fuels concerns the quantity of fossil fuels those appliances consume

Finally, the Village's view also relies on the argument that a complete ban on fossil fuels does not "concern" the "quantity" of "energy" an appliance consumes. *Plumbers*, 180 F.4th at 439–45; S.A. 19–20; Dkt. 35 at 12. That is wrong.

*Plumbers* first suggests that a state can avoid preemption by targeting "fossil fuels" specifically rather than energy generally. But EPCA defines "energy" to mean "electricity, or fossil fuels." 42 U.S.C. § 6291(3). *Plumbers* never even mentions

EPCA's definition of "energy," much less explains how its conclusion is consistent with that definition. It is not. Plugging EPCA's definition of "energy" into the statute's definition of "energy use" means that EPCA preempts regulations concerning "the quantity of [electricity, or fossil fuels]" consumed by covered appliances. *Id.* § 6291(4). Accordingly, EPCA preempts any ordinance that concerns the quantity of electricity *or fossil fuels* consumed by a covered product. *See* Scalia & Garner, Reading Law: The Interpretation of Legal Texts § 12 (West 2012) (noting that "A or B" means either A or B, or both).

Second, *Plumbers* insists that bans on "the use of fossil-fuel-powered appliances" "govern via the type of energy an appliance consumes . . . , not the *amount* of energy it consumes." 180 F.4th at 444 (emphasis added). *Plumbers* repeatedly asserts this point, arguing that "there is no equivalency between the type of energy an appliance uses and that appliance's 'energy use.'" *Id.* at 445–46 (quotation marks and citation omitted)). This argument essentially rests on the notion that completely banning an entire type of energy (i.e., capping the quantity that can be used at zero) is different than imposing some above-zero cap. But "more than zero" plainly *is* a quantity. *See Cal. Restaurant Ass'n*, 89 F.4th at 1102 (quoting Oxford English Dictionary Online (2022) to note that "'quantity' means 'a property or attribute that can be expressed in numerical terms'").

*Plumbers*' argument on this score is also self-contradictory. As noted, *Plumbers* effectively concedes that EPCA's express-preemption provision would apply to a building code that, for example, prohibited installation of gas stoves that consume

more than 900 kilo-BTUs of natural gas per year. *See supra* at 28–29; 10 CFR § 430.32(j)(1)(iii) (setting maximum annual energy consumption for gas stoves at about 1,770 kilo-BTUs of natural gas per year). It is all the more obvious that EPCA would preempt a regulation that prohibited gas stoves that consume more than *one* kilo-BTU of natural gas per year. And the only difference between that regulation and the Village's Ordinance—which bans appliances using more than *zero* kilo-BTUs—is the final kilo-BTU, a distinction that neither text nor commonsense supports. There is no legally significant difference between a regulation that caps fossil-fuel consumption at zero and a regulation that caps fossil-fuel consumption at slightly-more-than-zero: Both regulations indisputably regulate a "quantity of [fossil fuels] directly consumed by a consumer product," 42 U.S.C. § 6291(3), (4)), and they are thus equally preempted by EPCA.

* * *

In sum, EPCA's plain text resolves the case. The Ordinance concerns "energy use" because it sets the permissible quantity of fossil-fuel energy use at zero. The contrary view requires limiting the express-preemption provision in ways that contradict and render superfluous numerous statutory provisions—including the building-code exemption, which confirms that ordinances such as this one are preempted. The view pressed by the Coalition and adopted by the Ninth Circuit makes it easy to understand the scope of EPCA preemption: If the ordinance concerns—i.e., has a "direct relation to or impact on," *Lamar*, 584 U.S. at 720—the quantity of energy an appliance can use, it is preempted. In contrast, the contortions

required by the competing view make it impossible to discern the scope of EPCA preemption. The Court should reject the Village's competing convoluted view, reverse the district court, and apply EPCA's plain text to hold the Ordinance preempted.

