No. 26-2715

# United States Court of Appeals for the Seventh Circuit

CLEAN ENERGY CHOICE COALITION, NFP,

*Plaintiff-Appellant*,

v.

VILLAGE OF OAK PARK, ILLINOIS

*Defendant-Appellee*,

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:25-cv-04353
The Honorable Franklin U. Valderrama, District Judge

## DEFENDANT-APPELLEE'S ANSWERING BRIEF


Tony S. Fioretti
*Counsel of Record*
VILLAGE OF OAK PARK
123 Madison St.
Oak Park, IL 60302
(708) 358-5666
tony.fioretti@oak-park.us

Thomas Cmar
EARTHJUSTICE
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 257-9338
tcmar@earthjustice.org

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
(202) 793-5820
ldavisstermitz@earthjustice.org

Timothy R. Oberleiton
EARTHJUSTICE
1250 I St. N.W., Floor 4
Washington, DC 20005
(202) 667-4500
toberleiton@earthjustice.org

*Counsel for Defendant-Appellee Village of Oak Park, Illinois*


*Additional counsel on inside cover*

Gail L. Reich
ELROD FRIEDMAN LLP
350 N. Clark St., 2nd Floor
Chicago, IL 60654
(312) 528-5200
gail.reich@elrodfriedman.com

*Counsel for Defendant-Appellee Village of Oak Park, Illinois*

Save As Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition NFP v. Village of Oak Park

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Village of Oak Park

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Elrod Friedman LLP
Earthjustice

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and
N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

---

Attorney's Signature: /s/ Tony S. Fioretti Date: 9/30/26

Attorney's Printed Name: Tony S. Fioretti

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ☑ No ☐

Address: Village of Oak Park, Law Department, 123 Madison Street, Oak Park, Illinois 60302

Phone Number: (708) 358-5660 Fax Number: (708) 358-5106

E-Mail Address: Tony.Fioretti@oak-park.us

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition, NFP v. Village of Oak Park

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Village of Oak Park, Illinois

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Earthjustice; Village of Oak Park; Elrod Friedman, LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: [signature] Date: 9/29/2026

Attorney's Printed Name: Linnet Davis-Stermitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 810 3rd Avenue, Suite 610
Seattle, WA 98104

Phone Number: (202) 793-5820 Fax Number: 415-217-2040

E-Mail Address: ldavisstermitz@earthjustice.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition, NFP v. Village of Oak Park

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Village of Oak Park, Illinois

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Earthjustice; Village of Oak Park; Elrod Friedman, LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: /s Thomas Cmar Date: September 29, 2026

Attorney's Printed Name: Thomas Cmar

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 311 S. Wacker Dr., Suite 1400
Chicago, IL 60606

Phone Number: (312) 257-9338 Fax Number: (312) 667-8961

E-Mail Address: tcmar@earthjustice.org

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition, NFP v. Village of Oak Park

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Village of Oak Park, Illinois

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Earthjustice; Village of Oak Park; Elrod Friedman, LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: /s/ Timothy R. Oberleiton Date: September 29, 2026

Attorney's Printed Name: Timothy R. Oberleiton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 1250 I (Eye) Street, NW, Fourth Floor
Washington, DC 20005

Phone Number: (202) 793-5820 Fax Number: (202) 667-2356

E-Mail Address: toberleiton@earthjustice.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2715

Short Caption: Clean Energy Choice Coalition, NFP v. Village of Oak Park

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Village of Oak Park, Illinois

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Earthjustice; Village of Oak Park; Elrod Friedman, LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: /s/ Gail L. Reich Date: November 13, 2026

Attorney's Printed Name: Gail L. Reich

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: 350 N Clark St., 2nd Floor
Chicago, IL 60654

Phone Number: 312-528-5200 Fax Number:

E-Mail Address: gail.reich@elrodfriedman.com

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE CASE ........ 3

A. Statutory Background ........ 3

1. An Energy Supply Crisis Prompts Congress To Establish A Comprehensive Energy Conservation Program. ........ 3

2. Congress Re-orients EPCA Around Mandatory Energy Efficiency Standards. ........ 6

3. Congress Enacts EPCA As We Know It Today. ........ 7

B. Factual Background ........ 10

C. Procedural Background ........ 12

SUMMARY OF ARGUMENT ........ 13

ARGUMENT ........ 18

I. EPCA Preempts Regulations Establishing Appliance Energy Performance Standards And Similar Rules ........ 18

A. EPCA Preempts State And Local Laws Concerning Appliances' Excessive Energy Use. ........ 18

B. Oak Park's Code Amendments Do Not Restrict Excessive Energy Use. ........ 24

II. The Coalition's Interpretation of EPCA Contradicts Text, Context, and Common Sense. ........ 27

A. The Coalition's "Colloquial" Understanding Of "Energy Use" Is Unmoored From EPCA's Carefully Designed Statutory Text. ........ 28

B. The Coalition's Construction Of "Energy Use" Adopts An Incoherent Understanding Of "Quantity." ........ 36

## TABLE OF CONTENTS—Continued.

**Page**


C. The Word "Concerning" Does Not Transform Congress's Definition of "Energy Use." .................................................. 38

D. The Plain Meaning of EPCA's Preemption Clauses Does Not Render the Building Code Exemption Superfluous. ............ 41

E. EPCA's Waiver Provision Only Confirms the Coalition's Error. ........................................................................ 46

F. EPCA's History Reflects A Sustained Focus On Preempting State Conservation Standards And Similar Laws. ...................... 53

G. The Coalition's Policy Concerns Should Be Addressed to Congress. ....................................................................... 59

III. The Presumption Against Preemption Underscores That EPCA Does Not Preempt The Village's Code Amendments. ......................... 61

CONCLUSION ........................................................................... 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev't Comm'n*,
410 F.3d 492 (9th Cir. 2005) ....................3, 7, 23

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) .................... 61

*Ass'n of Contracting Plumbers v. City of New York*,
180 F.4th 434 (2d Cir. 2026) .................... 5, 13, 16, 18, 20, 24, 26, 30–32, 38–40, 50, 54, 59

*Ass'n of Contracting Plumbers, Inc. v. City of New York*,
2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) .................... 51

*Beeler v. Saul*,
977 F.3d 577 (7th Cir. 2020) .................... 51

*Bradley v. Village of University Park*,
59 F.4th 887 (7th Cir. 2023) .................... 26

*Building Indus. Ass'n v. Wash. State Bldg. Code Council*,
683 F.3d 1144 (9th Cir. 2012) .................... 42

*Cal. Restaurant Ass'n v. Berkeley*,
89 F.4th 1094 (9th Cir. 2024) .................... 12, 25, 28, 33, 40

*Colo. Apartment Ass'n v. Ryan*,
2026 WL 2935963 (D. Colo. Sep. 30, 2026) .................... 52

*Corning Glass Works v. Brennan*,
417 U.S. 188 (1974) .................... 34

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) ....................18, 47

*Dubin v. United States*,
599 U.S. 110 (2023) .................... 40

*FDA v Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................24, 50

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Happel v. Guilford Cnty. Bd. of Educ.*,
913 S.E.2d 174 (N.C. 2025) .................................................................. 62

*Justice v. CSX Transp., Inc.*,
908 F.2d 119 (7th Cir. 1990) ................................................................ 26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................. 58

*Lupian v. Joseph Cory Holdings LLC*,
905 F.3d 127 (3d Cir. 2018).................................................................. 62

*Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*,
828 F. Supp. 3d 617 (D. Md. 2026) ..................................................... 52

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ............................................................................. 18

*Monsalvo v. Bondi*,
604 U.S. 712 (2025) ............................................................................. 58

*Mulhern Gas Co. v. Mosley*,
798 F.Supp. 3d 304 (N.D.N.Y. 2025) .................................................. 51

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004)...........................................................3, 6, 7

*Nat. Res. Def. Council, Inc. v. Herrington*,
768 F.2d 1355 (D.C. Cir. 1985) ........................................................ 3, 7

*Nat'l Ass'n of Home Builders v. District of Columbia*,
2026 WL 837674 (D.D.C. Mar. 26, 2026)............................................ 52

*Nat'l Ass'n of Home Builders v. Montgomery County*,
2026 WL 817322 (D. Md. Mar. 25, 2026)............................................ 52

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ............................................................................. 59

*Rest. Law Ctr. v. Denver*,
2026 WL 2908083 (D. Colo. Aug. 7, 2026)......................................... 52

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*,
184 F.4th 1094 (9th Cir. 2026)............................................................52

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012)............................................................51

*Schanzenbach v. Town of Opal*,
706 F.3d 1269 (10th Cir. 2013)............................................................61

*Scurlock v. City of Lynn Haven*,
858 F.2d 1521 (11th Cir. 1988)............................................................60

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017)............................................................26

*United States ex rel. Streck v. Eli Lilly & Co.*,
152 F.4th 816 (7th Cir. 2025)............................................................51

*United States v. Miller*,
604 U.S. 518 (2025)............................................................41

*United States v. Uriarte*,
975 F.3d 596 (7th Cir. 2020)............................................................36

*United States v. Williams*,
106 F.4th 639 (7th Cir. 2024)............................................................34

*Van Buren v. United States*,
593 U.S. 374 (2021)............................................................34

*Watson v. United States*,
552 U.S. 74 (2007)............................................................37

*Wedermeyer v. CSX Transp., Inc.*,
850 F.3d 889 (7th Cir. 2017)............................................................26

*Williams v. Dieball*,
724 F.3d 957 (7th Cir. 2013)............................................................26

*Ye v. GlobalTranz Enters., Inc.*,
74 F.4th 453 (7th Cir. 2023)............................................................61

**Page(s)**

*Zero Zone, Inc. v. DOE*,
832 F.3d 654 (7th Cir. 2016) .......................................................... 21

**Statutes**

42 U.S.C. § 5403

42 U.S.C. § 5403(a) .......................................................... 60

42 U.S.C. § 5403(d) .......................................................... 60

42 U.S.C. § 5403(g) .......................................................... 60

42 U.S.C. § 6291

42 U.S.C. § 6291(1) .......................................................... 5, 37

42 U.S.C. § 6291(1)(B) .......................................................... 21

42 U.S.C. § 6291(2) .......................................................... 37

42 U.S.C. § 6291(3) .......................................................... 37

42 U.S.C. § 6291(4) .......................................................... 1, 5, 15, 19, 29, 37

42 U.S.C. § 6291(5) .......................................................... 5

42 U.S.C. § 6291(6) .......................................................... 21

42 U.S.C. § 6291(8) .......................................................... 30

42 U.S.C. § 6293

42 U.S.C. § 6293(b)(3) .......................................................... 5, 19, 22, 37

42 U.S.C. § 6293(b)(4) ..........................................................22, 30

42 U.S.C. § 6293(c)(1) .......................................................... 22

42 U.S.C. § 6293(c)(2) .......................................................... 22

42 U.S.C. § 6294

42 U.S.C. § 6294(c)(1)(A) .......................................................... 22, 29, 30

**Page(s)**

42 U.S.C. § 6295
42 U.S.C. § 6295 .......... 21
42 U.S.C. § 6295(b) .......... 45
42 U.S.C. § 6295(o) .......... 47
42 U.S.C. § 6295(o)(2)(B) .......... 48
42 U.S.C. § 6296
42 U.S.C. § 6296(d)(1) .......... 30
42 U.S.C. § 6297
42 U.S.C. § 6297(b) .......... 56
42 U.S.C. § 6297(b)(1)(A) .......... 10, 49
42 U.S.C. § 6297(c) .......... 1, 9, 10, 13, 19, 23, 53, 56
42 U.S.C. § 6297(c)(1) .......... 10
42 U.S.C. § 6297(c)(4) .......... 10
42 U.S.C. § 6297(c)(5) .......... 10
42 U.S.C. § 6297(c)(6) .......... 10
42 U.S.C. § 6297(c)(7) .......... 10
42 U.S.C. § 6297(c)(8) .......... 10
42 U.S.C. § 6297(c)(9) .......... 10
42 U.S.C. § 6297(d) .......... 16
42 U.S.C. § 6297(d)(1)(A) .......... 55
42 U.S.C. § 6297(d)(1)(B) .......... 46, 48, 50
42 U.S.C. § 6297(d)(1)(C) .......... 46, 50
42 U.S.C. § 6297(d)(4) .......... 47
42 U.S.C. § 6297(f) .......... 41

