No. 26-2715

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

CLEAN ENERGY CHOICE COALITION, NFP,
PLAINTIFF-APPELLANT,

v.

VILLAGE OF OAK PARK,
DEFENDANT-APPELLEE.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

**BRIEF FOR THE DISTRICT OF COLUMBIA, COLORADO, CONNECTICUT, DELAWARE, HAWAI‘I, ILLINOIS, NEVADA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND THE CITY OF NEW YORK AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ADAM J. TUETKEN
BRYAN J. LEITCH
BENJAMIN GRISWOLD
Assistant Attorneys General
Office of the Solicitor General

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

# TABLE OF CONTENTS


INTRODUCTION AND INTEREST OF AMICI ..... 1

BACKGROUND ..... 2

SUMMARY OF ARGUMENT ..... 4

ARGUMENT ..... 6

I. EPCA Has Long Been Understood To Preempt Only A Narrow Range Of State And Local Laws. ..... 6

A. The federal government, states, and localities have collectively understood that EPCA preempts only laws that target products' energy performance. ..... 6

B. EPCA and related federal laws support a variety of state energy policies, including policies like the Village's. ..... 8

II. The Coalition's Interpretation Is Wrong And Would Upset The Settled Understanding Of EPCA Preemption. ..... 12

III. Upsetting The Understanding Of EPCA Would Have Severe Consequences For States And Localities. ..... 24

A. The Coalition's interpretation would threaten to preempt a startling swath of laws. ..... 24

B. The Coalition's interpretation lacks clear, administrable rules that states and localities need. ..... 28

CONCLUSION ..... 30

## TABLE OF AUTHORITIES

*Cases*

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ... 22

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) ... 21

*Ass'n of Contracting Plumbers of the City of N.Y., Inc. v. City of New York*,
180 F.4th 434 (2d Cir. 2026) ... 3, 6, 7, 12, 13, 14, 17, 20, 21, 24

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) ... 20

*Biden v. Nebraska*,
600 U.S. 477 (2023) ... 22, 23

*Bond v. United States*,
572 U.S. 844 (2014) ... 28

*Cable Television Ass'n of N.Y. v. Finneran*,
954 F.2d 91 (2d Cir. 1992) ... 16

*California Restaurant Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ... 14

*California v. FERC*,
495 U.S. 490 (1990) ... 8

*Cavel Int'l, Inc. v. Madigan*,
500 F.3d 551 (7th Cir. 2007) ... 21

*Consumer Data Indus. Ass'n v. Frey*,
26 F.4th 1 (1st Cir. 2022) ... 17

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014) ... 11

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) ... 28

*DeHart v. Town of Austin*,
39 F.3d 718 (7th Cir. 1994) ........................................................................ 8

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018)................................................................................... 12

*Dubin v. United States*,
599 U.S. 110 (2023)............................................................................. 16, 18

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016)................................................................................... 28

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)..................................................................................... 1

*Haig v. Agee*,
453 U.S. 280 (1981)..................................................................................... 7

*Huron Portland Cement Co. v. City of Detroit*,
362 U.S. 440 (1960)..................................................................................... 1

*In re Pittsburgh & Lake Erie Props., Inc.*,
290 F.3d 516 (3d Cir. 2002) ...................................................................... 17

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
34 F.4th 1 (D.C. Cir. 2022)................................................................... 16, 18

*Kansas v. Garcia*,
589 U.S. 191 (2020)................................................................................... 23

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)................................................................................... 23

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)................................................................................... 28

*Mann v. Calumet City*,
588 F.3d 949 (7th Cir. 2009) ...................................................................... 26

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)..................................................................................... 1

*Melillo v. Brais*,
No. 3:17-cv-520, 2019 WL 1118091 (D. Conn. Mar. 11, 2019)........................ 26

*Mellouli v. Lynch*,
575 U.S. 798 (2015)........................................................................... 14, 18

*Monsalvo v. Bondi*,
604 U.S. 712 (2025)........................................................................... 7, 8

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)........................................................................... 11

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
413 U.S. 405 (1973)........................................................................... 11

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015)........................................................................... 1

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)............................................................................. 1

*Sinclair Wyo. Refin. Co. v. EPA*,
114 F.4th 693 (D.C. Cir. 2024)......................................................... 17

*United States v. Halseth*,
342 U.S. 277 (1952)........................................................................... 17

*United States v. Liestman*,
97 F.4th 1054 (7th Cir. 2024) ........................................................... 18

*United States v. Miller*,
604 U.S. 518 (2025)........................................................................... 12

*Wyeth v. Levine*,
555 U.S. 555 (2009)........................................................................... 15, 19

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
832 F.3d 654 (7th Cir. 2016) ............................................................ 12

*Statutes and Regulations*

10 C.F.R. § 430.2 ........ 24, 25

10 C.F.R. § 430.32 ........ 22, 25

25 Colo. Code Regs. § 1001-32 ........ 27

42 U.S.C. § 6201 ........ 1

42 U.S.C. § 6291 ........ 12, 13, 15

42 U.S.C. § 6292 ........ 24, 25

42 U.S.C. § 6293 ........ 12, 13, 15

42 U.S.C. § 6295 ........ 2

42 U.S.C. § 6297 ........ 3

42 U.S.C. § 6311 ........ 2

42 U.S.C. §§ 6321-6325 ........ 9, 11

42 U.S.C. § 6831 ........ 10

42 U.S.C. § 6834 ........ 19, 20

49 U.S.C. § 32919 ........ 16

425 Ill. Comp. Stat. Ann. § 65/8 ........ 24

425 Ill. Comp. Stat. Ann. § 65/9 ........ 24

Cal. Health & Safety Code § 19881 ........ 24

Energy Conservation Standards for New Buildings Act, Pub. L. No. 94-385, 90 Stat. 1125 (1976) ........ 10

Energy Policy and Conservation Act, Pub. L. No. 94-163, 89 Stat. 871 (1975) ........ 9

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) .................. 11

L.A. Mun. Code § 57.605.10.2 .......................................................................... 25

Minn. Stat. § 116.92 .......................................................................................... 25

N.Y. Real Prop. Law § 239-e ............................................................................. 24

N.Y.C. Admin. Code § 28-506.1 ........................................................................ 20

National Energy Conservation and Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978) ........................................................................................ 9