## CONCLUSION

For these reasons, this Court should reverse the district court's grant of summary judgment to the Village and direct the district court to enter summary judgment for the Coalition.

Respectfully submitted,

Dated: September 25, 2026

**BARNES & THORNBURG LLP**

By: */s/ Kian J. Hudson*

Kian J. Hudson
Kristin Froehle
BARNES & THORNBURG, LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Kian.hudson@btlaw.com
Kristin.froehle@btlaw.com

*Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

There are no prior or related proceedings in the district court of the Seventh Circuit, but there are cases outside the Seventh Circuit raising the same preemption issue, including:

1. *Cal. Restaurant Ass'n v. City of Berkeley*, 21-16278 (9th Cir.), decided January 2, 2024 (89 F.4th 1094 (9th Cir. 2024)).
2. *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 25-977 (2d Cir.), decided June 30, 2026 (180 F.4th 434 (2d Cir. 2026))
3. *Nat'l Ass'n of Home Builders v. Montgomery County*, No. 26-1449 (4th Cir.)
4. *Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*, No. 26-1552 (4th Cir.)
5. *Nat'l Ass'n of Home Builders v. District of Columbia*, No. 26-7050 (D.C. Cir.)

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because, according to the word count function of Microsoft Word, it contains approximately 10,614 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f).

This brief, which has been prepared in a proportionally spaced typeface using 12-point Century Schoolbook font (and 12-point footnotes), complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) as modified by Circuit Rule 32(b).

Further, pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) are included within the Short Appendix. There are no materials within the scope of Circuit Rule 30(b).

Dated: September 25, 2026

**BARNES & THORNBURG LLP**

By: */s/ Kian J. Hudson*

Kian J. Hudson
Kristin Froehle
BARNES & THORNBURG, LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Kian.hudson@btlaw.com
Kristin.froehle@btlaw.com

*Counsel for Plaintiff-Appellant*

# Short Appendix

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLEAN ENERGY CHOICE COALITION, NFP<br><br>Plaintiff,<br><br>v.<br><br>VILLAGE OF OAK PARK, ILLINOIS,<br><br>Defendant. | No. 25-cv-04353<br>Judge Franklin U. Valderrama |

## MEMORANDUM OPINION AND ORDER

The Energy Policy and Conservation Act of 1975 (EPCA) prohibits state and local regulations "concerning the energy efficiency [or] energy use" of certain products. 42 U.S.C. § 6297(c). The Village of Oak Park (the Village), as part of its effort to reduce its greenhouse emissions, enacted an ordinance which provides that, as to all "new buildings," "[t]he source of energy for the building shall be all electric and the source of energy shall not be fossil fuels." Oak Park Vill. Code § 7-1-2 at P301.1 (the Ordinance); R. 1, Compl.[1] Plaintiff Clean Energy Choice Coalition, NFP (Clean Energy), an assortment of groups whose members seek to preserve their interests in providing natural gas services and appliances to consumers, sued the Village asserting that the Ordinance is preempted by EPCA. Before the Court are Clean Energy and the Village's cross-motions for summary judgment. R. 27, Pl.'s Mot.

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Summm. J.; R. 34, Def.'s Cx-Mot. Summ. J. For the reasons below, the Court denies Clean Energy's motion and grants the Village's motion for summary judgment.

**Background**

In deciding cross-motions for summary judgment, the Court views the facts in the light most favorable to the respective non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). So, when the Court evaluates Clean Energy's motion for summary judgment, the Village gets the benefit of reasonable inferences; conversely, when evaluating the Village's motion, the Court gives Clean Energy the benefit of the doubt. On summary judgment, the Court assumes the truth of the facts presented by the parties, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

**I. The Ordinance**

In August 2022 the Village adopted Climate Ready Oak Park (CROP), a comprehensive planning framework under which the Village plans to reduce its greenhouse gas emissions and protect its residents' health, safety, and welfare. DSOF[2] ¶ 2, 5. Changes to the Village's building code are a key step in that plan, because the Village's older building stock runs largely on fossil fuels. *Id.* ¶ 2. After a