**TABLE OF AUTHORITIES—Continued**

**Page(s)**


42 U.S.C. § 6297(f)(3)(A) .......... 41

42 U.S.C. § 6297(f)(3)(B) .......... 41, 43

42 U.S.C. § 6297(f)(3)(C) .......... 41, 43

42 U.S.C. § 6297(f)(3)(D) .......... 41, 43

42 U.S.C. § 6297(f)(3)(E) .......... 41, 43

42 U.S.C. § 6297(f)(3)(F) .......... 41

42 U.S.C. § 6297(f)(3)(G) .......... 41

42 U.S.C. § 6297(g) .......... 15, 22, 31

42 U.S.C. § 6311

42 U.S.C. § 6311 .......... 37

42 U.S.C. § 6311(4) .......... 15, 19

42 U.S.C. § 6311(18) .......... 21

42 U.S.C. § 6313

42 U.S.C. § 6313 .......... 21

42 U.S.C. § 6313(a)(6)(A) .......... 42

42 U.S.C. § 6314

42 U.S.C. § 6314 .......... 19

42 U.S.C. § 6314(a)(2) .......... 22

42 U.S.C. § 6314(a)(3) .......... 22

42 U.S.C. § 6315

42 U.S.C. § 6315 .......... 22

42 U.S.C. § 6315(b) .......... 29, 30

42 U.S.C. § 6316

42 U.S.C. § 6316(b)(2) .......... 10

**Page(s)**

42 U.S.C. § 6316(b)(2)(A) .......... 13, 19, 22

Energy Policy and Conservation Act,
Pub. L. No. 94-163, 89 Stat. 871 (1975) .......... 4

§ 321(a)(4) .......... 4

§ 321(a)(5) .......... 4

§ 321(a)(6) .......... 5

§ 323(b) .......... 4

§ 325(a)(1)(A) .......... 5

§ 325(a)(4) .......... 5

§ 325(a)(5) .......... 5

§ 325(b) .......... 5

§ 325(c) .......... 5

§ 327(a) .......... 53

§ 327(a)(1) .......... 5

§ 327(a)(2) .......... 6

§ 327(b)(2) .......... 6

National Energy Conservation and Policy Act,
Pub. L. No. 95-619, 92 Stat. 3206 (1978) .......... 6

§ 421 .......... 6

§ 422 .......... 6

§ 424(a) .......... 6, 7, 53, 55

National Appliance Energy Conservation Act of 1987,
Pub. L. No. 100-12, 101 Stat. 103 .......... 7

§ 2(a) .......... 8

§ 5 .......... 7, 8

## TABLE OF AUTHORITIES—Continued

**Page(s)**


§ 7 .......... 8, 9

Energy Policy Act of 1992,
Pub. L. No. 102-486, 106 Stat. 2772 .......... 9

§ 122 .......... 9

§ 123 .......... 9

20 ILCS 3125/15 (2022) .......... 42

425 ILCS 65/8 (2026) .......... 48

425 ILCS 65/9 (2026) .......... 48

**Regulations**

10 C.F.R. § 429.12(a) (2026) .......... 22

10 C.F.R. § 430.32(a) (2026) .......... 21

10 C.F.R. § 430.32(b)(1) (2026) .......... 21

10 C.F.R. § 430.32(e)(1)(i) (2026) .......... 25

10 C.F.R. § 430.32(e)(1)(ii) (2026) .......... 25

10 C.F.R. § 430.32(h)(3)(iv) (2026) .......... 31

10 C.F.R. § 430.32(j) (2026) .......... 21

16 C.F.R. § 305.17(a)(9) (2026) .......... 30

42 Fed. Reg. 20012 (Apr. 15, 1977) .......... 33

47 Fed. Reg. 14424 (Apr. 2, 1982) .......... 33, 57, 58

47 Fed. Reg. 57198 (Dec. 12, 1982) .......... 57, 58

75 Fed. Reg. 6474 (Feb. 9, 2010) .......... 11

75 Fed. Reg. 59470 (Sep. 27, 2010) .......... 57

76 Fed. Reg. 51281 (Aug. 18, 2011) .......... 20

86 Fed. Reg. 66403 (Nov. 23, 2021) .......... 49

88 Fed. Reg. 36368 (June 2, 2023) .......... 42

Page(s)

**Other Authorities**

ILECC § C401.2.1 (2021) .......... 42, 44
ILECC § C403.5 (2021) .......... 44
ILECC § C403.5 (2024) .......... 44
ILECC § C406.1 (2021) .......... 44
ILECC § C406.2 (2021) .......... 43, 44
ILECC § C406.2.2.3 (2021) .......... 44
ILECC § C406.2.4 (2021) .......... 42
Oak Park Vill. Code § 7-1-1(A) .......... 10
Oak Park Vill. Code § 7-1-2 .......... 11
Oak Park Vill. Code § 7-6-1(A) .......... 10
Oak Park Vill. Code § 7-6-2 .......... 11
H.R. 6089, 118th Cong. § 2(a) (2023) .......... 60
H.R. Rep. No. 94-340 (1975) .......... 3, 4
H.R. Rep. No. 95-1751 (1978) .......... 6
H.R. Rep. No. 100-11 (1987) .......... 8, 41, 42, 46, 47, 56
S. Rep. No. 100-6 (1987) .......... 8, 56
144 Cong. Rec. S12706 (1998) .......... 33, 36
Cong. Rsch. Serv., Comm. Print 95-46, *The National Energy Plan* (Apr. 1978), https://bit.ly/4ztaImy .......... 33
Cong. Rsch. Serv., Comm. Print 95-51, *Energy and the Economy* (Apr. 1978), https://bit.ly/3Vx1szE .......... 33
*Emergency Petroleum Allocation Extension Act of 1974: Hearing on S. 3717 Before the Comm. on Interior & Insular Affs.,* 93 Cong., https://bit.ly/3VoXp8y .......... 35

**Page(s)**

Energy Res. Conservation & Dev. Comm'n, *Energy Conservation Standards for Nonresidential Buildings* (May 27, 1977)................................ 34

EPA, *Understanding the Issue: Household Energy and Clean Air* (last updated Sept. 30, 2026), https://bit.ly/4t3LhX4.................................... 11

Fed. Energy Admin., *Comparison of Energy Consumption Between West Germany and the United States* (June 1976), https://bit.ly/4zjMESR.......... 33

Fed. Energy Admin., *Project Independence* vol. 1 (Nov. 1974), https://bit.ly/4zlLRkc........................................................................ 33

*Fire Kills 3 Children; Space Heater Blamed*, Chi. Trib. (Dec. 28, 1985), http://bit.ly/4nfuCfl ........................................................................ 48

Nat. Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards* (2009) ........................................................ 33

*Random House Dictionary of the English Language* (1987) ................................ 21

*Space-Heater Fire Deaths Up*, Chi. Trib. (Jan. 10, 1986), http://bit.ly/46EBYD9 ...................................................................... 48

## INTRODUCTION

The Energy Policy and Conservation Act spells out exactly what regulations it preempts. Once the Department of Energy adopts an energy conservation standard for a consumer or industrial product, state and local governments cannot enact laws that likewise "concern[]" the "quantity of energy" the product is designed to consume. 42 U.S.C. §§ 6297(c), 6291(4). For decades, there was no dispute about what that meant: State and local governments cannot attempt to set their own energy conservation standards, but EPCA does not intrude on their wide latitude to address any of the public health and safety risks that EPCA-covered products pose.

But the Clean Energy Choice Coalition now insists that Congress did not stop there. As the Coalition sees it, Congress also swept aside all regulations that restrict where a covered product may be used. Because these laws could be described as setting a cap of "zero" on the "quantity of energy" a product can consume, they "concern" energy use and are preempted. With this convoluted reading, the Coalition attempts to stop the Village of Oak Park from protecting its residents from the health and safety risks of indoor fossil-fuel combustion. But the Coalition's logic applies equally to fire-safety regulations, noise ordinances, and zoning laws. And since the Department of Energy has no power over those issues, the Coalition's interpretation, if accepted, would create

a regulatory no-mans-land where *no one* could regulate many of the dangers of consumer and industrial products.

Only the Ninth Circuit has adopted this view of EPCA's preemption provision—and even then, eleven judges noted their disagreement. Until last year, the federal government had long rejected it. And no wonder: As every other court to address the issue has concluded, the Coalition's theory departs from the text Congress chose and clashes with the structure Congress established. Congress used "energy use" to refer to a fixed design characteristic that specifies how a product performs under representative testing conditions, not to sweep aside all regulations affecting the product once it leaves the factory floor. Congress incorporated that understanding into every component of EPCA's carefully calibrated statutory scheme. If Congress had intended instead to declare open season on state health and safety regulations, surely it would have said so. The district court was correct to reject the Coalition's theory, and this Court should affirm.

## JURISDICTIONAL STATEMENT

The jurisdictional summary in the Coalition's amended brief is correct.

## STATEMENT OF THE CASE

### A. Statutory Background

#### 1. An Energy Supply Crisis Prompts Congress To Establish A Comprehensive Energy Conservation Program.

Congress enacted EPCA to reduce the country's energy consumption. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev't Comm'n*, 410 F.3d 492, 498–99 (9th Cir. 2005) ("*ACRI*"). After the oil embargo of the early 1970s "vividly illustrat[ed]" the vulnerabilities of our energy economy, *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985), Congress took up the President's challenge to adopt a "far-reaching energy conservation program," *id.* at 1364 (quoting 11 Weekly Comp. Pres. Doc. 40, 41 (Jan. 20, 1975)). Home appliance efficiency was key to this effort. Residential energy consumption represented some 17% of the nation's energy demand, much of which powered products like water heaters and kitchen equipment. H.R. Rep. No. 94-340, at 94 (1975). Congress "set about improving the energy efficiency" of the thirteen biggest offenders, to be supplemented by any that "similarly contributed to energy demand." *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004).

When Congress first enacted EPCA in 1975, it sought appliance energy savings through voluntary action. Hoping that "better informed consumers" would make mandatory limits "unnecessary," *ACRI*, 410 F.3d at 499, it required

manufacturers to label "covered products"—consumer products that "consume energy," *see* Energy Policy and Conservation Act, Pub. L. No. 94-163, §§ 321(a)(1)–(2), 322, 89 Stat. 871, 917–19 (1975)—with measures of their "energy use" or "energy efficiency."

These terms capture two ways of assessing products' energy consumption. The first, "energy use," applies to products that operate more or less constantly (like refrigerators). It is measured as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with" prescribed "test procedures." EPCA § 321(a)(4), 89 Stat. at 917. Energy efficiency, by contrast, measures how much energy a product needs to perform a particular task (like drying a load of clothes). It is defined as "the ratio of the useful output of services from a consumer product to the energy use of such product," also "determined" by specified "test procedures." *Id.* § 321(a)(5), 89 Stat. at 917. To establish those test procedures, Congress required the Federal Energy Administration to set standardized rules for determining each product's "energy efficiency, energy use, or estimated annual operating cost . . . during a representative average use cycle." *Id.* § 323(b), 89 Stat. at 919–20; *see* H.R. Rep. No. 94-340 at 96–97. And by requiring that "energy use" measurements be taken at "point of use," Congress directed the agency to focus on the energy a product consumes itself—not the energy expended to generate or transmit that

energy. *Ass'n of Contracting Plumbers v. City of New York*, 180 F.4th 434, 451–52 (2d Cir. 2026).[1]

The initial EPCA combined this labeling regime with two ways to increase efficiency over time. The agency started with "energy efficiency improvement target[s]" for each covered product. EPCA § 325(a)(1)(A), 89 Stat. at 924. But if further improvements were technologically feasible and economically justifiable—and labeling was not on track to produce them—the agency could set an "energy efficiency standard" that would "prescribe[] a minimum level of energy efficiency for a covered product." *Id.* § 325(a)(4)(B)–(a)(5), (b)–(c), 89 Stat. at 924–25; *see id.* § 321(6), 89 Stat. at 917.