National Appliance Energy Conservation Act, Pub. L. No. 100-12, 101 Stat. 103 (1987) .......................................................................................... 6

Ohio Admin. Code § 3341-2-15(F)(4) ............................................................... 25

R.I. Gen. Laws § 23-24.9-2 ................................................................................ 25

R.I. Gen. Laws § 23-24.9-6.1 ............................................................................. 25

*Legislative History*

Clean Energy DC Building Code Amendment Act of 2022, D.C. Council, Report on Bill 24-420 (June 13, 2022) ............................................... 27

H.R. Rep. No. 100-11 ................................................................................... 7, 20

S. Rep. No. 100-6 ................................................................................................. 7

*Other Authorities*

47 Fed. Reg. 14424 (Apr. 2, 1982) ...................................................................... 6

47 Fed. Reg. 57198 (Dec. 22, 1982) ..................................................................... 6

71 Fed. Reg. 12634 (Mar. 13, 2006) ..................................................................... 7

75 Fed. Reg. 59470 (Sept. 27, 2010) ............................................................. 7, 19

85 Fed. Reg. 30878 (May 21, 2020) ........................................................................ 7

89 Fed. Reg. 28856 (Apr. 19, 2024) ........................................................................ 7

Br. for the U.S., *Cal. Rest. Ass'n v. City of Berkeley*,
No. 21-16278, 2022 WL 433159 (9th Cir. Feb. 2, 2022) .................................. 8

Br. for the U.S. & FTC, *In re Rail Freight Fuel Surcharge Antitrust Litig.*,
Nos. 21-7093, 21-7095, 2021 WL 6091019 (D.C. Cir. Dec. 22, 2021), ........... 16

Br. for the U.S. in Supp. of Pet. for Reh'g, *Cal. Rest. Ass'n v. City of Berkeley*,
No. 21-16278 (9th Cir. June 12, 2023), ECF No. 94 .............................. 8, 20, 23

David Iaconangelo, *Washington State Hits the Brakes on Landmark Gas Ban*, E&E News (May 25, 2023) ................................................................. 29

Def.'s Mem. of L. in Supp. of Mot. to Dismiss, *Hess v. Samsung Elecs. Am., Inc.*, 3:23-cv-50106 (N.D. Ill. June 5, 2023), ECF No. 19 ................................ 26

FDNY Found., *Don't Use Kerosene or Propane Space Heaters* ........................... 25

Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, *Sherzai v. LG Elecs. USA, Inc.*, No. 2:23-cv-429 (E.D. Cal. May 12, 2023), ECF No. 14-1 ............. 26

Gov. Jared Polis, *Colorado Greenhouse Pollution Reduction Roadmap 2.0* (Feb. 2024) ........................................................................................... 27

David Santana Ortiz & Mark Allen Bernstein, RAND, MR-1105.0-DOE,

*Measures of Residential Energy Consumption and Their Relationships to*

*DOE Policy* (1999) ..................................................................................... 11

Brady Seals & Leah Louis-Prescott, *Uncovering the Deadly Toll of Air Pollution From Buildings*, RMI (May 5, 2021) ................................................ 27

Susannah Shoemaker, *NREL Researchers Reveal How Buildings Across United States Do—and Could—Use Energy*, Nat'l Renewable Energy Lab. (Sept. 14, 2023) ........................................................................... 27

*The American Heritage College Dictionary* (3d ed. 1993) ................................... 16

*The Random House Dictionary of the English Language* (2d ed. 1987)................ 16

U.S. Dep't of Energy, *Small Space Heaters* .......................................................... 25

U.S.'s Statement of Interest, *Nat'l Ass'n of Home Builders v. Montgomery County*, No. 24-cv-3024 (D. Md. Jan. 17, 2025), ECF No. 30.... 8, 11, 17, 20, 22

Vt. Dep't of Env't. Conservation., *10 VSA §7152(a) Sale of Mercury-Containing Lamps Final Determination Notice* ............................................... 25

*Webster's Ninth New Collegiate Dictionary* (1985)............................................. 16

*Zero*, Merriam-Webster Dictionary ...................................................................... 14

## INTRODUCTION AND INTEREST OF AMICI

The District of Columbia and Colorado, Connecticut, Delaware, Hawai‘i, Illinois, Nevada, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Virginia, and the City of New York ("Amici") file this brief as amici curiae in support of Defendant-Appellee the Village of Oak Park ("the Village") and affirmance, pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Our federalist system leaves most policymaking powers to states and localities, as they are closest to the people. *Gregory v. Ashcroft*, 501 U.S. 452, 457-58 (1991). That includes the powers to protect the health and safety of their residents, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996), enact building codes, *Pennell v. City of San Jose*, 485 U.S. 1, 12 (1988), minimize air pollution, *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960), and regulate gas distribution, *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 378 (2015). Pursuant to these powers, Amici have enacted building energy codes, fostered reliance on renewable energy, and restricted unsafe products. All the while, Amici have complied with federal law, which has supported—not stymied—those efforts.

The theories advanced by Plaintiff Clean Energy Choice Coalition ("the Coalition") would needlessly curtail these traditional powers without a clear congressional mandate. The Coalition alleges that the Energy Policy and

Conservation Act (EPCA), 42 U.S.C. § 6201 *et seq.*, preempts provisions of the Village's building code that require certain new buildings to use electricity, not fossil fuels, as their source of energy. EPCA, however, sets performance standards that appliance manufacturers must meet when designing certain products. Through a narrow preemption provision, EPCA prevents states or localities from imposing their own performance standards on manufacturers. The Village's law sets no such standards, whether directly or indirectly. Therefore, the law is not preempted, as the district court correctly held.

To argue otherwise, the Coalition stretches EPCA far beyond its text and purpose to preempt any state or local law that affects whether EPCA-covered products can be used. The Coalition not only invents a federal right to use gas appliances, but it further reimagines EPCA to leave states and localities with vanishingly little power to enact laws to conserve energy. In fact, the Coalition goes so far to argue that EPCA preempts "most building codes." Coal. Br. 10, 27. That interpretation contradicts the entrenched understanding of EPCA and would upend settled expectations—with severe consequences for states and localities. This Court should reject that theory and affirm.