[2]Citations to the Parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "PSOF" for Clean Energy's Statement of Material Facts (R. 29); "Def.'s Resp. PSOF" for the Village's Response to Clean Energy's Statement of Material Facts (R. 35); "DSOF" for the Village's Statement of Material Facts (R. 34-1); and "Pl.'s Resp DSOF" for Clean Energy's Response to the Village's Statement of Material Facts. (R. 47).

series of meetings in June 2023, the Village amended its building and residential codes for new construction (the Ordinance). *Id.* ¶¶ 10–11.

Under the Ordinance, most new buildings and residences in the Village are required to use electricity as their "source of energy" and may not combust "fossil fuels" indoors. Oak Park Vill. Code § 7-1-2 at P301.1; § 7-6-2 at X301.1. The purpose of this prohibition is "to reduce production of greenhouse gases." *Id.* § 7-1-2 at P101.2; § 7-6-2 at X101.2. In addition to its general prohibition on fossil fuels, the Ordinance prescribes several requirements for appliances installed in new buildings. PSOF ¶ 7. For example, it amends the Building Code to require all cooktops to be "electric induction types," all ovens to be "electric types," and "energy for any clothes dryer shall be provided by an electric pump." Oak Park Vill. Code § 7-1-2 at P30; § 7-6-2 at X301.1(6). The Ordinance also prohibits "directly piped exterior gas fire pits and gas cooking grills whose source of energy are fossil fuels." *Id.* § 7-1-2 P301.1(10); § 7-6-2 at X301.1(8). The Ordinance went into effect on January 1, 2024. PSOF ¶ 8.

## II. EPCA

Congress enacted EPCA in 1975, "in the aftermath of the oil embargo imposed against the United States in 1973 and 1974 by certain petroleum-producing countries." *Nat. Res. Def. Council, Inc., v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985). "EPCA was designed, in part, to reduce the United States' domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n.*, 410 F.3d 492, 498–99 (9th Cir. 2005) (citation

omitted). EPCA sought to achieve this goal by authorizing energy efficiency standards and prescribing labeling requirements for "major home appliances and certain other consumer products," in the hope that "better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499.

In 1978 Congress amended EPCA with the National Energy Conservation and Policy Act (NECPA), which "required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products," namely kitchen ranges, ovens clothes dryers and furnaces. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499. NECPA allowed states to "prescribe regulations more stringent than federal regulations *only if* the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation" and the regulation "would not unduly burden interstate commerce." *Id.* (emphasis in original). The Department of Energy (DOE), however, concluded in 1982 that "establishing minimum energy efficiency standards for the relevant appliances would not result in significant energy conservation and would not be economically justified," thus "the DOE determined no efficiency standards were required under NECPA." *Id.* While adopting this policy, the DOE also initiated a "general policy of granting petitions from States requesting waivers from preemption." *Id.* This resulted in a "growing patchwork of differing State regulation" that complicated the "design, production, and marketing of appliances." *Id.* at 500 (cleaned up). So, Congress passed the National Appliance Energy Conservation Act of 1987 (NAECA), which established uniform federal energy

standards for residential appliances. *Id.* at 499–500. NAECA also made changes to the preemption clause and made it more difficult for states to obtain a waiver. *Id.*

EPCA's current preemption provision for consumer products provides in relevant part:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered [consumer] product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product[.]

42 U.S.C. § 6297(c).

"Energy" is defined as "electricity, or fossil fuels." 42 U.S.C. § 6291(3). "Energy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4). "Energy efficiency" means "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(5). "Energy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. *Id.* § 6291(6).