Finally, Congress gave its new program primacy over state labeling or efficiency requirements. State-imposed energy consumption disclosure requirements and alternative testing procedures were "supersede[d]." *Id.* § 327(a)(1), 89 Stat. at 926. So were state regulations setting any "energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product" that was "not identical to" an applicable

---

[1] As we discuss below, Congress has reworked parts of EPCA. But not these: The definitions of energy use and energy efficiency remain unchanged, *see* 42 U.S.C. § 6291(4)–(5), and provisions defining "covered product" and the essential requirements for testing procedures nearly so, *id.* §§ 6291(1), 6293(b)(3).

federal standard. *Id.* § 327(a)(2), 89 Stat. at 926–27. At the same time, Congress made preemption waivable if a State demonstrated that it needed a more stringent standard that did not burden interstate commerce. *Id.* § 327(b)(2), 89 Stat. at 927.

### 2. Congress Re-orients EPCA Around Mandatory Energy Efficiency Standards.

After three years, Congress grew "impatient" with its initial approach and enacted the National Energy Conservation and Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978). *Abraham*, 355 F.3d at 185–86. The new statute required "the recently created [Department of Energy to] proceed directly to establishing" the mandatory efficiency standards the original EPCA had made only optional. *Id.* at 186; *see* Pub. L. No. 95-619 § 422, 92 Stat. at 3259–62.

Congress aligned the rest of EPCA with the new standards-focused regime. That included minor adjustments to test procedures, *id.* § 421, 92 Stat. at 3257–58, and a periodic reevaluation requirement, *id.* § 422, 92 Stat. at 3261. And Congress tweaked EPCA's approach to state regulations. State laws that imposed their own labeling or testing requirements or that set conflicting efficiency standards remained superseded. *See id.* § 424(a), 92 Stat. at 3263–64 (leaving 42 U.S.C. § 6397(a) untouched). To that group Congress added a period of "automatic preemption" for products awaiting federal efficiency standards. H.R. Rep. No. 95-1751, at 117 (1978). Moving forward, EPCA

would preempt any new state regulation "respecting energy use or energy efficiency of a . . . covered product[]," and any existing regulation if a manufacturer petitioned for that result. NECPA § 424(a), 92 Stat. at 3263–64. Congress continued to authorize the Department to waive preemption. *Id.*

### 3. Congress Enacts EPCA As We Know It Today.

In 1987, Congress intervened again, this time through the National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 5, 101 Stat. 103. To Congress's frustration, in the preceding decade, the Department of Energy had declined to adopt energy efficiency standards at all. *Herrington*, 768 F.2d at 1368. Instead, it had "adopted [a] policy of . . . 'no-standard' standards" while granting waiver after waiver to state and local governments. *ACRI*, 410 F.3d at 499 (quoting S. Rep. No. 100-6, at 4 (1987)). The result was exactly what Congress had sought to avoid: A "significant amount of the nation's energy demand . . . continued to be attributable to home appliances," while a "growing patchwork of state efficiency standards had proliferated." *Abraham*, 355 F.3d at 187 n.3. Congress designed NAECA to solve both problems.

First, Congress adopted a set of uniform standards. Now dubbed "energy conservation standards," these standards encompassed both (1) "performance standard[s]" that "prescribe[] a minimum level of energy efficiency or a maximum quantity of energy use for a covered product, determined in

accordance with test procedures" and (2) "design requirement[s]" for certain products. NAECA § 2(a), 101 Stat. at 103 (codified at 42 U.S.C. § 6291(6)). Congress set thirteen itself and authorized the Department to set (and then update) others. *Id.* § 5, 101 Stat. at 107–15 (codified at 42 U.S.C. § 6295(o)(4)).

Meanwhile, to counteract the problem of "separate State appliance standards," S. Rep. No. 100-6, at 4, Congress revised EPCA's preemption regime. For its core preemption rule, Congress "follow[ed] substantially the preemption requirements in current EPCA." H.R. Rep. No. 100-11, at 23–24 (1987). State testing and labeling requirements were still preempted. NAECA § 7, 101 Stat. at 117–18 (codified at 42 U.S.C. § 6297(a)). And once a product was governed by an energy conservation standard, "no State regulation concerning" the product's "energy efficiency or energy use" could "be effective." *Id.* § 7, 101 Stat. at 118 (codified at 42 U.S.C. § 6297(c)). But Congress "significantly" raised the bar for a waiver. H.R. Rep. No. 100-11, at 24. Among other things, states must identify "unusual and compelling State or local energy interests" that are "substantially different in nature or magnitude than those prevailing in the United States generally." NAECA § 7, 101 Stat. at 118–19 (codified as amended at 42 U.S.C. § 6297(d)(B)–(C)).

Congress also tailored EPCA preemption in two specific contexts. First, it exempted any "more stringent" "procurement standards" states may set for

themselves. *Id.* § 7, 101 Stat. at 120 (codified at 42 U.S.C. § 6297(e)). Second, Congress clarified how EPCA applied to the growing universe of state or local building codes. *Id.* § 7, 101 Stat. at 121 (codified at 42 U.S.C. § 6297(f)).

Finally, Congress added one more safeguard for manufacturers: a warranty to prevent consumers from misinterpreting product labels. Those disclosures do not "create an express or implied warranty under State or Federal law" that the energy efficiency they describe—or energy use or estimated annual operating cost they entail—will be met "under conditions of actual use." *Id.* § 7, 101 Stat. at 122 (codified at 42 U.S.C. § 6297(g)).

While Congress enacted further amendments over time, it has retained EPCA's basic framework. In 1992, it expanded the statute to add energy conservation standards for certain industrial equipment and plumbing fixtures and expanded the statute's preemption scheme accordingly. *See* Energy Policy Act of 1992, Pub. L. No. 102-486, §§ 122–23, 106 Stat. 2772, 2806–32. The end result of Congress's tinkering with EPCA preemption is a few "general rule[s] of preemption for energy conservation standards." 42 U.S.C. § 6297(c). The core provision applies "when [a] Federal standard becomes effective." *Id.* For consumer appliances, "effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy

use, or water use of such covered product shall be effective with respect to such product." *Id.*[2] A similar bar applies even "before [a] Federal standard becomes effective" to most regulations adopted after NAECA was enacted. *Id.* § 6297(b)(1)(A). And industrial appliances are subject to an almost-identical version of the first rule. *Id.* § 6316(b)(2).

### B. Factual Background

The Village of Oak Park is a municipality in western Cook County. Like municipalities throughout the country, it maintains building and residential codes designed to ensure that buildings and homes are safely designed, constructed, and maintained. *See* Oak Park Vill. Code §§ 7-1-1(A), 7-6-1(A).

In August 2022, the Village modified those codes for new construction. S.A. 2–3. The Village adopted the changes as part of Climate Ready Oak Park, a comprehensive plan designed to make the Village more sustainable, healthy, and resilient. Dkt. 34-1 at 1–2. After several years of study, including a vulnerability assessment and extensive public outreach, the Village concluded that fossil-fuel combustion placed its residents' health, safety, and welfare at risk. *Id.*; *see* S.A. 2. Due to the Village's older building stock, buildings—and the appliances within them—were a key part of the problem. S.A. 2.

---

[2] The statute includes other exemptions not relevant here. *See, e.g.*, 42 U.S.C. § 6297(c)(1), (4)–(9).

Appliance fossil-fuel combustion causes dangers in and outside the home. As the Environmental Protection Agency has explained, some of the risk comes from direct exposure to appliance emissions, *see, e.g.*, EPA, *Understanding the Issue: Household Energy and Clean Air* (last updated Sept. 30, 2026), https://bit.ly/4t3LhX4, which can lead to asthma, heart disease, and chronic lung function impairment, *see, e.g.*, 75 Fed. Reg. 6474, 6479-80 (Feb. 9, 2010). But other consequences are more diffuse. The Village's fossil-fuel appliances emit greenhouse gases that lead to higher ground-level ozone in the immediate vicinity, compounding local pollution problems. Dkt. 34-1 at 1–2. They also contribute to changes in global climate that fuel increasingly frequent heat waves, droughts, and flash floods. *Id.*

The Village amended its building and residential codes to counteract these risks. *See id.* at 2–4. Moving forward, the "source of energy" for all new buildings and residences "shall not be fossil fuels" (with exemptions for "emergency backup power and commercial kitchens"). Oak Park Vill. Code §§ 7-1-2 at P301.1, 7-6-2 at X301.1.1. Nor can new buildings or residences employ "directly piped exterior gas fire pits" or "gas cooking grills whose source of energy [is] fossil fuels." S.A. 3 (quoting Oak Park Vill. Code §§ 7-1-2 at P.301.1.10, 7-6-2 at X301.1.8). The result is a revised code designed to make Oak Park buildings safer for those who live or work in them.

### C. Procedural Background

Oak Park's code amendments took effect on January 1, 2024. S.A. 3. Clean Energy Choice Coalition, an organization that represents members who sell natural gas services and appliances, S.A. 5–6, filed this action in April 2025, Dkt. 1.

The parties then briefed cross-motions for summary judgment. *See* S.A. 10–13. The Coalition sought a declaratory judgment and an injunction barring Oak Park from enforcing its restrictions on the use of fossil fuels and fossil-fuel-powered appliances. S.A. 5–7, 10–11. The Coalition did not argue that the code amendments set local energy conservation or design standards—or, indeed, that they regulate how appliances may be designed at all. *See generally* Dkts. 28, 46. Instead, invoking the U.S. Court of Appeals for the Ninth Circuit's reasoning in *California Restaurant Ass'n v. Berkeley*, 89 F.4th 1094, 1102 (9th Cir. 2024), the Coalition contended that EPCA is equally "concerned with the end-user's ability to *use* installed covered products at their intended final destinations." S.A. 11 (quoting *Berkeley*, 89 F.4th at 1101–02). While EPCA preempts only regulations "concerning . . . energy use," under the Coalition's reading, restrictions on installing covered appliances did just that—any appliance prohibition sets the "quantity of energy" an appliance may consume to "zero." S.A. 10–11. Based

on this theory, the Coalition claimed that Oak Park's fossil-fuel appliance restrictions were federally preempted. *Id.*

The district court disagreed and granted summary judgment for the Village. S.A. 17–21. Since the *Berkeley* decision, the district court explained, other courts across the country—including the Second Circuit in *Association of Contracting Plumbers*, 180 F.4th at 434—have repeatedly rejected the Coalition's position. S.A. 13–17. As they each explained, EPCA's nested definitions make "energy use" a "predetermined value that is assigned to a product before it reaches consumers"—not the "*actual* energy an appliance consumes" in consumers' hands. S.A. 19 (emphasis added). As a result, whether that ultimate use is, in some sense, "zero" is "irrelevant under the statute." *Id.* The rest of EPCA's statutory language, together with the statute's context and history, underscore that understanding. S.A. 19–20. EPCA thus preempts regulations that, directly or indirectly, "mandate installation of appliances with energy efficiency exceeding predetermined federal standards." *Id.* But it has no bearing on electrification requirements like Oak Park's.

## SUMMARY OF ARGUMENT

**I.A.** EPCA says what it preempts: state or local regulations that "concern[] the . . . energy use" of a covered product. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). And it says what "energy use" means: the quantity of energy a

product consumes, as determined in accordance with test procedures that measure the product's performance under representative conditions. That makes energy use a standardized, fixed measure that is assigned to a product before it is ever sold and remains the same regardless of how often the product is actually operated—or whether the product is used at all.

EPCA integrates that concept into every corner of a cohesive statutory scheme. The same static measure of "energy use" is how the Department of Energy sets an energy use standard, and how a manufacturer satisfies one. It is what consumers are told about a product's performance. And it creates a straightforward preemption rule: When the Department of Energy sets an energy conservation standard that specifies how much energy a product may be designed to consume, EPCA's preemption clause protects manufacturers from state and local regulations that would function as competing standards.

**B.1.** Oak Park's fossil-fuel restrictions thus do not concern "energy use" as EPCA defines that term. They do not limit how much energy any product may be designed to consume. No matter how a product performs on that measure, the code amendments treat it the same way. EPCA does not preempt them.