## BACKGROUND

EPCA preemption is straightforward. As relevant here, the statute or the Department of Energy (DOE) establishes "energy conservation standards" for

products covered by EPCA. 42 U.S.C. § 6295(a).[1] An "energy conservation standard" is "a performance standard which prescribes . . . a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures prescribed under section 6293." *Id.* § 6291(6)(A). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." *Id.* § 6291(4). And Section 6293's test procedures measure the "energy use" of "a covered product during a representative average use cycle or period of use." *Id.* § 6293(b)(3). EPCA thus defines "energy use" as "a standardized, fixed measure assigned to a product before it reaches consumers" based on "tests" "performed in a controlled setting." *Ass'n of Contracting Plumbers of the City of N.Y., Inc. v. City of New York*, 180 F.4th 434, 439 (2d Cir. 2026) ("*Plumbers*"); *see id.* at 440-41 (identifying provisions in EPCA indicating that "energy use" is a fixed, pre-market measurement).

EPCA then provides a "[g]eneral rule of preemption for energy conservation standards when [a] Federal standard becomes effective for [a] product." 42 U.S.C. § 6297(c). That rule states in relevant part: "on the effective date of an energy conservation standard . . . , no State regulation concerning the . . . energy use . . . of

---

[1] EPCA applies similar, and often identical, policies to industrial equipment. *See, e.g.*, 42 U.S.C. § 6311. This brief will refer to EPCA's consumer provisions, but the same interpretations apply to the corresponding industrial provisions.

such covered product shall be effective with respect to such product." *Id.* Applying EPCA's definition of "energy use," a "regulation concern[s]" the "energy use" of a "covered product" when it concerns the typical quantity of energy a product is designed to consume under carefully prescribed testing conditions. *Id.* §§ 6293(b)(3), 6297(c). The prime example would be a state energy conservation standard establishing a product's "maximum quantity of energy use" as "determined in accordance with [DOE] test procedures." *Id.* § 6291(6)(A). The statute otherwise does not preempt state and local regulations unless they concern the "energy use" of a covered product as defined by EPCA.

Accordingly, the district court held that the Village's law is not preempted. SA17. Under that law, "most new buildings and residences in the Village are required to use electricity as their source of energy and may not combust fossil fuels indoors." SA3 (citation modified). The district court explained that the law is not preempted because it does not regulate based on "energy use"—as that phrase is defined in EPCA. SA19.

## SUMMARY OF ARGUMENT

1. Based on repeated guidance from DOE, states and localities have long understood EPCA to preempt laws that regulate the energy performance of EPCA-covered products. Consistent with that understanding, federal energy laws encourage states and localities to adopt all manner of energy policies other than

appliance performance standards, including building codes that—like the Village's—transition buildings away from reliance on fossil fuels.

2. The Coalition's interpretation would overturn this understanding. If adopted, its interpretation would transform EPCA from a shield protecting product manufacturers from conflicting performance standards into a sword for anyone to invalidate potentially any law affecting appliances' usage or availability. Until recently, no one has misunderstood EPCA that way. And although the United States now joins in the Coalition's misconstruction, the United States' interpretation contradicts EPCA's text, the United States' prior positions, and fundamental limits on federal agencies' power.

3. The Coalition's interpretation, taken to its limit, could also have severe consequences for states and localities. The laws that could be swallowed by the Coalition's sweeping preemption theory could run the gamut from college dorm rules to zoning plans. And the Coalition's interpretation leaves states and localities with no concrete standard for understanding what is and is not preempted, frustrating their ability to respond to the needs of their local constituencies in the way our federal system envisions.

# ARGUMENT

## I. EPCA Has Long Been Understood To Preempt Only A Narrow Range Of State And Local Laws.

For decades, states, localities, and the federal government shared a common—and narrow—understanding of EPCA preemption. That shared understanding is reflected in the myriad federal laws supporting state and local energy policies, all of which are incompatible with the Coalition's expansive view of EPCA preemption.

### A. The federal government, states, and localities have collectively understood that EPCA preempts only laws that target products' energy performance.

EPCA's implementing agency (DOE) has frequently interpreted the statute to preempt only a narrow subset of state energy regulations. *See Plumbers*, 180 F.4th at 447 n.12, 448-49 (relying on DOE's decades-long position that EPCA preempts regulations that use "energy use"—as defined by EPCA—as the mechanism of regulation). In 1982, DOE advised that "only State regulations that are appliance *efficiency* standards" or that "established the energy efficiency of a particular appliance" were preempted, not "regulations that have only a peripheral effect on the energy efficiency of a covered product." 47 Fed. Reg. 14424, 14456 (Apr. 2, 1982). DOE explained that EPCA would preempt, for example, a "[p]rohibition of hook-ups for appliances with less than a certain efficiency," i.e., less than a specific energy use figure. 47 Fed. Reg. 57198, 57215 (Dec. 22, 1982). But, in contrast, a prohibition on installing a covered product at all in new buildings would *not* be

preempted. *See id.* ("Prohibition against placing oversized furnaces and air conditioners in new buildings, would not be subject to preemption."). The difference between the two is that the latter does not turn on whether a product has a particular "energy use" figure. *See Plumbers*, 180 F.4th at 447 n.12.

Congress acquiesced in DOE's view of EPCA preemption a few years later in the National Appliance Energy Conservation Act (NAECA), Pub. L. No. 100-12, 101 Stat. 103 (1987). While NAECA changed "the criteria" for DOE preemption *waivers*, H.R. Rep. No. 100-11, at 24 (1987), Congress did not disagree with DOE about what laws were preempted in the first place. To the contrary, NAECA "follow[ed] substantially the preemption requirements in current EPCA" by "continu[ing] the basic concept of preempting State energy efficiency standards," *id.* at 23-24, "as provided under current law," S. Rep. No. 100-6, at 9 (1987). Congress's deliberate choice to maintain the status quo in NAECA reinforces EPCA's narrow preemptive scope. *Plumbers*, 180 F.4th at 449; *see Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025) ("When Congress adopts a new law against the backdrop of a 'longstanding administrative construction,' this Court generally presumes the new provision should be understood to work in harmony with what has come before." (quoting *Haig v. Agee*, 453 U.S. 280, 297-98 (1981))).