## III. Clean Energy

Clean Energy is an Illinois non-profit organization seeking to guarantee that energy consumers in the Chicagoland area and the State of Illinois have access to a

wide range of established technologies and energy alternatives, including natural gas. PSOF ¶ 1. Its members include, among others, the International Union of Operating Engineers Local 150, AFL-CIO (Local 150); National Association of Homebuilders (NAHB); and NPL Construction Co. (NPL). *Id.* ¶ 12. Both Local 150 and NAHB have thousands of members, including construction workers and homebuilders, some with specialized training on natural gas distribution and maintenance processes. *Id.* ¶¶ 13–15, 18. NPL installs and restores natural gas utilities in Oak Park and surrounding communities. *Id.* ¶ 21.

According to Clean Energy, the Ordinance has led to increased costs, which in turn deny coalition members potential new customers who would otherwise choose to use natural gas. PSOF ¶ 23. The Ordinance eliminated significant work opportunities for Local 150 members, who have specialized training in this field.[3] *Id.* ¶¶ 15–16. Since the Ordinance's enactment, demand for NPL's services has declined in the Village and directly reduced its revenue.[4] PSOF ¶ 22. Clean Energy seeks a declaratory judgment and permanent injunction prohibiting enforcement of the Ordinance as preempted by EPCA. Compl. ¶¶ 75–76. Predictably, the Village sees things differently and insists that EPCA's preemption clause, the meaning of its technical terms, and the broader statutory framework all make clear that EPCA only

[3]The Village disputes these allegations. The Village argues that other work opportunities exist for Local 150 members. Def's Resp. PSOF ¶ 16. The Court need not resolve this factual dispute, as it is immaterial to resolution of the parties' cross-motions.

[4]The Village objects to this allegation on the basis that Clean Energy has not provided adequate evidentiary support. Def's Resp. PSOF ¶ 22. As above, resolution of this factual dispute is unnecessary for resolution of the cross-motions.

preempts local regulations that prescribe the equivalent of a federal energy conservation standard for a covered product's characteristics as manufactured. R. 35, Def.'s Resp./Cx-Memo. at 6.

**IV. Amici Curiae**

Amici Curiae (Amici) are four organizations with interests in preserving the public health and climate benefits of the Village's all-electric new construction ordinance and similar policies beyond the Village. R. 37, Amici Memo. at 1. Amici argue that Clean Energy's expansive reading of EPCA's preemptive reach would completely negate the Village's firmly established authority to reduce air pollution that harms the public health, pursuant to its valid police powers. *Id.* at 2. According to Amici, when analyzing express preemption provisions, the Seventh Circuit applies a presumption against preemption in areas of traditional state regulation. *Id.* at 12 (citing *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 931 (7th Cir. 2018)). This presumption applies here, assert Amici, because the Ordinance is a valid exercise of the Village's traditional police power to regulate public health and safety. *Id.* at 14 (citing *Sutker v. Ill. State Dental Soc.*, 808 F.2d 632, 635-36 (7th Cir. 1986)). Amici argue that even though EPCA's plain language, statutory structure, and legislative history clearly show the Ordinance is not preempted, the Seventh Circuit's presumption against preemption creates an even higher bar —which the Village fails to clear. *Id.*

The parties' fully briefed cross motions for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure are before the Court.[5]

**Legal Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *See Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

[5]The Court heard oral arguments on the respective motions.

## Analysis

### I. Preemption

Given that the parties' cross-motions center on whether the Ordinance is preempted by EPCA, the Court starts with the law of preemption. The Supremacy Clause of the U.S. Constitution provides that the Constitution and laws of the United States shall be the "supreme law of the land." U.S. Const. art. VI, cl.2. The Supremacy clause "invalidates state laws that interfere with, or are contrary to, federal law." *Nelson v. Great Lakes Educ. Loan Servs. Inc.*, 928 F.3d 639, 646 (7th Cir. 2019) (quoting *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 712–713 (1985)). There are three types of preemption: express, field, and conflict. *Id.* At issue here is express preemption, as Clean Energy argues that the Ordinance is expressly preempted by EPCA.