**2.** The Village's Energy Star certification requirements are not before the Court. The Coalition has forfeited any challenge to them, an amicus cannot

unforfeit the issue, and in any event, the Coalition has not established standing to bring such a challenge.

**II.** The Coalition's contrary interpretation of EPCA contradicts the statute's text, structure, and common sense.

**A.** A product's energy use is not the amount of energy it actually consumes when a consumer takes it home. *First*, that view ignores half of the definition of energy use, where Congress specified that energy use is measured "in accordance with test procedures," not conditions of actual use. 42 U.S.C. §§ 6291(4), 6311(4). *Second*, when Congress wanted to refer to how products perform under "conditions of actual use," it did so. *See id.* § 6297(g). *Third*, if "energy use" meant "*actual* energy use," an energy efficiency standard would just as readily concern energy use, giving Congress no reason to specify that both were preempted. *Fourth*, in the energy sector, "point of use" does not mean the place where something is used. The term distinguishes between energy used at the pipe or outlet and energy used upstream.

**B.** Oak Park's code amendments do not "set" any product's "energy use" to "zero." Under EPCA's statutory scheme, EPCA-covered products must be designed to consume energy, whether fossil fuels or electricity, and cannot operate on "zero" of it. And under the basic conventions of English, a product ban is not a zero-energy-use standard.

**C.** The word "concerning" does not help the Coalition either. All agree that laws can concern energy use even if they are not themselves energy conservation standards, but merely "operate in a similar manner." *Ass'n of Contracting Plumbers*, 180 F.4th at 436, 441–42. And even an expansive understanding of "concerning" requires Oak Park's code amendments to be connected to or reference energy use as EPCA defines it. They don't.

**D.** The building code exemption makes plenty of sense without resorting to the Coalition's construction. It is not difficult to identify regulations the building code exemption saves from preemption—like provisions in the Illinois Energy Conservation Code that set the equivalent of an energy conservation standard as one compliance option among various alternatives. The Coalition's theory misunderstands how these codes and the exemption works.

**E.** The Coalition's interpretation of EPCA creates an inexplicable disconnect between the statute's waiver and preemption provisions. Its theory does not stop at fossil-fuel restrictions, but rather would sweep aside appliance restrictions in innumerable fire, zoning, and building codes. Yet the Department can waive preemption only for "unusual or compelling energy or water interests," and it cannot regulate health or safety issues itself. 42 U.S.C. § 6297(d). That would leave EPCA-covered products in a regulatory no-mans-land where no one could regulate many of their risks.

**F.** The history of EPCA preemption reflects Congress's consistent focus on state and local energy conservation standards. Even as Congress has tweaked the preemption clause's phrasing, it has maintained this basic scope. And it has done so against the backdrop of the Department of Energy's longstanding view that EPCA does not reach beyond those standards to preempt state and local health and safety regulations with only an incidental impact on product efficiency.

**G.** Policy arguments cannot salvage the Coalition's misunderstanding of EPCA's statutory text. EPCA did not create a right to sell or purchase covered products. If Congress had wanted to do that, it would have said so explicitly. And it does not "end-run EPCA" to enforce its statutory text. In EPCA as elsewhere, a preemption clause that prohibits regulating products in one way does not prohibit regulating them in any other.

**III.** If this case were a close call, the presumption that Congress does not lightly override historic police powers would resolve it. The Village preserves the argument that that presumption remains available in cases that, like this one, involve traditional state and local authority.

# ARGUMENT

## I. EPCA Preempts Regulations Establishing Appliance Energy Performance Standards And Similar Rules.

For Congress to override state or local enactments, its preemptive intent must be discernible in "the language of the preemption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quotation omitted). Here, the text of EPCA's express preemption provisions, the meaning of the terms they contain, and EPCA's broader statutory framework make plain that EPCA preempts only those regulations that "concern[]" the specific types of "energy use" and "energy efficiency" Congress embraced in EPCA—static figures that measure an appliance's performance under representative conditions. In essence, these are regulations that either prescribe "energy conservation standards for covered appliances" or "operate in a similar manner." *Ass'n of Contracting Plumbers*, 180 F.4th at 436. Because Oak Park's restrictions on fossil-fuel-powered appliances fall well "outside of that realm," they are not preempted. *Id.* at 436.

### A. EPCA Preempts State And Local Laws Concerning Appliances' Excessive Energy Use.

EPCA's statutory language "necessarily contains the best evidence of Congress' pre-emptive intent," *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quotation omitted), and here that is all the Court needs. Congress

specified what kinds of laws EPCA preempts: as relevant here, those "concerning the . . . energy use" of a "covered product." 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). It specified exactly what "energy use" is: a static figure capturing how much energy a product consumes under controlled testing conditions established by the Department of Energy. And it integrated that concept into a cohesive statutory scheme built to produce a set of federal energy conservation standards that restrict how much energy manufacturers may design covered products to consume—while protecting manufacturers from state or local regulations that do the same.

Start with Congress's express definition of "energy use." Under EPCA, "energy use" is "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under [42 U.S.C. §] 6293." *Id.* § 6291(4); *see also id.* § 6311(4) (equivalent definition for industrial equipment). Section 6293, in turn, provides for test procedures "reasonably designed to produce test results which measure . . . energy use . . . of a covered product during a representative average use cycle or period of use, as determined by [the Department of Energy]." *Id.* § 6293(b)(3); *see also id.* § 6314 (equivalent rules for industrial equipment). And in the energy sector, "point of use" describes a measurement taken "without adjustment for any energy loss in the generation, transmission, and distribution of that energy."

*Ass'n of Contracting Plumbers*, 180 F.4th at 451–52 (quoting U.S. Dep't of Energy, *Energy Intensity Indicators: Terminology and Definitions* (last updated Mar. 19, 2025), http://bit.ly/3I7L8yP).[3]

In sum, then, "energy use" is a representative measure of how much energy a product typically consumes over a standardized period of time. As the Second Circuit put it in *Association of Contracting Plumbers*: The term is "a standardized, fixed measure"—a design characteristic assigned to a product based on its performance "in a controlled setting" well "before it reaches consumers." 180 F.4th at 439. Thus, "once an appliance has been sold, nothing a consumer does with the appliance changes that appliance's 'energy use.'" *Id.*

This concept is an essential component of EPCA's statutory framework. EPCA establishes (or requires the Department of Energy to establish) "energy conservation standards" that restrict how manufacturers may design covered products by "prescrib[ing] a minimum level of energy efficiency" or a "maximum quantity of energy use" the products must attain before they may be

---

[3] *See also, e.g.*, 76 Fed. Reg. 51281, 51282–83 (Aug. 18, 2011) ("point of use" assessments measure how much "electricity, natural gas, propane, and/or fuel oil" an appliance uses "where [it] is operated," omitting "losses associated with" steps like "transmission[] and distribution of electricity"). This usage has been a mainstay of the energy sector for decades and was commonplace at the time of EPCA's enactment. *See Ass'n of Contracting Plumbers*, 180 F.4th at 452–53; *infra* at 32–35.

"distributed in commerce." 42 U.S.C. § 6291(1)(B), (6); *see also id.* § 6311(18) (equivalent definition for industrial products); *id.* §§ 6295, 6313 (provisions for standard-setting). In other words, the Department of Energy must either restrict how much energy a product may consume in absolute terms (a standard concerning "energy use") or bar it from producing too little usable output relative to that energy consumption (an "energy efficiency" standard). Energy use figures are expressed with metrics like the maximum number of kilowatt-hours or British thermal units an appliance may consume per year, *see, e.g.*, 10 C.F.R. § 430.32(a), (j) (2026), while energy efficiency figures are usually captured as ratios of attainable energy efficiency, *see, e.g.*, *id.* § 430.32(b)(1).[4]

This fixed, pre-tested understanding of energy use likewise structures manufacturers' EPCA obligations. Once the Department of Energy has set a standard, manufacturers may use whatever "design path[]" they wish to "attain the performance levels required." *Zero Zone, Inc. v. DOE*, 832 F.3d 654, 666 (7th Cir. 2016) (quotation omitted). Whatever they choose, before they put a product on the market, manufacturers must test it under conditions that reflect a

[4] A kilowatt-hour is a unit of energy that is "equivalent to the energy transferred or expended in one hour by one kilowatt of power," while a British thermal unit is the "amount of heat required to raise the temperature" of one pound of water by one degree Fahrenheit. *Random House Dictionary of the English Language* 263, 1056 (1987).

"representative average use cycle or period of use." 42 U.S.C. §§ 6293(b)(3)–(4), 6314(a)(2)–(3). They must certify to the Department of Energy that the product meets the Department's standard. 10 C.F.R. § 429.12(a) (2026). And when they offer their product up for sale, they must affix a label that informs the public how much energy the product has been tested to consume. 42 U.S.C. § 6294(c)(1)(A); *see generally id.* § 6315.

Still further provisions, specific to consumer products, draw on the same understanding. Once testing procedures are established, manufacturers cannot make marketing representations "with respect to the energy use or efficiency" of a product unless the product has been tested properly and their representations "fairly disclose[] the results of such testing." 42 U.S.C. § 6293(c)(1)–(2). And if, when placed "under conditions of *actual* use"—as distinguished from the "energy use" the manufacturer's disclosure attests to—a product does not perform exactly as described, manufacturers cannot be blamed. *Id.* § 6297(g) (emphasis added). Their representations make no "express or implied warranty" as to what will happen in the home. *Id.*

EPCA's preemption provisions fit neatly into this same framework. Once the Department of Energy establishes an "energy conservation standard" for a particular covered product, the preemption clauses ensure that no state or local regulation that likewise "concern[s]" the "energy use" (or energy efficiency or

water use) of "such covered product" may "be effective with respect to such product." 42 U.S.C. § 6297(c); *see also id.* § 6316(b)(2)(A) (similar for industrial products). As the consumer products provision's title puts it, this amounts to a "[g]eneral rule of preemption for energy conservation standards" states might otherwise set. *Id.* § 6297(c). By establishing such a rule, EPCA ensures that, when manufacturers design and produce their products, they need not juggle competing state and federal standards and are subject to a single set of rules, governed by specified test procedures. *See ACRI*, 410 F.3d at 499.

Reading EPCA in this straightforward manner produces straightforward results: Once the Department of Energy establishes, for example, a maximum amount of energy that gas-burning boilers may use to output a particular level of heat, Oak Park cannot adopt a different energy efficiency standard restricting how gas-burning boilers installed within the Village may be *designed*. And once the Department of Energy restricts refrigerators to consuming no more than some specified amount of energy per cubic foot cooled, Oak Park cannot, directly or indirectly, adopt an energy use standard of its own. But the mere existence of a federal design standard does not prevent Oak Park from regulating other aspects of either appliance, and it certainly does not force the Village to permit their unrestricted "use."

### B. Oak Park's Code Amendments Do Not Restrict Excessive Energy Use.

EPCA's consistent technical definition of "energy use" as a design characteristic, and that definition's role throughout EPCA's "coherent regulatory scheme," *FDA v Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), foreclose the Coalition's preemption claim. None of the electrification requirements the Coalition takes issue with set an energy conservation standard or otherwise concern the amount of energy covered products may be designed to consume. Instead, they do what virtually every building and fire code does: They protect health and safety by restricting where some appliances may be installed or how some buildings may be constructed.

**1.** As the Coalition put it, "this case turns on whether" the Village's "prohibition," for "appliances in new buildings," of one specific "source of energy"—fossil fuels—is a regulation concerning "energy use" within the meaning of EPCA's preemption clause. Coalition Br. 14 (quoting S.A. 1) (emphasis omitted). It is not.

The Village's fossil-fuels restriction does not limit how much energy covered products may be designed to consume or require that they be designed to produce their output more efficiently. "[B]efore and after" Oak Park amended its code, "[t]he same energy conservation standards" applied in the Village as anywhere else. *Ass'n of Contracting Plumbers*, 180 F.4th at 444.