DOE's own post-NAECA actions confirm as much. Since NAECA's enactment, DOE has continued across administrations to "interpret[] 'regulation

concerning energy use' to be equivalent to 'energy conservation standard,'" and it has emphasized that the preemption provision's title "further clarifies that this section addresses energy conservation standards." 75 Fed. Reg. 59470, 59530 (Sept. 27, 2010); *see, e.g.*, 89 Fed. Reg. 28856, 28865 (Apr. 19, 2024); 85 Fed. Reg. 30878, 30879 (May 21, 2020); 71 Fed. Reg. 12634, 12635 (Mar. 13, 2006); *Plumbers*, 180 F.4th at 449. In recent years, moreover, the United States reaffirmed this interpretation and represented that EPCA does not preempt laws that prohibit gas appliances—including the very law challenged here.[2] Had Congress intended NAECA to expand EPCA's preemptive scope, then surely DOE would have acknowledged that expansion in the nearly four decades since NAECA was enacted. *See Monsalvo*, 604 U.S. at 725-27 (concluding that Congress acquiesced in longstanding administrative construction based in part on post-enactment governmental conduct).

### B. EPCA and related federal laws support a variety of state energy policies, including policies like the Village's.

Further refuting the Coalition's sweeping vision of EPCA is the fact that Congress has long supported state energy policies and building codes similar to the

---

[2] U.S.'s Statement of Interest 4-6, *Nat'l Ass'n of Home Builders v. Montgomery County*, No. 24-cv-3024 (D. Md. Jan. 17, 2025), ECF No. 30 ("U.S. *Montgomery* Br."); Br. for the U.S. 8-9, 19-21, *Cal. Rest. Ass'n v. City of Berkeley*, No. 21-16278 (9th Cir. Feb. 2, 2022), ECF No. 33, 2022 WL 433159 ("U.S. *Berkeley* Br."); Br. for the U.S. in Supp. of Pet. for Reh'g 7-13, *Berkeley*, No. 21-16278 (9th Cir. June 12, 2023), ECF No. 94 ("U.S. *Berkeley* Reh'g Br.").

Village's. *See California v. FERC*, 495 U.S. 490, 497 (1990) (courts "must . . . give full effect to evidence that Congress considered, and sought to preserve, the States' coordinate regulatory role in our federal scheme"); *DeHart v. Town of Austin*, 39 F.3d 718, 722 (7th Cir. 1994) (finding no preemption when there were "clear expressions of Congressional intent to foster cooperation with state and local governments"). In EPCA itself, for example, Congress declared its support for "the development and implementation by States of laws, policies, programs, and procedures to conserve and to improve efficiency in the use of energy." Pub. L. No. 94-163, § 361(a)(1), 89 Stat. 871, 932 (1975). Likewise, Congress commanded that "all sectors of our Nation's economy must begin immediately to significantly reduce the demand for nonrenewable energy resources such as oil and natural gas." National Energy Conservation and Policy Act, Pub. L. No. 95-619, § 102(a)(3), 92 Stat. 3206, 3209 (1978) (amending EPCA).

To that end, EPCA supports states and localities by:

- providing financial and technical support to create energy conservation plans, which are comprehensive policy plans to reduce energy consumption and improve energy efficiency, 42 U.S.C. §§ 6321-6325, and may include "programs to promote energy efficiency in residential housing" and "programs for the development of building retrofit standards and regulations," *id.* § 6322(d)(8), (14);

- funding "renewable-resource energy measure[s]," *id.* § 6325(e), defined to include measures for pre-1976 buildings that "involve changing, in whole or in part, the fuel or source of the energy used to meet the requirements of such building or plant from a depletable source of energy to a nondepletable source of energy," *id.* § 6321(c)(7)(A);
- allocating funds "[i]f [DOE] determines that a State has demonstrated a commitment to improving the energy efficiency of buildings," *id.* § 6323(e);
- and providing financial and technical support for state and local plans to reduce fossil fuel dependency and energy consumption of public schools, public hospitals, buildings owned by local governments, and public care institutions, *id.* §§ 6371-6371k, 6372-6372i.

Congress's post-EPCA enactments reinforce the point. In 1976, for instance, Congress directed DOE to help states develop building codes with an eye toward "stimulation of use of nondepletable sources of energy." Energy Conservation Standards for New Buildings Act, Pub. L. No. 94-385, § 310, 90 Stat. 1125, 1149 (1976). Congress recognized that "State and local building codes . . . can provide an existing means by which to assure, . . . with a minimum of Federal interference in State and local transactions, that newly constructed buildings contain adequate energy conservation features." 42 U.S.C. § 6831(4). So, Congress today provides financial and technical support for states to create and implement building codes that

conserve energy. *Id.* §§ 6833, 6836, 6838. And so, EPCA has always coexisted with extensive state regulation of buildings' energy consumption. David Santana Ortiz & Mark Allen Bernstein, *Measures of Residential Energy Consumption and Their Relationships to DOE Policy* 29, 61 (1999), https://tinyurl.com/2exjm4s3.

Recently in 2022, the Inflation Reduction Act (IRA) directed DOE to issue grants to states and localities—pursuant to its authority under EPCA—to adopt "building energy code[s]" that "meet[] or exceed[] the zero energy provisions in the 2021 International Energy Conservation Code [IECC]." Pub. L. No. 117-169, §§ 50131(a)(2), (c)(1), 136 Stat. 1818, 2042 (2022) (citing 42 U.S.C. §§ 6321-6326). According to DOE, "[a]pproaches to comply with the IECC requirements include all-electric buildings." U.S. *Montgomery Br.* 9. Thus, pursuant to the IRA, DOE awarded Montgomery County, Maryland, a grant to pursue a building code requiring "all-electric buildings." *Id.*

This carefully reticulated, cooperative federalism regime repudiates the Coalition's sweeping view of EPCA preemption. When, as here, Congress "encourage[s]" state policies by providing "federal funding" or "technical assistance," "it just makes good sense to reject" a broad interpretation of a preemption provision. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 665-67 (1995); *see CTS Corp. v. Waldburger*, 573 U.S. 1, 18 (2014) (rejecting preemption where federal law left "many areas of state

law untouched”); *N.Y. State Dep’t of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973) (“Where coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.”). At the least, Congress’s continued efforts to support and preserve complimentary state building energy codes—including codes that shift buildings’ reliance on fossil fuels to renewable energy—makes plain that EPCA does not sweep “broad[ly],” Coal. Br. 9, or preempt “most building codes,” Coal. Br. 10, 27.