Express preemption exists when Congress clearly declares its intention to preempt state law. *See C.Y. Wholesale, Inc., v. Holcomb,* 965 F.3d 541, 546 (7th Cir. 2020). "In all pre-emption cases, and particularly in those in which Congress has legislated in a field in which the States have traditionally occupied, [courts] must start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up). "Express preemption presents a question of statutory interpretation." *Nelson,* 928 F.3d at 647. The "purpose of Congress is the ultimate touchstone in every pre-emption case."

*Medtronic, Inc., v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted). Congressional intent, of course is "primarily [] discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Id.* (citation omitted). Also relevant "is the structure and purpose of the statute as a whole." *Id.* (citation omitted).

When it comes to the presumption against preemption, the Court agrees with Clean Energy that the presumption should not apply here. The Village does not dispute this principle, but Amici do. *See* R. 48, Def.'s Cx-Reply at 7 n.1; Amici Memo. at 12–14. The Supreme Court and the Seventh Circuit have held that courts should "not invoke any presumption against preemption" in express preemption cases and should "instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)); *see also Planned Parenthood of Indiana, Inc. v. Commr. of Indiana State Dept. Health*, 699 F.3d 962, 984 (7th Cir. 2012). The Court therefore disagrees with Amici that a presumption against preemption should apply here.

## II. The Competing Interpretations

### a. *Clean Energy's Position and* California Restaurant Association[6]

Clean Energy argues that under the plain text of EPCA, the Ordinance is preempted. Pl.'s Memo. Summ. J. at 8. Clean Energy points out that EPCA expressly preempts any "State regulation concerning . . . the energy use of" gas appliances. *Id.*

[6]*California Rest. Ass'n v. City of Berkely*, 89 F. 4th 1094 (9th Cir. 2024).

(quoting 42 U.S.C. §§ 6297(c)). The statutory definitions of key terms, according to Clean Energy, confirm it applies to natural gas bans, such as the Ordinance. *Id*. Clean Energy notes that the Ordinance prohibits any appliance that uses more than zero fossil fuels, which it maintains is "indisputably a quantity." *Id*. at 9 (citation omitted). In short, Clean Energy argues that EPCA preempts state regulations concerning energy use and energy use is defined as a quantity of energy consumed by a consumer. Therefore, the Ordinance's requirement that the "quantity" of energy made by fossil fuels be zero is preempted. In support of this interpretation, Clean Energy relies heavily on *California Rest. Ass'n v. City of Berkely*, 89 F. 4th 1094 (9th Cir. 2024).

In *California Rest. Ass'n*, the plaintiffs challenged a municipal regulation prohibiting the installation of natural gas piping within newly constructed buildings. 89 F. 4th at 1098. The Ninth Circuit held that EPCA preempted the ordinance, reasoning that because "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations," the ordinance impermissibly regulated "energy use" by setting the quantity to be used in new construction at 'zero.'" *Id*. at 1101–02 (emphasis in original). From the majority's point of view, "a building code that prohibits consumers from using natural gas–powered appliances in newly constructed buildings necessarily regulates the quantity of energy directly consumed by the appliances at point of use," which EPCA expressly prohibits. *Id*. at 1102 (cleaned up).

In dissent, Judge Friedland accused the majority of misinterpreting EPCA's key terms "to have colloquial meanings instead of the technical meanings required

by established canons of statutory interpretation." *California Rest. Ass'n*, 89 F. 4th at 1120. The way Judge Friedland saw it, EPCA from its inception was designed to set "uniform appliance efficiency standards" for covered products that proceeded to market, and not to create a "consumer right to use" any covered appliance. *Id.* at 1121. According to Judge Friedland, EPCA is a "technical statute" whose words must be interpreted in accordance with "specialized meanings." *Id.* The critical terms "energy use" and "point of use" must be given their technical and industry-relevant meanings. *Id.* at 1121–23. "Energy use," for example, is a technical term meant to encompass "the typical amount of energy consumed per use cycle or in a given amount of time while the appliance is in operation." *Id.* "Energy use" is a fixed performance standard that "aims to approximate the *typical* energy use of an appliance during operation, the measure does not depend on any given consumer's *actual* use." *Id.* (emphases in original).