Certainly, the restrictions may cause builders and consumers to deploy "one set of products with one set of federal efficiency standards (electric appliances)" rather than "another set of products with different federal efficiency standards (gas appliances)." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting). But that development has no relationship to those products' EPCA-measured "energy use." Instead, the restrictions apply the same way to every gas or electric appliance, whether the appliance is designed to guzzle energy or to sip it. Indeed, in some instances, they may even cause new buildings, or the appliances within them, to consume *more* energy overall—because some gas appliances face a more stringent energy efficiency standard than their electric counterparts. *See, e.g.*, 10 C.F.R. § 430.32(e)(1)(i)–(ii) (2026) (standards for certain types of gas and electric furnaces).

The same logic applies to all sorts of Village regulations. For instance, when the Village zones an area of new construction for residential use, it necessarily prohibits a range of industrial appliances that are subject to federal energy conservation standards. But by prohibiting industrial appliances, the Village has not set a competing standard limiting how much energy those appliances may be designed to consume. "Before and after" Oak Park makes a zoning decision, "[t]he same energy conservation standards" apply in the

rezoned area as anywhere else—regardless of whether industrial appliances may actually be used there. *Ass'n of Contracting Plumbers*, 180 F.4th at 444.

**2.** While the United States, as the Coalition's amicus, devotes significant attention (at 6–7, 12–14) to the Village's Energy Star certification requirements, those requirements are not before the Court. The Coalition did not press those arguments in its summary judgment papers, *see* Dkts. 28, 46, and has not asserted them as a ground for reversal in its opening brief, *see* Opening Br. 11–23; *Williams v. Dieball*, 724 F.3d 957, 961–62 (7th Cir. 2013) (argument not raised in district court is forfeited); *Wedermeyer v. CSX Transp., Inc.*, 850 F.3d 889, 897 (7th Cir. 2017) (same for claims not raised in opening brief). "An appellant is ordinarily expected to assert any available grounds for reversal, on penalty of waiver," and there is no cause for departure from this general rule. *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023). And when a party waives issues on appeal, "an amicus could not unwaive them." *Justice v. CSX Transp., Inc.*, 908 F.2d 119, 125 (7th Cir. 1990).

Even absent waiver, the Coalition has not established Article III standing to raise these claims. Standing is not dispensed in gross or to non-parties, *see Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017), and the Coalition has only asserted harm from the portions of the code amendments that directly or indirectly "ban[] natural gas appliances," Coalition Br. 1; *see* Dkt. 29 at 2–3.

And Energy Star requirements are not germane to the Coalition's purpose, nor do they affect its members' interests in the "availability of natural-gas service, appliances, and infrastructure." Coalition Br. 12. So even if the Village's Energy Star certification requirements were before this Court, nothing in the record suggests that the Coalition is harmed by them.

## II. The Coalition's Interpretation of EPCA Contradicts Text, Context, and Common Sense.

The Coalition asks this Court to favor a "commonsense" interpretation of EPCA preemption focused not on how EPCA-covered products may be designed in a factory, but rather on how they may be used in a home or business. But try as it might, the Coalition cannot tie this theory to EPCA's statutory text. The Coalition's construction of "energy use" shears off half the term's statutory definition and replaces EPCA's context-specific language with its own purportedly "colloquial" understanding. Its insistence that any product ban "sets to zero" an appliance's energy use is anything but commonsense. And other statutory language—the term "concerning" in the preemption clause, or the exceptions to EPCA's preemption regime—is no help.

To the contrary, if energy use were not the fixed, laboratory-assessed measure EPCA defines it to be, EPCA's carefully designed statutory scheme would fall apart. So would state or local regulations that restrict where covered appliances may be used—whether to protect resident health or safety or simply

to enforce zoning codes. And because the Department of Energy has no authority over those matters, no one could step into the breach. Nothing in EPCA's text, structure, or history suggests that Congress intended that result.

### A. The Coalition's "Colloquial" Understanding Of "Energy Use" Is Unmoored From EPCA's Carefully Designed Statutory Text.

The Coalition's textual argument founders on the definition of "energy use." As the Coalition sees it, a product's energy use is the actual amount of fuel that it "uses," in the "colloquial sense," when a consumer (or business) brings the product home and turns it on. Coalition Br. 17–18 (quotation omitted). In other words, it's "the energy an appliance consumes in the hands of consumers," at the "place where the appliance is used." *Id.* at 2, 26 (quotation omitted). The Coalition borrows this interpretation from the Ninth Circuit's decision in *Berkeley*, 89 F.4th at 1101–03, as well as a handful of dictionaries, a water-use statute, and a few unrelated regulations. But, as every court to consider the issue since *Berkeley* has concluded, and eleven judges of the Ninth Circuit observed even then, this theory cannot withstand scrutiny.

**1.** *First*, the Coalition's reading inexplicably ignores half of EPCA's statutory definition of "energy use." EPCA specifies how to determine how much energy an appliance consumes, and it isn't by accounting for "real-world energy use." Coalition Br. 29 (emphasis omitted). It is by testing, "in accordance with test procedures under section 6293," how much energy that

product is *designed* to consume. 42 U.S.C. § 6291(4). And those "test procedures" do not somehow measure how an appliance actually operates each time it is installed in a home or business, but rather measure how it performs "during a representative average use cycle or period of use." S.A. 18 (quoting 42 U.S.C § 6293(b)(3)).

The Coalition has almost no response to this point. It offers no explanation of why, if Congress thought of "energy use" as a variable measure that depends on how (or whether) an appliance is ultimately used, Congress insisted that energy use be determined by "extremely detailed" testing "requirements" (Coalition Br. 8 n.1). Nor does the Coalition wrestle with EPCA's "representative average use cycle" language at all. Instead, it urges that provisions elsewhere in the statute diminish this language's force. *Id.* 27–37.

But the rest of the statute only hurts the Coalition. We respond below to its arguments about the breadth of the preemption clause and its exceptions. *See infra* at 38–51. Long before getting there, however, core statutory provisions foreclose the Coalition's understanding of "energy use."

Take the requirement that manufacturers inform consumers how much energy their appliances use. 42 U.S.C. §§ 6294(c)(1)(A), 6315(b). Congress requires that figure to be based on either "estimated annual operating costs" (a quantity "calculated from measurements of energy use") or "energy use" itself.

*See id.* §§ 6293(b)(4), 6291(8). Either way, the figure must be "determined in accordance with" EPCA test procedures. *Id.* §§ 6294(c)(1)(A), 6315(b). And once it is determined, it populates a blank field on a standardized label that applies to every product of its type, *see, e.g.*, 16 C.F.R. § 305.17(a)(9) (2026) (labels for water heaters must read: "Estimated yearly energy use: __ [kWh or therms]."). If an appliance's "energy use" "fluctuat[ed]" depending on whether its "ultimate destination" was Oak Park or South Bend, manufacturers would have no way of complying with any of these requirements. *Ass'n of Contracting Plumbers*, 180 F.4th at 440.

Or take the information the Department of Energy collects to determine what standards and testing procedures to establish. *See* 42 U.S.C. § 6296(d)(1). That information includes "reports" that are supposed to describe products' "energy use." *Id.* If that meant determining how consumers *actually* use their products, manufacturers would have to somehow "track and report on the performance of their products after they leave their control and are placed in the hands of consumers." *Ass'n of Contracting Plumbers*, 180 F.4th at 440.

**2.** *Second*, the Coalition's interpretation ignores that when Congress wanted to refer to how products operate under "conditions of actual use," it said so. As we have explained, EPCA's consumer warranty waiver explicitly distinguishes between the "energy use" figure manufacturers must test and

disclose to consumers before sale and the energy a product consumes "under conditions of actual use." 42 U.S.C. § 6297(g); *see supra* at 22. Congress thus was perfectly aware that products might consume energy at different levels in the home than they did in the factory. But rather than force manufacturers to anticipate that "shifting value," Congress defined "energy use" as a fixed measure. *Ass'n of Contracting Plumbers*, 180 F.4th at 440. And it designed EPCA's warranty to prevent consumers from confusing the two.

**3.** *Third*, if accepted, the Coalition's interpretation of "energy use" would swallow the term that precedes it—"energy efficiency." If, as the Coalition insists, any regulation that relates, in any way, to the amount of energy an appliance ultimately consumes is a regulation "concerning . . . energy use," Congress wasted its ink when it preempted regulations "concerning . . . energy efficiency" as well.

To see why, take a classic "energy efficiency" regulation: the rule that certain clothes dryers must dry 3.3 pounds of clothing for every kilowatt-hour of energy they consume while in use. *See* 10 C.F.R. § 430.32(h)(3)(iv) (2026). That rule certainly relates to the amount of energy dryers are permitted to "use" in consumers' homes. But if that's what Congress meant by "energy use," it had no reason to specify that regulations concerning "energy efficiency" were preempted as well. Indeed, such "energy use" standards would encompass

"energy efficiency" standards altogether, even though Congress took great pains to keep them separate throughout EPCA. The Coalition identifies its own error: Courts have "deep reluctance" to interpret statutes "so as to render superfluous other provisions in the same enactment." Coalition Br. 25 (quoting *Freytag v. C.I.R.*, 501 U.S. 868, 877 (1991)). The better reading is that EPCA's preemption clause tracks the statute's consistent treatment of "energy efficiency" and "energy use" as distinct, specialized concepts, calibrating each to a different type of energy consumption, explaining how each is measured, and preempting state regulations of either one.

**4.** *Fourth*, the Coalition's understanding of "point of use" cannot displace Congress's context-specific meaning. As explained above, in EPCA, "point of use" does not refer to where a consumer literally *uses* a product. *See supra* at 19–20. In the energy sector, it has a "well-established" meaning, S.A. 12 (quotation omitted), that clarifies how energy use should be measured: based on the energy a product consumes directly from the pipe or outlet, not the additional energy required to generate, transmit, and distribute that energy.

Insofar as the Coalition disputes (at 18, 30) that "point of use" has this meaning, it is simply wrong. In the 1970s, "[a] consistent stream of congressional and legislative sources" used the term to "indicate the scope of energy consumption measured." *Ass'n of Contracting Plumbers*, 180 F.4th at 452–

53; *see also Berkeley*, 89 F.4th at 1123–24 (Friedland, J., dissenting from denial of rehearing). Scores of regulatory and industry publications did the same. To take just a few, the Congressional Research Service repeatedly invoked this meaning.[5] Federal energy regulators did the same.[6] And the term has retained the same meaning ever since.[7]

---

[5] *See, e.g.*, Cong. Rsch. Serv., Comm. Print 95-51, *Energy and the Economy* 7 (Apr. 1978), https://bit.ly/3Vx1szE (distinguishing between energy consumed at "point of use" and energy expended "by conversion and transmission"); Cong. Rsch. Serv., Comm. Print 95-46, *The National Energy Plan* 171 n.1 (Apr. 1978), https://bit.ly/4ztaImy (distinguishing between "the power plant" and "the point of use").

[6] *See, e.g.*, 42 Fed. Reg. 20012, 20013 (Apr. 15, 1977) (distinguishing between upstream energy consumption and "point of use" measurements); Fed. Energy Admin., *Project Independence* vol. 1 at 3 (Nov. 1974), https://bit.ly/4zlLRkc ("CEQ/FEA suggested . . . that we not consider the efficiency of electrical generation or the fuel used at the power plant, but rather the energy demand only at the point of use."); Fed. Energy Admin., *Comparison of Energy Consumption Between West Germany and the United States* 63 (June 1976), https://bit.ly/4zjMESR ("[E]nergy use is measured at the point of use, and hence excludes the losses in electric power generation."), .

[7] *See, e.g.*, 47 Fed. Reg. 14424, 14434 (Apr. 2, 1982) ("[I]n defining 'energy use,'" EPCA "measures the quantity of energy consumed at the point of use, thereby avoiding the calculation of inefficiencies of generating and transmitting electricity."); 144 Cong. Rec. S12706 (1998) (in 1975 EPCA "wisely rejected" consideration of total fuel cycle energy consumption as "unworkable" in favor of a " 'point of use' standard"); Nat. Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards* 4, 6 (2009) ("Current DOE standards . . . call for measurement at the site (point of use) of the appliance.").

"[W]hen a statute, like this one, is 'addressing a technical subject, a specialized meaning is to be expected.'" *Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) (ellipses omitted) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)). So even if, in colloquial speech—or other contexts—"point of use" can refer to the "place where something is used," Coalition Br. 31 (quotation marks omitted), that meaning has no bearing when, as here, Congress used "terms of art" in the very context for which they were designed, *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974).