## II. The Coalition’s Interpretation Is Wrong And Would Upset The Settled Understanding Of EPCA Preemption.

The Coalition’s preemption theory rests on a fundamental misreading of EPCA that “would upend decades of practice.” *United States v. Miller*, 604 U.S. 518, 531 (2025). The Coalition wrongly argues that the Village’s law is preempted because, by prohibiting gas appliances in new construction, it prohibits those appliances from using energy. Coal. Br. 2.

That theory misunderstands EPCA’s definition of “energy use,” which the Court must follow. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018); *Plumbers*, 180 F.4th at 439. EPCA defines “energy use” as a fixed “representative” figure “determined” through premarket “test procedures.” 42 U.S.C. §§ 6293(b)(3), 6291(4). EPCA’s test procedures are critical to EPCA’s concept of “energy use” because, as this Court explained, “[m]anufacturers must use these test procedures

when determining whether their equipment complies with the applicable energy conservation standards." *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 663 (7th Cir. 2016). The "energy use" figure determined by a manufacturer and assigned to a product does not change based on what happens once the product enters the market. *Plumbers*, 180 F.4th at 439. So, if a consumer cannot install and use a gas appliance due to a local ordinance, that appliance's "energy use" figure is unchanged. The Coalition's contrary theory—conflating EPCA's concept of "energy use" with their own concept of actual energy consumption—would improperly preempt any state law affecting whether or if EPCA-covered appliances can be used. Nothing in the text or structure of EPCA supports that anomalous position.

The Coalition fares no better in arguing that, even under the statutory definition of "energy use," the Village's law sets an "energy use" of zero. *See* Coal. Br. 3-4, 36-37. The Coalition's arguments about zero energy use are misguided because there is no such thing as zero energy use under EPCA. "Energy use" is "determined" "during a representative average *use* cycle or period of *use*," so the product must operate to determine the "quantity of energy directly consumed." *Id.* §§ 6293(b)(3), 6291(4) (emphases added). No product can operate for a period or cycle on zero energy. So "energy use" must be a "quantity," *id.* § 6291(4), but

"zero" is "the absence of a measurable quantity," *Zero*, Merriam-Webster Dictionary, tinyurl.com/4snaz7a3 (last visited Nov. 19, 2025).

The Coalition's atextual and illogical theory also lacks historical support. Indeed, the Coalition cannot point to any source in EPCA's history in which someone read EPCA as they do, besides one aberrational case from the 2020s, *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). That is a tell-tale sign that the Coalition's interpretation is wrong. *See Mellouli v. Lynch*, 575 U.S. 798, 813 (2015) (recognizing that when a "sweeping interpretation departs so sharply from the statute's text and history," "it cannot be considered a permissible reading.").

And if more were needed, the Second Circuit recently joined the "growing consensus" of courts to reject *Berkeley* and hold that EPCA does not preempt state or local laws that "effectively prohibit the use of fossil-fuel-powered appliances in new buildings." *Plumbers*, 180 F.4th at 450 n.15, 436. As the Second Circuit explained, the *Berkeley* decision "went astray" because it "ignored the second half of the statutory definition" of "energy use" referring to test procedures. *Id.* at 451. "[T]he statutory definition and its reliance on 'test procedures" is simply incompatible with the idea that 'energy use' refers to the energy an appliance consumes at its 'intended final destination[ ].'" *Id.* (quoting *Berkeley*, 89 F.4th at 1102). The Coalition makes the same mistake. It repeatedly nixes the "test

procedures" language from the definition of "energy use," and it does not once even quote—let alone contend with—the language of the test procedures provision. *See, e.g.*, Coal. Br. 1. That is enough for this Court to reject the Coalition's and the Ninth Circuit's mistaken view of the statute. *See Plumbers*, 180 F.4th at 439 ("[O]ur interpretation of 'energy use' alone undercuts Appellants' primary argument for preemption from the start.").

The United States joins in the Coalition's and Ninth Circuit's errors. *See* U.S. Br. 2-3. Contradicting its prior construction of EPCA preemption across administrations, the United States now argues that EPCA preempts regulations that prohibit covered products or prevent them from being used. U.S. Br. 9. The United States' newfound position deserves no weight for at least four reasons. *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009) ("The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.").

*First*, the United States misreads EPCA. Like the Coalition, the United States fundamentally misunderstands "energy use" in EPCA to equate to actual energy use, and the source of its misreading can be pinpointed: The United States does not even address § 6293(b)(3), which critically provides that EPCA's test procedures measure the "energy use" of "a covered product during a representative average use cycle or

period of use." That provision is incompatible with the "zero energy use" theory, as explained above.

Compounding its error, the United States relies on "concerning" to further misconstrue the preemption provision, arguing that (1) "concerning" necessarily means "relating to," and (2) "relating to" always has a broadening effect. U.S. Br. 13-15, 19. Neither proposition is correct.

For one, "concerning" can also mean "about," "of," "regarding," or "in reference to." *Webster's Ninth New Collegiate Dictionary* 272 (1985); *The Random House Dictionary of the English Language* 423 (2d ed. 1987); *The American Heritage College Dictionary* 288 (3d ed. 1993). And in common usage, "concerning" is often used to point to a subject—in the sense of what something is "about." *E.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 34 F.4th 1, 10 (D.C. Cir. 2022).

In contrast, "relating to" is often used to indicate "a relationship or nexus of some kind." *Dubin v. United States*, 599 U.S. 110, 119 (2023). To see the difference, consider an illustration previously provided by the United States: No one would say that World War II "concerned" a beach in Normandy, even though it undoubtedly "related to" a beach in Normandy. *See* Br. for the U.S. & FTC 10, *Rail Freight*, Nos. 21-7093, 21-7095 (D.C. Cir. Dec. 22, 2021), 2021 WL 6091019. Thus, "concerning" is often used in a narrower way than "relating to." *Id.*; U.S.