Similarly, "point of use," explained Judge Friedland, has a "well-established technical meaning" and does not refer to the place where an appliance is used. *California Rest. Ass'n*, 89 F. 4th at 1124–25. Rather, the technical meaning of the term refers to a way of measuring energy consumption. *Id.* "Point of use" measures "site energy," the energy that is directly consumed by the appliance from the pipe or outlet, and Congress intended for its inclusion to "give a technical instruction" to the DOE and manufacturers upstream in the supply chain. *Id.* Point of use does not expand EPCA's scope to govern the end-user's ability to *use* installed covered products at their intended final destinations. *Id.* Rather, it fits neatly into the statutory

definition of "energy use," which refers to a covered product's characteristics as manufactured.

*b. The Village's Position and* Plumbers[7]

The Village argues that EPCA preempts only those local regulations that create the equivalent of a federal energy conservation standard for a covered product. Def.'s Resp./Cx-Memo. at 6. Because the Ordinance, from the Village's perspective, does not, the Ordinance is not preempted. *Id.* Clean Energy's argument, notes the Village, is premised on "regulation concerning . . . energy use." *Id.* at 7. But "energy use" is a representative measure of how much energy a product typically consumes per use cycle, or over a given period, measured under controlled conditions simulating actual use. *Id.* The Village maintains that energy use is a design characteristic of a product, and a function of how it is manufactured, supplying a fixed value to estimate and describe its performance. *Id.* The Village contends that although the Ordinance restricts, in some circumstances, what appliances new buildings may use, it does not set energy conservation standards and imposes no design requirements. *Id.* at 4–5. In support of this interpretation, the Village relies on *Ass'n of Contracting Plumbers of the City of New York Inc v. City of New York*, 180 F.4th 434 (2d Cir. 2026)[8] (*Plumbers*).

[7]*Ass'n of Contracting Plumbers of the City of New York, Inc v. City of New York*, 180 F.4th 434 (2d Cir. 2026).

[8]*Plumbers* was issued after the parties concluded their briefing and oral argument. The Village cited *Plumbers* as supplemental authority (R. 58) and Clean Energy filed a response (R. 60). In its response/cross-motion, the Village relied on one of the two district court cases the Second Circuit affirmed in *Plumbers*. *See* Def.'s Resp./Cx-Memo. (citing *Ass'n of*

In *Plumbers*, the City of New York and New York State enacted laws that, in effect, prohibited the use of fossil fueled appliances in newly constructed residential buildings. 180 F.4th at 436. Two separate suits were filed, one against the City of New York and one against New York State. The plaintiffs, trade associations and unions, alleged that the laws were preempted by EPCA. *Id.* at 437. The district court in the case against the City granted the City's motion to dismiss; the district court in the case against the State of New York granted summary judgment in favor of the State. Both courts found that EPCA did not preempt the laws, as the laws did not concern the energy use of a covered product. In doing so, the courts declined to adopt the Ninth Circuit's definition of "energy use," and instead adopted Judge Friedland's interpretation of EPCA. *Id.* The Second Circuit affirmed.

The Second Circuit first determined the meaning of "energy use" as used in EPCA. *Plumbers*, 180 F.4th at 439-40. There, as in this case, the plaintiffs argued that the "energy use" of a covered product was "the amount of energy consumed by covered products in the hands of the consumer." *Id.* at 439. The court rejected that interpretation of "energy use." The court noted that manufacturers ascertain an appliance's energy use by using test procedures, the results of which are determinative. *Id.* And those test procedures, from the court's point of view, "are designed to *replicate* the appliance's average use, meaning the tests performed in a controlled setting, not at the appliance's ultimate destination in the hands of consumers." *Id.* (emphasis in original). The court thus found "energy use" to mean "a

---

*Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)).

standardized, fixed measure assigned to a product before it reaches consumers," so "once an appliance has been sold, nothing a consumer does with the appliance changes that appliance's energy use." *Id*. Therefore, reasoned the court, "a regulation that effectively bars the use of a covered appliance by certain consumers, like the challenged laws, has little to do with that appliance's 'energy use.'" *Id*. In short, "'energy use,' as that term is used in the preemption provision, has no effect whatsoever on that appliance's coverage under the challenged laws." *Id*. at 445.