Moreover, even if "point of use" had "several plausible definitions, context differentiates among them" to make the Coalition's definition unworkable. *United States v. Williams*, 106 F.4th 639, 650 (7th Cir. 2024) (quoting *United States v. Hansen*, 599 U.S. 762, 775 (2023)). As we have explained, ascertaining each product's "energy use" at the place where it is ultimately used is inconsistent with EPCA's statutory design. *See supra* at 20–23, 28–30. Congress also had good reason to clarify whether EPCA energy use accounted for upstream energy losses. When EPCA was enacted, other regulators *did* consider indirect energy consumption when adopting energy standards.[8] And there was a robust debate—including in the lead-up to EPCA's

[8] *See, e.g.*, Energy Res. Conservation & Dev. Comm'n, *Energy Conservation Standards for Nonresidential Buildings* 5 (May 27, 1977) (when setting certain

enactment—about whether the federal government should do the same.[9] Congress would not have used a term that took one side of that debate if it had not intended to.

Changing tacks, the Coalition suggests that this definition of "point of use" incorporates the same "locational component" that its "colloquial" understanding might. Coalition Br. 17 (quotation omitted), 34–36. Point-of-use measurements are, indeed, designed to capture energy use at the site of consumption, and to exclude energy consumed at other points and times upstream. But that does not make them measurements of how much energy a product *actually* consumes once it leaves the factory floor and ends up at its "final

standards, California's Energy Resources Conservation and Development Commission was required by state statute to "tak[e] into account power plant and distribution losses," not just "energy delivered to the building boundary").

[9] The gas industry, for instance, strongly—but unsuccessfully—urged the government to focus on source rather than site energy. *See Emergency Petroleum Allocation Extension Act of 1974: Hearing on S. 3717 Before the Comm. on Interior & Insular Affs.,* 93 Cong. 747, https://bit.ly/3VoXp8y (exhibit appended to testimony of George H. Lawrence, Am. Gas Ass'n) (opposing "[a]n energy rating system based on point-of-use energy consumption" because it would not "properly reflect the national consumption of fuel required to generate, transport, and utilize electric power"); *id.* at 751–52 (documenting same); *see also id.* at 503 (statement of Hon. John A. Busterud, Mem., Council on Env't Quality) (explaining that "gas-powered appliance[s] consume[] more energy at point of use" while electric appliances use more energy "when the entire energy production-transmission-consumption system is considered").

destination[].” U.S. Br. 21 (quoting *Berkeley*, 89 F.4th at 1102).[10] Rather, they are laboratory measures of how much energy a product is designed to consume at *any* site of consumption, regardless of where it ultimately ends up, or, indeed, whether it is ever used at all.

### B. The Coalition's Construction Of "Energy Use" Adopts An Incoherent Understanding Of "Quantity."

The Coalition's confusion only deepens when it gets to the "quantity" of energy an appliance consumes. As the Coalition sees it (at 15), by restricting the types of fuels EPCA-covered products may use, Oak Park's electrification requirements can be thought of as "setting th[e] quantity" of energy those products may consume to "zero." Because "zero" is "indisputably a quantity," and "fossil fuels" are a type of "energy," the Village's requirements concern the "quantity of energy" products consume, and are preempted. *Id.* at 18 (quotations omitted); *see id.* at 37–39. The Coalition cannot "pay the words of the statute" enough to make this interpretation make sense. *United States v. Uriarte*, 975 F.3d 596, 602–03 (7th Cir. 2020) (en banc) ("borrow[ing] a phrase from Lewis Carroll").

[10] Indeed, one of the virtues of point-of-use measurements is that they can be taken in a laboratory setting without "attempting to factor in" the "various exogenous factors" that affect an appliance's full draw on the energy system, 144 Cong. Rec. S12706 (1998), and which may vary with grid composition.

At every turn, EPCA defeats the Coalition's argument. EPCA only applies to products that "in operation consume[], or [are] designed to consume, energy." 42 U.S.C. §§ 6291(1)–(2), 6311. And that "energy use" must be determined over a "representative use cycle or period of use." *Id.* §§ 6291(4), 6293(b)(3). But no product—or at least no product that is "designed to consume" energy—can "operat[e]" for a "cycle" or a "period" on none of it. The "energy use" of a "covered product" thus must refer to a positive, non-zero quantity. As we have explained, that is a *fixed* quantity that the Village's electrification requirements cannot alter. An appliance's "energy use," under EPCA, is set long before the product is introduced to commerce, and is the same whether it can lawfully be installed in all, some, or none of Oak Park's buildings.

EPCA's definition of "energy" as "electricity, or fossil fuels" plugs right into this understanding. 42 U.S.C. § 6291(3). If a product runs on fossil fuels, its energy use is the quantity of fossil fuels the Department of Energy's testing procedures say that it consumes over a set period. And if it runs on electricity, its energy use is the quantity of *electricity* those procedures say it consumes. As EPCA is written, neither one can be zero.

This logic does not just accord with the definitions in EPCA; it follows from the "conventions of English." *Watson v. United States*, 552 U.S. 74, 83

(2007). Ordinary English speakers do not describe prohibitions as "zero-energy-use standards," and there is no reason to think Congress did either.

### C. The Word "Concerning" Does Not Transform Congress's Definition of "Energy Use."

Because Congress's definition of "energy use" ultimately does not help its argument, the Coalition seizes on other parts of the statutory text. It starts with the preemption clause, urging the Court to interpret the term "concerning" "expansively." Coalition Br. 18–22 (quotations omitted). If the Coalition's point is simply that "concerning" "sweeps even more broadly than facial regulations of a product's energy use," U.S. Amicus Br. 13, that observation is both unremarkable and unhelpful. But if the Coalition's point is that "concerning" somehow broadens what Congress meant by "energy use," that argument flouts the basic principles of statutory construction and must be rejected.

**1.** There is no dispute that laws can "concern[]" energy use even if they do not directly establish appliance energy conservation standards, but rather "operate in a similar manner." *Ass'n of Contracting Plumbers*, 180 F.4th at 436, 441–42; *see* S.A. 19–20. For example, a law restricting the total number of kilowatt-hours a building could consume per year could indirectly restrict how much energy the appliances installed within it may be designed to consume, even if it imposed no yearly kilowatt-hour limit directly upon them. So could a

law that provided incentives for using appliances that were designed to use less energy than the Department of Energy requires—like a sales tax surcharge for purchasing a more energy-intensive refrigerator. The district court's interpretation of EPCA thus does not render Congress's use of "concerning" superfluous, as the Coalition suggests (at 20–21). Congress used "concerning" to capture indirect energy conservation standards as well as directly established ones.

The problem for the Coalition is that Oak Park's challenged electrification requirements neither directly *nor indirectly* concern "energy use" as EPCA defines that term. As we have explained, they are indifferent to how much energy an appliance is designed to consume. They regulate something distinct: the health and environmental impacts of particular fuel sources.

**2.** Insofar as the Coalition claims that Congress's use of "concerning" broadens EPCA's preemptive scope to any restriction on the use of covered appliances, it is wrong. Even if the term "concerning" has a "broadening" meaning (Coalition Br. 18), it still requires that the challenged law be "'connected to' the forbidden subject matter" or at least "reference" it. *Ass'n of Contracting Plumbers*, 180 F.4th at 441–42. Here, that subject matter is "energy use"—not appliance use or source of energy. And no construction of "concerning" can "transform the meaning" of that term from the meaning

Congress chose: a standardized measure of an appliance's energy during a use period. *Cal. Restaurant Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing)

Oak Park's code amendments neither reference that measure nor have any connection with it. To enforce the code amendments, the Village does not need to know how many British thermal units a product consumes per year under standardized testing conditions. All the Village needs to know is that the product combusts fossil fuels. *See Ass'n of Contracting Plumbers*, 180 F.4th at 445–46. The Village thus treats every covered product the same way, with no "direct relation to"—and certainly no "impact on"—how it performs under the Department of Energy's testing procedures. Coalition Br. 37 (quotation omitted). That leaves a fundamental mismatch between the Coalition's theory and the preempted domain.

"Concerning" does not fill that gap. Because words like these are indeterminate, the Supreme Court has instructed courts to "go beyond [such] unhelpful text." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (quotation omitted). Indeed, "the fundamental canon" that words "must be read in their context and with a view to their place in the overall statutory scheme . . . carries particular force when construing phrases that govern conceptual relationships," whose "meanings inherently depend on their surrounding context." *United*

*States v. Miller*, 604 U.S. 518, 520 (2025) (quotation omitted). Here, text and context tell this Court all it needs to know. EPCA preempts state and local energy conservation standards and regulations that function like them. It does not preempt regulations that concern pollution or fire safety but happen to restrict the use of EPCA-covered products along the way.

### D. The Plain Meaning of EPCA's Preemption Clauses Does Not Render the Building Code Exemption Superfluous.

EPCA's exemption for building codes cannot expand the scope of EPCA preemption either. The Coalition insists (at 27–30) that the district court's interpretation of EPCA preemption gives the exemption no work to do. But the exemption saves plenty of regulations from preemption.

**1.** Congress crafted the building code exemption to align EPCA with the "increasingly important role" building codes played in states' "management of energy resources." H.R. Rep. No. 100-11 at 24. To that end, Congress authorized states and localities to adopt code provisions that EPCA would otherwise preempt—that "concern[] the energy efficiency or energy use of a covered product"—so long as they follow specified criteria. 42 U.S.C. § 6297(f). For instance, these provisions can be one of a series of "optional combinations," may not "*require* that the covered product have an energy efficiency exceeding the applicable energy conservation standard," and must measure any energy-use requirements using EPCA-mandated test procedures. 42 U.S.C.

§ 6297(f)(3)(A)–(G) (emphasis added). States thus can't use building codes as a way to "effectively require higher efficiency products," *Building Indus. Ass'n v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1148, 1152 (9th Cir. 2012), but they retain "flexibility" to encourage efficiency improvements, H.R. Rep. No. 100-11 at 25.

**2.** Building codes throughout the country follow this blueprint. Consider the following example of an energy efficiency regulation. Section C406.2 of the 2021 Illinois Energy Conservation Code, which supplied the "minimum requirements" for constructing commercial buildings in the state when Oak Park adopted the code amendments, 20 ILCS 3125/15 (2022), authorizes multiple pathways for constructing commercial buildings. Under one pathway, the "Prescriptive Compliance Plan" identified in Section C401.2.1(1), builders chose among several compliance options in Section C406 to achieve a specified number of credits. One of these options, Section C406.2.4, required a "ten-percent" improvement in "cooling efficiency" above a set of industry energy conservation standards that parallel the Department of Energy's.[11]

[11] *See* 42 U.S.C. § 6313(a)(6)(A) (requiring that the Department of Energy "establish an amended uniform national standard" at the "level specified" by amendments to these industry standards unless "clear and convincing evidence" compels a more stringent rule). Some of the Department of Energy's standards exceed those set by the industry body, but for others, the Department has adopted the industry body's rules wholesale. *See, e.g.*, 88 Fed. Reg. 36368, 36370

On its own, this provision fell within the scope of EPCA's preemption clause. It clearly imposed a requirement that, even if not expressed as an energy conservation standard, affected the energy efficiency air conditioners could be designed to attain by requiring that they exceed federal standards. Section C406.2 thus related to energy efficiency as EPCA understands the term and may well have incentivized manufacturers to build their products to a more rigorous standard than the Department of Energy requires. If EPCA said nothing else, it would have been preempted.

But that is where the building code exemption comes in. Section 6297(f)(3) requires evaluating each building code as a whole rather than looking at individual sections in isolation. Under the exemption, code provisions that would otherwise be preempted can nevertheless survive so long as the rest of the code offers "at least one" path to compliance that does not require installing appliances that exceed federal standards. 42 U.S.C. § 6297(f)(3)(B)–(E).