*Montgomery* Br. 13-14. That is particularly true in the context of EPCA, where Congress used "related to" in another preemption provision, *see* 49 U.S.C. § 32919(a), thus confirming that it intended "concerning" to signal a narrower preemptive reach for present purposes, *see Cable Television Ass'n of N.Y. v. Finneran*, 954 F.2d 91, 101-02 (2d Cir. 1992) (reasoning that Congress's choice of other terms besides "relate to" expresses an intent for a preemption provision to be interpreted more narrowly); *Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 7-8 (1st Cir. 2022) (similar); *Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 709 (D.C. Cir. 2024) (presuming Congress acts intentionally when using language in one provision but not another, including when the provisions "were enacted at different times").[3]

Several decisions illustrate the distinction between "concerning" and "relating to." In *United States v. Halseth*, 342 U.S. 277 (1952), for example, the Supreme Court held that a statute criminalizing mailing a letter "concerning any lottery" encompassed only "an existing, going lottery" and thus did not cover "the mailing of gambling paraphernalia that may be used to set up a lottery"—even though the latter plainly *relates to* "any lottery," *id.* at 279-80. Similarly, the Third Circuit, in

---

[3] Echoing the above, the Second Circuit identified reasons to doubt the argument that "concerning" means "relating to" in EPCA. *Plumbers*, 180 F.4th at 441 n.4. But the Second Circuit found no need to reach the issue because "there is no preemption even if the two terms are synonymous." *Id.*

an opinion joined by then-Judge Alito, concluded that a statute governing bankruptcy cases "concerning a railroad" did not cover petitions filed by "former railroads seeking bankruptcy adjustment of assets and liabilities obtained while they were railroads"—even though such petitions plainly *relate to* "a railroad." *In re Pittsburgh & Lake Erie Props., Inc.*, 290 F.3d 516, 519 (3d Cir. 2002). And the D.C. Circuit construed "discussion or agreement [that] concerned an interline movement of the rail carrier" to refer to discussions or agreements "about" "shared interline traffic" but not discussions or agreements about single-line traffic—even though the latter discussions and agreements may *relate to* "an interline movement." *Rail Freight*, 34 F.4th at 10-11.

But even if "concerning" meant "relating to" in EPCA, that phrase is neither determinative nor necessarily broad. Rather, it is context-sensitive, and this Court must look to the surrounding text and context to determine precisely what regulations "relate to" energy use. *See Dubin*, 599 U.S. at 119 (interpreting "in relation to" narrowly based on context); *Mellouli*, 575 U.S. at 808-13 & nn.9-11 (construing "relating to" narrowly to "require[] a direct link" based on structure, context, and history); *United States v. Liestman*, 97 F.4th 1054, 1060 (7th Cir. 2024) (the "presumption" that "relating to" has a broad meaning "can be overcome" by "other clues in the text, structure, and history"), *cert. denied sub nom. Liestman v. United States*, 145 S. Ct. 1046 (2025). There is no indication in EPCA's text or

history that it was intended to preempt any law that affects covered products' actual usage, so "concerning" cannot reach those laws. Therefore, the United States is wrong about "concerning" twice over: (1) it does not always mean "relating to," and even if it did, (2) "relating to" is neither determinative nor inherently broad.

*Second*, the United States' current position does not reflect a consistent or reasoned position. *See Wyeth*, 555 U.S. at 577-78 (giving FDA's views little weight for this reason). Far from it. The United States' new position effectively reverses DOE's longstanding views without reasoned explanation and is diametrically opposed to arguments it has made in three other briefs. *See* note 2, *supra*. Worse, the United States shows no awareness of many of DOE's past pronouncements on EPCA preemption, *e.g.*, 75 Fed. Reg. 59470, 59530 (Sept. 27, 2010), or of DOE's statutorily mandated programs supporting the types of state and local laws that its new position threatens, Argument § I.B, *supra*. Worse still, although the United States decries building electrification laws as contrary to federal policy, *see, e.g.*, U.S. Br. 32-33, its brief overlooks the federal statute that requires a phase-out of fossil fuels in federal buildings such that, after 2030, "new Federal buildings and Federal buildings undergoing major renovations" must have no "fossil fuel-generated energy consumption," 42 U.S.C. § 6834(a)(3)(D)(i)(I). The United States fails to explain how the Village's law is antithetical to federal law when it resembles a federal law.

The only explanation the United States gives for its reversal is that it found the *Berkeley* panel opinion "persuasive." U.S. Br. 3 n.1. But in *Berkeley*, the United States supported a petition for rehearing en banc, extensively explaining why the panel opinion erred. U.S. *Berkeley* Reh'g Br. 1-2, 11-22. Later, the United States urged a district court outside the Ninth Circuit not to follow *Berkeley*'s "erroneous decision." U.S. *Montgomery* Br. 11-12. The existence of a decision that the United States itself described as "erroneous" is hardly a reasoned explanation for such a radical shift in position. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (finding the United States's changed interpretation of a preemption provision "particularly dubious given that just five years ago the United States advocated the interpretation that we adopt today").

*Third*, the United States' concerns over how the Village's law or similar laws may affect the EPCA program are unsupported and misguided. *See* U.S. Br. 32-33, 25. To start, building electrification laws have already been implemented or enacted across the country—including by the federal government. *See, e.g.*, 42 U.S.C. § 6834(a)(3)(D)(i)(I); N.Y.C. Admin. Code § 28-506.1. Yet neither the United States nor the Coalition points to any evidence that manufacturers are being forced to change the design of their products or are unable to comply with DOE's energy conservation standards. What is more, several Amici are defending against similar claims, and plaintiffs across those cases have not been able to produce such evidence

either. Additionally, the United States overstates EPCA's focus on uniformity. Congress was concerned with one type of "patchwork": a patchwork of "State energy efficiency standards." H.R. Rep. No. 100-11, at 24; *see also Plumbers*, 180 F.4th at 444 n.8. Any other "patchwork," such as diverse health and safety regulations across the states, is simply an inherent part of our federalist system. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (reaffirming the principles that states may experiment with policies sensitive to local needs and may differ in their policy choices).

Nor does it follow that building electrification laws frustrate DOE's ability to administer EPCA. The United States' baseline theory is that because DOE authorizes the sale of covered products if they meet federal energy conservation standards, states and localities cannot restrict access to or use of those products. US Br. 13, 29. But this Court already rejected similar logic when it held that federal regulation of slaughterhouse operations did not mean that states could not ban horse-slaughtering in the first place. *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 553-54 (7th Cir. 2007). Citing *Cavel* and similarly reasoned cases, the Second Circuit explained that "federal regulation of certain activities, like the energy conservation standards of covered appliances, does not mean that States must authorize activities antecedent to those federally regulated, like the production and

sale of covered appliances, in the first place." *Plumbers*, 180 F.4th at 445 (citation modified).