Next, the court looked to the statutory context, meaning the "structure and purpose of the Act." *Plumbers*, 180 F.4th at 440. The court concluded that the statutory context confirmed that "energy use" "refers to a metric determined before an appliance ever reaches consumers, not the energy that appliance uses in the hands of consumers." *Id*. at 441.

The court then turned to the plaintiffs' argument—an argument also advanced by Clean Energy here—that Congress intended to preempt any regulation "concerning" energy use of a covered product under EPCA. *Plumbers*, 180 F.4th at 441-42. Not so, according to the court, which found that "phrases such as 'related to,' and 'concerning' do not endlessly stretch the scope of preemption provisions." *Id*. Based on the definition of energy use, the law neither directly regulates energy use of any covered product, nor does it *concern* the energy use of a covered product. *Id*. at 444-46.

The plaintiffs in *Plumbers* further argued that EPCA's exemptions for certain building codes confirm that preemption applies even if the state or local ordinance

does not regulate appliances directly. 180 F.4th at 447-48. The Second Circuit disagreed that the building code exemptions undermined its interpretation of the preemption provision as applied to the challenged laws. *Id.* For starters, observed the court, "for the exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exception would do no work." *Id*. at 447. The building code regulations were "not the kind of performance standards that Congress was most directly concerned with," but nonetheless had "an impermissible relationship to EPCA's subject matter" because they achieved the goal of regulating the performances of appliances in buildings and also directly "implicate[d] Congress's objectives in maintaining uniform energy conservation standards." *Id.* at 447-48. Therefore, the court found that its interpretation of the preemption provision internally consistent with the building code exemption, and indeed, found that the exemption provision further supported its interpretation. *Id.*

The court also found its interpretation supported by the preemption provision's history, as "it is clear that the challenged laws would not be preempted under the prior versions of [EPCA's] preemption provision," and further amendments "illustrate[] that Congress's revisions to the preemption provision were intended to reinforce the limits of its scope, not broaden them." *Plumbers*, 180 F.4th at 448-49.

Lastly, the Second Circuit disagreed with *California Restaurant Association.* From the court's point of view, the Ninth Circuit's emphasis on "point of use" ignored the second half of the statutory definition of "energy use," which references point of use as "determined in accordance with test procedures under section 6293." *Plumbers*,

180 F.4th at 451. The court found it "simply incompatible" that the statutory definition of "energy use" and reliance on manufacturer test procedures to determine usage would refer to energy an appliance consumes "at its intended final destination." *Id.* (citation omitted).

While the Second Circuit is the latest court to have addressed the issue of preemption by EPCA, it is not the only court to have concluded that EPCA does not preempt state or local ordinances that prohibit the use of fossil fuels such as natural gas and heating fuel in newly constructed residential buildings. *See Nat'l Ass'n of Home Builders of the States v. District of Columbia*, 2026 WL 837674 (D.D.C. Mar. 26, 2026); *Nat'l Ass'n of Home Builders of the U.S. v. Montgomery Cnty*, 2026 WL 817322 (D. Md. Mar. 25, 2026).

**III. EPCA and the Ordinance**

With these considerations in mind, the Court turns to the Ordinance and EPCA. The Court starts with the text of EPCA's preemption clause. The preemption clause provides that "for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c). Applying the tools of statutory construction, the Court finds that EPCA does not preempt the Ordinance.