Illinois's Section C406.2 is just such a standard. The 2021 ILECC as a whole met the requirements of EPCA's building code exemption because it offered alternative compliance options that aligned with the Department's

---

(June 2, 2023) ("adopting the levels specified in ASHRAE 90.1-2019" and "ASHRAE 90.1-2022 for "three-phase, less than 65,000 Btu/h" air-cooled air conditioners and heat pumps). Even where the rules vary slightly, a ten percent efficiency improvement would frequently exceed the federal standard.

minimum requirements. For example, builders could choose alternative packages such as "[o]n-site renewable energy." ILECC § C406.1. They could opt for better thermal insulation through "[e]nhanced envelope performance." *Id.* Or they could forgo the "Prescriptive Compliance" option in favor of a different set of requirements. *Id.* § C401.2.1. Such builders would have no obligation to comply with Section C406.2, and could choose to install a commercial air conditioner that met only the Department's minimum standards.

These alternative pathways triggered the building code exemption. They meant that the ILECC as whole did not *require* the installation of devices that were more efficient than the federal minimum—even as one optional subsection *directly regulated* those appliances' energy efficiency. Section C406.2 was saved from preemption only because EPCA includes a building code waiver. Without it, nothing would save provisions that, like this one, concern appliance energy efficiency and incentivize the manufacture and use of appliances that exceed the Department of Energy's minimum standards.[12]

---

[12] Similar provisions exist throughout the ILECC and other building codes nationwide. The 2024 ILECC adopted a more complicated credit-based model, but it too offers compliance options (like C406.2.2.3) that require equipment to outpace federal efficiency standards. Or take Section C403.5 of both the 2021 and 2024 ILECCs, which requires the installation of an economizer (a mechanical system that brings cool outdoor air into a building) to reduce the energy usage of air conditioning equipment. If a building's air conditioning equipment exceeds the code minimum—which, as above, aligns with federal standards—by twenty percent, the economizer requirement is waived. EPCA

The same logic would save a similar energy *use* regulation from preemption. Unlike air conditioners, which are generally used only when the outside temperature reaches levels Illinoisans spend much of the year dreaming about, refrigerators run constantly throughout the year. EPCA therefore establishes an "energy use" standard for refrigerators restricting how many kilowatt-hours per year they may be designed to consume. *See* 42 U.S.C. § 6295(b). The ILECC could provide builders with a set of options for compliance that include (1) kitchens with heightened thermal insulation, (2) kitchens with enhanced lighting controls, or (3) refrigerators that consume ten percent fewer kilowatt-hours per year than the federal standard. The third option would on its own serve as an "energy use" standard, and so, absent the building exemption, Illinois could not adopt it. But because it is just one of several alternative pathways for compliance, the exemption can spare it.

**3.** At bottom, it is the Coalition's interpretation that makes little sense of the building code exemption. The Coalition suggests that any code that complies with the exemption concerns "actual energy use in the building," or how appliances actually perform there. Coalition Br. 28 (emphasis omitted).

---

would ordinarily preempt this incentive because it concerns the energy efficiency products could be designed to attain. But the ILECC as a whole provides sufficient alternative compliance pathways to qualify for EPCA's building code exemption, saving provisions like this one.

But as we have explained—and as the examples above show—the exemption is, like every other part of EPCA, concerned with how much energy appliances may be *designed* to consume. It thus "does not affect a State's authority to adopt provisions in building codes that do not affect the energy efficiency or energy use of covered products," as EPCA defines those terms—"such as insulation, structure, fire, heating or safety standards." H.R. No. 100-10 at 24.

### E. EPCA's Waiver Provision Only Confirms the Coalition's Error.

EPCA's waiver provision is even less helpful to the Coalition. The Coalition has little to say about it, while the United States argues (at 25–26) that the fact that the Village's code amendments would not qualify for a waiver demonstrates that they are the sort of regulation Congress wanted to preempt. That inference does not follow. To the contrary, the Coalition's interpretation creates an inexplicable disconnect between the scope of EPCA's waiver and preemption provisions.

**1.** As we have explained, EPCA's waiver provision reflects Congress's overriding focus on energy conservation standards. Indeed, standards approved under the section operate *like* federal energy conservation standards—just those tailored to certain "unusual and compelling" state or local interests that generally applicable federal standards cannot serve. 42 U.S.C. § 6297(d)(1)(B)–(C). As the United States acknowledges (at 25 n.5), this subset of standards even

faces the same bar on rendering a performance characteristic unavailable as do federal standards. *Compare* 42 U.S.C. § 6297(d)(4), *with id.* § 6295(o).

Certainly, the waiver provision imposes the additional requirement to consider specific burdens on manufacturers, including impacts on servicing or sales. *Id.* § 6297(d)(3). But considering those kinds of burdens aligns with how the Department of Energy sets energy conservation standards. *See, e.g.*, *id.* § 6295(o)(2)(B) (considering savings over the estimated average life of a product in light of maintenance expenses likely to result from a standard). It doesn't show that Congress had something other than energy conservation standards in mind. In any event, exceptions "do not in themselves delineate the scope of the rule." *Dan's City Used Cars*, 569 U.S. at 264. Especially when, as here, Congress drew a strict scheme to rein in past abuses of the waiver program while maintaining "substantially the preemption requirements" it always had. H.R. Rep. No. 100-11, at 23–24.

**2.** Moreover, the Coalition's preemption theory creates a disconnect between the scope of EPCA's waiver and preemption provisions that would inexplicably sweep aside whole swaths of state law that have nothing to do with energy conservation. If the Coalition were correct, then Congress preempted every state or local health or safety regulation that bars the use of a covered appliance or fuel source. Yet at the same time, it authorized the Department of

Energy to *waive* preemption only as to laws targeting "unusual and compelling State or local energy or water interests." 42 U.S.C. § 6297(d)(1)(B). Under this theory, from the moment the Department sets an energy conservation standard for a covered product, it does not just preclude state and local governments from setting health and safety restrictions on the product's use. It creates a regulatory vacuum.

Consider how this would play out. Illinois bans the use of kerosene space heaters in many structures—including nursing homes, day-care centers, and buildings more than three stories tall. 425 ILCS 65/9 (2026). And it heavily restricts their use in many other circumstances. *See,* 425 ILCS 65/8 (2026). With good reason: In the 1980s, kerosene space heaters were responsible for a terrible spate of fires around Chicago. *See Fire Kills 3 Children; Space Heater Blamed*, Chi. Trib. (Dec. 28, 1985), http://bit.ly/4nfuCfl; *Space-Heater Fire Deaths Up*, Chi. Trib. (Jan. 10, 1986), http://bit.ly/46EBYD9.

According to the Coalition's theory of EPCA preemption, when Illinois imposed these restrictions, it "set[] the permissible quantity of fossil fuels" kerosene space heaters may employ "to zero." Coalition Br. 20; *see id.* at 37–38. Kerosene, after all, is a fossil fuel, and kerosene space heaters are covered products under EPCA. Indeed, the Department of Energy has considered whether to issue an energy conservation standard for them (pausing only

because, when the topic was last studied, insufficient energy savings were available). *See* 86 Fed. Reg. 66403, 66404 (Nov. 23, 2021). As the Coalition sees it, when Congress enacted EPCA, it placed these laws on borrowed time. The moment the Department decides that there are energy savings to be had by setting a kerosene space heater standard, Illinois's crucial fire-safety regulations—and countless others like them—will be wiped off the books. Or even sooner: Because EPCA *also* preempts regulations enacted after 1987 even in the absence of an energy conservation standard, if Illinois—or any other state or local government—adopted a new or broader kerosene space heater ban, under the Coalition's logic, it would instantly be preempted. 42 U.S.C. § 6297(b)(1)(A).

The same fate faces appliance after appliance. The Department of Energy has set energy conservation standards for over 70 categories of appliances—ranging from furnaces to fans, industrial boilers to residential freezers. Under the Coalition's theory, merely by doing so, the Department has exempted these appliances from large swaths of state and local regulatory authority. And even where it has held off, new state or local regulations are dead on arrival. Noise ordinances cannot restrict the use of loud industrial fans. Zoning laws cannot prohibit the use of industrial furnaces in residential neighborhoods or towns. Cities must not restrict the use of walk-in freezers. Doing so would set the

maximum quantity of energy any one of those appliances could consume at zero.

Then, after sweeping all these regulations aside, EPCA would leave no one to step into the breach. The Department of Energy can't waive EPCA preemption for kerosene heater restrictions, noisy appliance bans, or walk-in freezer prohibitions, because none of them involve "unusual and compelling State or local energy or water interests." 42 U.S.C. § 6297(d)(1)(B)–(C). And the Department lacks the statutory authority to regulate these appliances' fire, health, or safety risks itself.

Simply put, that is not a result that one would impute to a rational Congress. Nor does it make sense that, if Congress *did* envision such radical results, it would have accomplished them obliquely, through the preemption provision of a statute that "by-and-large imposes energy conservation standards." *Ass'n of Contracting Plumbers*, 180 F.4th at 450. The better interpretation is that Congress intended EPCA's preemption clause, waiver authority, and the Department of Energy's own powers under the statute to work as a "symmetrical and coherent regulatory scheme" whose parts fit into a "harmonious whole." *Brown & Williamson*, 529 U.S. at 835 (quotations omitted). The Department sets national conservation standards; the preemption clause bars state and local governments from enacting competing standards or

their equivalents; and the waiver provision recognizes that some needs are so unique that they call for special local attention.

**3.** The United States urges (at 35) the Court to defer these problems for another day. But the Court is not at liberty to ignore statutory "context" or the preemption provision's "place" in EPCA's "overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quotation omitted). And understanding the implications of a litigant's view is not a distraction from statutory interpretation. It *is* statutory interpretation. *See, e.g.*, *Beeler v. Saul*, 977 F.3d 577, 589–90 (7th Cir. 2020) (examining how interpretation would fit into statutory scheme). Especially so when, as here, the Coalition has landed at a "nonsensical destination inconsistent with the statute's" text, structure, and "clear purpose." *United States ex rel. Streck v. Eli Lilly & Co.*, 152 F.4th 816, 835 (7th Cir. 2025).

Nor can the Court take much comfort in the United States' claims that few cases or waiver requests pose these issues. Where that is true, it is because no court to consider this issue since the Ninth Circuit has accepted the Coalition's interpretation of EPCA. *See Ass'n of Contracting Plumbers, Inc. v. City of New York*, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025), *aff'd*, *Ass'n of Contracting Plumbers*, 180 F.4th at 454; *Mulhern Gas Co. v. Mosley*, 798 F.Supp. 3d 304, 325–26 (N.D.N.Y. 2025), *aff'd*, *Ass'n of Contracting Plumbers*, 180 F.4th at

454; *Nat'l Ass'n of Home Builders v. Montgomery County.*, 2026 WL 817322, at *6–7 (D. Md. Mar. 25, 2026); *Nat'l Ass'n of Home Builders v. District of Columbia*, 2026 WL 837674, at *7 (D.D.C. Mar. 26, 2026); *Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*, 828 F. Supp. 3d 617, 640–42 & n.16 (D. Md. 2026); *Rest. Law Ctr. v. Denver*, 2026 WL 2908083, at *7 (D. Colo. Aug. 7, 2026); *Colo. Apartment Ass'n v. Ryan*, 2026 WL 2935963, at *7 (D. Colo. Sep. 30, 2026).

But in fact, industry has not held its fire. In the Ninth Circuit, it has claimed that *Berkeley* prevents local governments from regulating appliances' nitrogen oxide emissions (though that position has thus far been rebuffed). *See Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, 184 F.4th 1094, 1101–02 (9th Cir. 2026); *but see id.* at 1111–15 (Lee, J., dissenting). And manufacturers have begun to assert the Coalition's theory as a defense to design-defect or consumer-protection claims. *See, e.g.*, Memo. of Law 3–4, *Hess v. Samsung Elecs. Am., Inc.*, 3:23-cv-50106 (N.D. Ill. June 5, 2023), Dkt. 19. Endorsing the Coalition's argument here will only fuel their efforts.

And the chaos the Coalition invites will only hamstring state and local governments. It took Oak Park the better part of two years to enact the code amendments challenged here. If the Coalition wants to intrude on the Village's authority to solve the difficult problems state and local governments face, it must justify how far its theory goes.