Moreover, EPCA and the Village's law operate in different fields. As the United States admits, energy conservation standards "are primarily performance-based" and fuel agnostic. U.S. Br. 33. But the Village's law does not require a certain performance level from any appliances; it instead focuses on fuel type in buildings. Yet EPCA takes no position on what types of fuel an appliance can use—and certainly no position on what types of fuel *buildings* can use. Accordingly, and as the United States previously explained, laws like the Village's do not affect DOE's administration of EPCA. *See* U.S. *Montgomery* Br. 8. In fact, electric appliances must comply with the applicable energy conservation standards, and nothing in the Village's law would impede that requirement. *See, e.g.*, 10 C.F.R. § 430.32(c), (d), (j) (establishing standards for electric heat pumps, water heaters, and stoves, respectively).

*Fourth*, the United States' new position fundamentally revises EPCA and portends the sort of unprecedented intrusion into traditionally state domains that warrants strong judicial skepticism. *See Biden v. Nebraska*, 600 U.S. 477, 501-02 (2023); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021) (per curiam). Until now, DOE interpreted its regulatory authority and EPCA's preemptive scope to be coterminous: EPCA or DOE sets energy conservation standards, and states

cannot make different energy conservation standards for those same products. U.S. *Berkeley* Reh'g Br. 6-7. But now, the United States suggests that once EPCA or DOE sets an energy conservation standard, that standard preempts an array of other state and local laws far beyond state standards or their equivalents. The United States' new position thus transforms EPCA from a program focused on improving appliances' efficiency into a deregulatory weapon of sweeping scope; and it transforms DOE from an agency that regulates one aspect of appliances into the exclusive arbiter of any regulation that could touch appliances.

That aggrandizement violates core principles that protect the states and the people from overreach by federal agencies. For one, Congress does not confer massive amounts of agency authority through minor means. *See Nebraska*, 600 U.S. at 501-02. It strains text and reason to conclude that Congress empowered DOE to nullify wide areas of state and local authority through words like "concerning" or "point of use." *See* Coal. Br. 2, 18-22, 30-36. For another, usually an agency cannot preempt what it cannot regulate itself. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986). Yet, DOE's new interpretation of EPCA creates a serious mismatch between its regulatory authority under EPCA and EPCA's preemptive scope.

## III. Upsetting The Understanding Of EPCA Would Have Severe Consequences For States And Localities.

### A. The Coalition's interpretation would threaten to preempt a startling swath of laws.

Adopting the Coalition's view of EPCA could invite litigation against any state or local law that affects whether covered products can be used on the misguided theory that they "set[]" an appliance's "energy use" "at zero." Coal. Br. 3-4. That is good reason to reject the Coalition's position. *See Kansas v. Garcia*, 589 U.S. 191, 206 (2020) (rejecting express-preemption claim that yielded "strange consequences"); *Plumbers*, 180 F.4th at 449-50 (rejecting similar EPCA preemption claim as "far-fetched" and leading to "absurd results").

A few examples illustrate the point. According to the Coalition and the United States, EPCA-covered products simply cannot be banned or their usage restricted, *see* Coal. Br. 2, 38; U.S. Br. 32, yet states have long prohibited or regulated EPCA-covered products to ensure consumer safety. For example, because EPCA covers home heating equipment,[4] the Coalition's theory could call into question longstanding state laws banning fossil-fuel-burning space heaters,[5] which pose a

---

[4] *See* 42 U.S.C. § 6292(a)(9) (listing "[d]irect heating equipment" as a covered product); 10 C.F.R. § 430.2 (defining "[d]irect heating equipment" as "vented home heating equipment and unvented home heating equipment").

[5] *E.g.*, Cal. Health & Safety Code § 19881(a) (unvented natural gas heaters); 425 Ill. Comp. Stat. Ann. §§ 65/8, 65/9 (kerosene heaters); N.Y. Real Prop. Law § 239-e (kerosene heaters).

deadly risk of fire and carbon-monoxide poisoning,[6] none of which DOE has ever objected to before.[7] Likewise, because EPCA covers various types of lightbulbs,[8] the Coalition's theory could also call into question state laws banning lightbulbs that contain mercury,[9] even though such laws have nothing to do with energy efficiency regulation.[10]

Next, the Coalition's position could affect state laws regulating the use of covered products in certain buildings.[11] Public universities, for instance, usually ban a laundry list of items in student housing that could qualify as covered products under EPCA. *E.g.*, Ohio Admin. Code § 3341-2-15(F)(4). Yet the Coalition's

---

[6] FDNY Found., *Don't Use Kerosene or Propane Space Heaters*, tinyurl.com/497kefvd (last visited Nov. 19, 2025).

[7] *See* DOE, *Small Space Heaters*, tinyurl.com/37byajyc [https://web.archive.org/web/20260629195545/https://www.energy.gov/energysaver/small-space-heaters] (last visited Nov. 19, 2025) (recognizing that "[m]ost states have banned unvented kerosene heaters for use in the home" and "California, and some other cities and counties, have banned the use of unvented natural gas heaters in the home").

[8] *See* 42 U.S.C. § 6292(a)(14) (listing "[g]eneral service fluorescent lamps" and "general service incandescent lamps" as covered products); 10 C.F.R. § 430.2 (defining "[g]eneral service fluorescent lamps" and "general service incandescent lamps"); *id.* § 430.32(n), (dd) (energy conservation standards for various lamps).

[9] *E.g.*, R.I. Gen. Laws §§ 23-24.9-2, 23-24.9-6.1; Minn. Stat. § 116.92(7b).

[10] *See* Vt. Dep't of Envtl. Conserv., *10 VSA §7152(a) Sale of Mercury-Containing Lamps Final Determination Notice*, tinyurl.com/343fycrj (last visited Nov. 19, 2025).

[11] *See, e.g.*, L.A. Mun. Code § 57.605.10.2 (prohibiting certain heating and lighting products in industrial buildings).

theory leads to the untenable conclusion that universities set a performance standard of zero energy use when they tell freshmen not to bring their own microwaves—as well as the equally untenable conclusion that college kids can come to court and claim a right to use any covered appliance in dorms.