"Statutory construction . . . is a holistic endeavor." *United Sav. Ass'n of Tex. v. Timers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). When interpreting a statute, courts begin with the language of the statute, "giving the words used their ordinary meaning." *Artis v. District of Columbia*, 583 U.S. 71, 83 (2018) (citation

omitted); *see also Schneider Nat'l Leasing, Inc. v. United States*, 11 F.4th 548, 554, 559 (7th Cir. 2021) (citations omitted). As the Supreme Court has explained, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (citation omitted). In interpreting an express preemption clause, the court must "identify the domain expressly pre-empted" by the statute. *Nelson,* 928 F.3d at 647 (citation omitted).

The Court begins with the term "energy use." "When a statute includes an explicit definition of a term, a court must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (citation omitted) (cleaned up). Recall that EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4). Section 6293 requires that such test procedures be "reasonably designed to produce test results which measure [the] . . . energy use . . . of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Clean Energy maintains that EPCA preempts any regulation of the quantity of energy that a gas appliance consumes. Since the Ordinance bans the use of gas appliances, Clean Energy argues it effectively sets the appliance's consumption to zero, and as such, is preempted. The Village, on the other hand, insists that EPCA preempts energy conservation standards that compete with federal standards, but does not preempt local laws that have nothing to do with energy conservation, such

as the Ordinance. The Court finds that the Village has the better of the argument and in doing so, joins the courts who have declined to adopt Clean Energy's interpretation of "energy use."

The reasoning in *Plumbers* is applicable and persuasive, and the Court agrees with the Second Circuit and the Village that "energy use" in EPCA refers to a predetermined value that is assigned to a product before it reaches consumers. This definition is supported by the statute's explicit direction that "energy use" be determined in accordance with test procedures under section 6293. 42 U.S.C. § 6291(4). The test procedures themselves are designed to produce test results measuring "a representative *average use cycle or period of use*." 42 U.S.C. § 6293 (emphasis added). "Energy use" as preempted in EPCA is thus unimpacted by the actual energy an appliance consumes in the hands of consumers. Whether that use is zero is irrelevant under the statute. Because the Ordinance here regulates the types of energy or fuel that covered appliances may use in certain buildings, rather than establishing or affecting the appliances' federally regulated energy-efficiency or energy-use performance standards, the Ordinance does not "concern" energy use under EPCA. The Court further finds that the Ordinance does not create the type of conflicting product standards or burdens on manufacturers that EPCA's preemption provision was intended to prevent and therefore falls outside the statute's preemptive scope.

And, like the Second Circuit in *Plumbers*, the Court finds that EPCA's building code exemption supports the Court's reading of its preemption provision. The

provision states that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [that] covered [consumer] product" is not preempted if seven requirements are met. 42 U.S.C. § 6297(f)(3). It is important to note that the regulations covered by the exemption are different from the kind of energy conservation standards that primarily concerned Congress—the regulations covered by the building code exemption are building-wide and operate through incentives. *See Plumbers*, 180 F.4th at 447. Regardless, as other courts have noted, the "legislative history of the building code exception to preemption confirms that Congress wanted to ensure that state building codes could not frustrate national uniformity in appliance standards by requiring the installation of products whose efficiencies exceeded federal standards." *Maryland Bldg. Indus. Ass'n, Inc. v. McIlwain*, 828 F. Supp. 3d 617, 637 (D. Md. 2026). The building code exemption illustrates that Congress intended to preempt regulations that mandate installation of appliances with energy efficiency exceeding predetermined federal standards. This is in line with the Court's interpretation of EPCA's "energy use": a predetermined value that is assigned to a product before it reaches consumers. Regulations that require the use of appliances with energy efficiencies exceeding federal standards are preempted. The Ordinance is not one such regulation.

## Conclusion

For the foregoing reasons, the Court finds that the Ordinance is not preempted under EPCA. Accordingly, the Court denies Plaintiff's motion for summary judgment [R. 27] and grants Defendant's cross-motion for summary judgment [R. 34].

Dated: July 30, 2026

United States District Judge
Franklin U. Valderrama