### F. EPCA's History Reflects A Sustained Focus On Preempting State Conservation Standards And Similar Laws.

EPCA's history aligns with its text. The Coalition suggests (at 19) that that history has involved a "consistently" broadening scope of preemption. But both it and the United States (at 27–31) neglect the statute's continuity. Perhaps for that reason, the federal government for decades interpreted EPCA preemption as extending only to state regulations that establish energy conservation standards or similar requirements. The federal government has very recently changed its view, but it was right before and is wrong now.

EPCA's preemption provision reflects a consistent focus on energy conservation standards. *Compare* EPCA § 327(a) (1975 statute preempting any "regulation" that "provide[s] for . . . any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product" that is more stringent than a federal standard) *with* NECPA § 424(a) (1978 amendment preempting any new regulation "which establishes an energy efficiency standard or other requirement respecting energy use or energy efficiency" and allowing manufacturers to petition to apply the same rule to preexisting regulations) *and* 42 U.S.C. § 6297(c) (1987 amendment preempting any regulation "concerning the energy efficiency" or "energy use" of a covered product).

The Coalition and the United States claim that these amendments reflect a deliberate expansion of the scope of preemption beyond "energy efficiency standards," but they are mistaken. EPCA has always preempted more than those standards by encompassing "similar" (1975) and then "other" (1978) requirements as well. Nor are there material differences between a "regulation concerning," a "regulation which establishes" a "requirement respecting," or a "regulation" that "provides for," notwithstanding the United States' strained suggestion otherwise (at 28–29).

Meanwhile, there is a much more obvious explanation for Congress's decision, in 1987, to take "energy efficiency standard" out of the preemption clause. The 1987 amendments "coincided with a broader, statute-wide change": replacing the concept of "energy efficiency standard[s]" altogether with "energy *conservation* standard[s]." *Ass'n of Contracting Plumbers*, 180 F.4th at 449 (quotation omitted). Congress appears to have dealt with this change by simplifying the preemption provision to list only the component parts of such a standard.[13] But just one subsection later, in the waiver provision, Congress made crystal clear that its meaning was the same by retaining the "energy conservation standard or other requirement" language when describing what

[13] It is also possible that Congress did not want to extend the full scope of EPCA preemption to the design requirements encompassed by that broader term. *See Ass'n of Contracting Plumbers*, 180 F.4th at 449.

regulations are available for a waiver. 42 U.S.C. § 6297(d)(1)(A). The United States dismisses (at 29 n.7) this language as a holdover. But Congress's replacement of the outdated term "energy efficiency standard" refutes that claim. The Coalition, for its part, suggests (at 25–26) that Congress's use of the two phrases shows that Congress did not think they meant the same thing. True, but beside the point: As we have explained, that's because Congress wanted to reach energy conservation standards set both directly and indirectly. *See supra* at 38–39.

Other changes Congress made to EPCA's preemption regime are no more informative. We have already explained why the waiver provision undercuts the Coalition's argument. *See supra* at 46–51. And while the United States emphasizes the short-lived requirement, under the 1978 statute, that manufacturers petition the government before part of the preemption provision could take effect, U.S. Br. 28–29, it neglects to mention that the same statute adopted automatic preemption for any regulation prescribed after 1978, *see* NECPA § 424(a) (amending § 327(b)(2)). Meanwhile, the fact that Congress described the baseline for EPCA preemption similarly even as the procedures to trigger it changed, and even as Congress expanded and retracted its preemption of preexisting regulations, only underscores that it had a consistent concept in mind.

For these reasons, before a shift in position last year, the federal government consistently understood EPCA just as the Village does (and other state and local governments have). When Congress adopted the 1987 amendments, it on multiple occasions described its changes as preserving EPCA's longstanding preemption of state energy conservation standards or the equivalent: first, in the title to each consumer products subsection, 42 U.S.C. § 6297(b)–(c) ("general rule of preemption for energy conservation standards"), and then again in both chambers' descriptions of the statute's changes, H.R. Rep. No. 100-11 at 23–24 ("follow[ing] substantially the preemption requirements in current EPCA" and "continu[ing] the basic concept of preempting State energy efficiency standards" with no effect on "insulation, structure, fire, heating or safety standards"); S. Rep. 100-6 at 9 (revisions operate "as provided under current law").

When the Department of Energy has described EPCA preemption, it, too, has consistently understood preemption as applying to energy conservation standards alone. In 1982, for instance, the Department proposed to "review only State regulations that are appliance *efficiency* standards," not "State or local regulations that have only a peripheral effect on the energy efficiency of a covered product." 47 Fed. Reg. at 14456. The Department underscored its meaning: Given the "clear[]" language of EPCA's preemption provision, laws

"whose purpose is other than energy efficiency[,] such as a law on fire safety, would not appear to be preempted by the Federal rule," even if they had a "secondary and incidental effect" on appliance efficiency. *Id.*

And when it adopted the proposed regulations, the Department offered a few instructive examples. *See* 47 Fed. Reg. 57198, 57215 (Dec. 12, 1982). A "prohibition of hook-ups of appliances with less than a certain efficiency," for instance, would be preempted—presumably because, by making a connection contingent on product efficiency, such a prohibition concerned product efficiency. *Id.* But a "prohibition against placing oversized furnaces and air conditioners in new buildings" would not—presumably because such a ban concerned their size, not how much energy they were designed to consume. *Id.*

Later interpretations echo this understanding. *See* 75 Fed. Reg. 59470, 59530 (Sep. 27, 2010) (interpreting "'regulation concerning energy use' to be equivalent to 'energy conservation standard'" and thus reading EPCA preemption to preclude state and local "performance-based standard[s]"); *id.* (declining to find demand response feature preempted notwithstanding its effects on when energy is consumed); U.S. Br. in Support of Appellee 7–16, *California Rest. Ass'n v. Berkeley*, No. 21-16278 (9th Cir. Feb. 8, 2022), Dkt. 42.

Taken together, these pronouncements are the sort of longstanding, consistent, and contemporaneous agency interpretation that proves useful in

discerning statutory meaning. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Even more so when Congress has repeatedly updated EPCA "against the backdrop of" that interpretation, suggesting an intent to "work in harmony with what has come before." *Monsalvo v. Bondi*, 604 U.S. 712, 1242 (2025).

The United States' efforts (at 30–31) to downplay this history are unconvincing. It points out that the Department of Energy in 1982 understood Congress to recognize that the "standard that might save the greatest amount of energy could effectively ban appliances using certain types of fuel." 47 Fed. Reg. at 14434. But that point goes to the constraints Congress placed on how the Department may set its own energy efficiency standards. *See id.* It has no bearing on regulations that, like Oak Park's, are concededly not energy efficiency standards at all. And the United States' quibbles with the 1982 final rule make little sense either. Persisting "uncertainty" as to the scope of preemption reflects commenters' questions about the statute, not the Department's proposed rule. 47 Fed. Reg. at 57215. And, while "hook-ups" and "pilot lights" are not themselves covered products, the appliances that deploy them presumably could be.

### G. The Coalition's Policy Concerns Should Be Addressed to Congress.

At bottom, the Coalition raises a policy argument: If "energy use" is interpreted as EPCA says it should be, localities could "dictate the type and quantity of actual energy consumed at a building while claiming they are not regulating 'energy use' at all." Coalition Br. 37. The United States articulates broader worries: Allowing EPCA-covered products to be banned would "end-run EPCA," "disrupt" its energy conservation program, and "cut off consumers' options." U.S. Br. 32. These concerns are not well-founded. But even if they were, "no amount of policy-talk can overcome a plain statutory command." *Niz-Chavez v. Garland*, 593 U.S. 155, 171 (2021).

To begin with, Congress did not enact EPCA to "affirmatively protect consumers' ability to access covered products" or "manufacturers' ability to operate in static markets." *Ass'n of Contracting Plumbers*, 180 F.4th at 443. It enacted and amended EPCA to effect energy conservation while insulating manufacturers from a competing patchwork of state efficiency targets. "Indeed," in doing so, "the statute operates to *confine* the choices of consumers and manufacturers." *Id.*

The Coalition also cannot explain why, if Congress wanted to create a nationwide product access guarantee, it chose to do so through EPCA's preemption clause and a tortured syllogism involving "zero" energy use. *Id.* at

441. That is not for lack of alternatives. Congress could have enacted a law like the "Energy Choice Act" introduced in the 188th Congress, which aimed to prohibit any "State or local government" from restricting consumers' access to "an energy service based on the type or source of energy to be delivered to an end-user of such energy service." H.R. 6089, 118th Cong. § 2(a) (2023). Or it could enact an "Appliance Choice Act" to guarantee access to specified products. It has simply chosen not to.

Nor is there anything strange about a preemption clause that insulates manufacturers from one kind of challenge without creating some kind of right to use their products. Consider the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401 *et seq.* Like EPCA, this statute directs an agency to develop national standards for a class of products—*i.e.*, manufactured homes. *Id.* § 5403(a), (g). And like EPCA, it expressly preempts state and local laws that establish conflicting regulations of the same kind—*i.e.*, that set distinct standards "regarding the construction or safety" of manufactured homes. *Id.* § 5403(d). In other words, like EPCA, the statute insulates manufactured-home producers from a patchwork of standards affecting how those homes may be designed. *See, e.g.*, *Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1524–25 (11th Cir. 1988) (statute preempted zoning

ordinance requiring mobile homes to meet construction standards differing from federal ones).

But like EPCA, that preemption clause does not stop localities from regulating manufactured homes in *other* ways—such as using zoning to bar manufactured homes altogether, *id.*, or forbidding those above a certain age, *Schanzenbach v. Town of Opal*, 706 F.3d 1269, 1272–76 (10th Cir. 2013). Just so here. Congress specified how far each of these forms of preemption reached. The "legally significant difference" between an appliance ban and a standard of "one kilo-BTU of natural gas," Coalition Br. 39 (emphasis omitted)—or a manufactured home ban and a stringent safety requirement—is that Congress wrote the statutes to preempt the latter and not the former.

## III. The Presumption Against Preemption Underscores That EPCA Does Not Preempt The Village's Code Amendments.

Even if there were lingering doubt as to EPCA's preemptive scope, it would be put to rest by the presumption that Congress does not override "the historic police powers of the States" except where there is "clear and manifest" evidence that it intended to do so. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quotation omitted). The Village recognizes that this Court has suggested that that presumption does not apply in cases involving an express preemption clause. *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 465 (7th Cir. 2023), *abrogated on other grounds by Montgomery v. Caribe Transp. II, LLC*, 608 U.S. 219 (2026). But

the Village preserves the argument that the presumption remains available in cases that, like this one, implicate traditional state and local authority. *See, e.g.*, *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 n.5 (3d Cir. 2018); *Happel v. Guilford Cnty. Bd. of Educ.*, 913 S.E.2d 174, 189 n.8 (N.C. 2025).

## CONCLUSION

This Court should affirm the judgment of the district court.

November 16, 2026

Respectfully submitted,

*s/ Linnet Davis-Stermitz*


Tony S. Fioretti
VILLAGE OF OAK PARK
123 Madison St.
Oak Park, IL 60302
(708) 358-5666
tony.fioretti@oak-park.us

Gail L. Reich
ELROD FRIEDMAN LLP
350 N. Clark St., 2nd Floor
Chicago, IL 60654
(312) 528-5200
gail.reich@elrodfriedman.com

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
(202) 793-5820
ldavisstermitz@earthjustice.org

Timothy R. Oberleiton
EARTHJUSTICE
1250 I St. N.W., Floor 4
Washington, DC 20005
(202) 667-4500
toberleiton@earthjustice.org

Thomas Cmar
EARTHJUSTICE
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 257-9338
tcmar@earthjustice.org

*Counsel for Defendant-Appellee Village of Oak Park, Illinois*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because it contains 13,998 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

November 16, 2026

*s/ Linnet Davis-Stermitz*

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
(202) 793-5820
ldavisstermitz@earthjustice.org

*Counsel for Defendant-Appellee*

## CERTIFICATE OF SERVICE

I certify that this response was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit via the appellate CM/ECF system on November 16, 2026. I certify that this response was served on all ECF-registered counsel via the Court's CM/ECF system.

November 16, 2026

*s/ Linnet Davis-Stermitz*

Linnet Davis-Stermitz
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
(202) 793-5820
ldavisstermitz@earthjustice.org

*Counsel for Defendant-Appellee*