The Coalition's interpretation could also threaten state laws regulating zoning and products liability. Zoning laws, for example, can restrict the use of industrial-grade appliances in residential areas or otherwise limit whether owners may install appliances. *See, e.g.*, *Mann v. Calumet City*, 588 F.3d 949, 952 (7th Cir. 2009) ("[States may] enact building codes and zoning regulations even though such measures limit the property owner's right to do what he wants with his property"); *Melillo v. Brais*, No. 3:17-cv-520, 2019 WL 1118091, at *1-2 (D. Conn. Mar. 11, 2019) (rejecting constitutional claims arising from a town ordering removal of appliances from apartments in a detached garage for noncompliance with zoning regulations). And manufacturers have gone so far to argue that ordinary design-defect and consumer-protection claims are preempted by EPCA under the Coalition's theory. *E.g.*, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss 3-4, *Sherzai v. LG Elecs. USA, Inc.*, No. 2:23-cv-429 (E.D. Cal. May 12, 2023), ECF No. 14-1; Def.'s Mem. of L. in Supp. of Mot. to Dismiss 3-4, *Hess v. Samsung Elecs. Am., Inc.*, 3:23-cv-50106 (N.D. Ill. June 5, 2023), ECF No. 19. The Coalition's

expansive theory, if accepted, could create a de facto immunity from zoning laws and products-liability litigation that Congress could not possibly have intended.

Still further, the Coalition's interpretation could also obstruct laws that seek to achieve state and local emission- and air-pollution-related goals. Buildings are responsible for 35% of greenhouse gas emissions. Susannah Shoemaker, *NREL Researchers Reveal How Buildings Across United States Do—and Could—Use Energy*, Nat'l Renewable Energy Lab. (Sept. 14, 2023), perma.cc/KY4D-DU9E. Buildings' combustion of fossil fuels likewise releases various air pollutants such as nitrogen oxides, sulfur dioxide, volatile organic compounds, and ammonia. Brady Seals & Leah Louis-Prescott, *Uncovering the Deadly Toll of Air Pollution From Buildings*, RMI (May 5, 2021), perma.cc/LS4B-G6E8. Because buildings account for a large portion of emissions and pollution, many jurisdictions have taken decisive action on buildings' combustion of fossil fuels (the primary cause of site greenhouse gas emissions and other air pollution). *See, e.g.*, D.C. Council Comm. on Transp. & Env't, *B24-420, the "Clean Energy DC Building Code Amendment Act of 2022"* 1 (June 13, 2022), perma.cc/6E4D-ZETE; Gov. Jared Polis, *Colorado Greenhouse Pollution Reduction Roadmap 2.0* 14-19, 56-61 (Feb. 2024), perma.cc/6GU7-EW8H; 25 Colo. Code Regs. § 1001-32. But the Coalition contends that such policy responses are off-limits—never mind that nothing in EPCA clearly precludes them.

The Coalition does not even try to explain away these consequences of their interpretation. For its part, the United States urges the Court to blind itself to what laws would fall within the "scope" of its new interpretation. *See* U.S. Br. 33. But the Court's "task is to 'identify the domain expressly pre-empted'" by EPCA. *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 259 (2013) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). "That the statute *would* apply so broadly" under their theory to potentially preempt the laws identified above (and more) may be "the inescapable conclusion of [the Coalition's] position." *Bond v. United States*, 572 U.S. 844, 862 (2014). If it is, the Court should consider those astounding consequences in determining EPCA's true preemptive scope.

### B. The Coalition's interpretation lacks clear, administrable rules that states and localities need.

The Coalition's interpretation is not just broad—it appears limitless. The Coalition does not try to articulate any limit on its interpretation, other than to circularly repeat the language of the statute. *See* Coal. Br. 20. The United States does not either, except to suggest that invalidating the Village's law may not require preemption of "health and safety regulations[]" with "incidental impacts on covered products." U.S. Br. 34. The United States offers neither a text-based reason for this distinction nor standards for determining what is an "incidental impact."

The Coalition's limitless interpretation will thus create significant problems for states and localities—not to mention courts—which need "workable standards"

for preemption. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016). If states and localities can understand the metes and bounds of a preemption provision, then they can make policies that comply with federal law. Legislating with an eye toward clearly demarcated federal law also makes it less likely that governments will later have to defend against preemption challenges. But when the limits of a preemption provision are unclear, as they are under the Coalition's interpretation, policymakers are left to stumble in the dark, and government attorneys are left to defend against claims capitalizing on a preemption provision's indeterminacy.

Amici know firsthand that these problems attend the Coalition's interpretation. For most of EPCA's history, there were vanishingly few preemption challenges because it was widely understood that EPCA preempted only a narrow slice of laws. But all that changed with the Ninth Circuit's outlier panel opinion in *Berkeley*, which unleashed a wave of challenges in which plaintiffs leverage EPCA to attempt to overturn state and local policies they dislike. The effects extend past the courthouse to the statehouse. Opponents of health and environmental policies have used the *Berkeley* opinion to pressure lawmakers to drop consideration of those policies, rather than risk litigation or pursue the costly, timely, and likely unavailing waiver process. *See, e.g.*, David Iaconangelo, *Washington State Hits the Brakes on Landmark Gas Ban*, E&E News (May 25, 2023), perma.cc/6BUW-5YG9.

This cannot be what Congress intended. This Court should confine EPCA to its text and traditional understanding by rejecting the Coalition's misinterpretation.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ADAM J. TUETKEN
BRYAN J. LEITCH
BENJAMIN GRISWOLD
Assistant Attorneys General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

November 2026

On behalf of:

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawai‘i

KWAME RAOUL
*Attorney General*
State of Illinois

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA JOY CAMPBELL
*Attorney General*
Commonwealth Of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

JENNIFER DAVENPORT
*Attorney General*
State of New Jersey

RAÚL TORREZ
*Attorney General*
State of New Mexico

LETITIA JAMES
*Attorney General*
State of New York

DAN RAYFIELD
*Attorney General*
State of Oregon

PETER F. NERONHA
*Attorney General*
State of Rhode Island

CHARITY R. CLARK
*Attorney General*
State of Vermont

JAY JONES
*Attorney General*
Commonwealth of Virginia

STEVEN BANKS
*Corporation Counsel*
City Of New York

## CERTIFICATE OF FILING AND SERVICE

I certify that on November 23, 2026, an electronic copy of the foregoing was filed with the Clerk of Court using the electronic filing system and thereby served upon all counsel appearing in this case.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a)(5) because the brief contains 6,769 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE